**No. 2024-2118**

IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

WILLIS ELECTRIC CO., LTD.,

*Plaintiff-Appellee*

v.

POLYGROUP LTD. (MACAO COMMERCIAL OFFSHORE),
POLYGROUP MACAU LIMITED BVI, POLYTREE (HK) CO. LTD.,
POLYGROUP TRADING LTD.,

*Defendants-Appellants*

**Appeal from the United States District Court for the District of Minnesota, Judge Joan N. Ericksen, No. 0:15-cv-03443-JNE-DTS**

## BRIEF FOR DEFENDANTS-APPELLANTS

Rachel Zimmerman Scobie
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300

J. Michael Jakes
Jason L. Romrell
Ryan V. McDonnell
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Counsel for Defendants-Appellants*

# PATENT CLAIM AT ISSUE

Dependent claim 15 of U.S. Patent No. 8,454,186 B2:

> 10. A lighted artificial tree, comprising:
>
> a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string, the first trunk portion having a first trunk body and a trunk connector, at least a portion of the trunk connector housed within the first trunk body and electrically connected to the first light string;
>
> a second tree portion including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string, the second trunk portion having a trunk body and a trunk connector, at least a portion of the trunk connector housed within the second trunk portion and electrically connected to the second light string; and
>
> wherein the second tree portion is mechanically and electrically connectable to the first tree portion by coupling a lower end of the second trunk body to an upper end of the first trunk body along a common vertical axis at a rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis, thereby causing the trunk connector of the first trunk portion to make an electrical connection with the trunk connector of the second trunk portion within an interior of the lighted artificial tree, the electrical connection being made independent of the rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis.
>
> 15. The lighted artificial tree of claim 10, wherein the trunk connectors of the first and second tree portions form coaxial trunk connectors.

Appx149(22:34-60); Appx150(23:8-10).

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number:** | 2024-2118 |
| **Short Case Caption:** | Willis Electric Co., Ltd. v. Polygroup Ltd. (Macao Commercial Offshore) |
| **Filing Party/Entity:** | Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd., and Polygroup Trading Limited |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: September 20, 2024

Signature: /s/ J. Michael Jakes

Name: J. Michael Jakes

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Polygroup Limited (Macao Commercial Offshore) | | Polygroup Holdings Limited |
| Polygroup Macau Limited (BVI) | | Polygroup Asia Pacific Limited |
| Polytree (H.K.) Co. Ltd. | | |
| Polygroup Trading Limited | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this **court** for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☒ Additional pages attached

| | | |
|---|---|---|
| MERCHANT & GOULD P.C.: | John T. Winemiller | Thomas J. Leach, III |
| Elisabeth Muirhead | Marra Mancina Clay | Rachel C. Hughey (formerly) |
| Gabrielle Kiefer | Paige S. Stradley | James Warren Beard |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☒ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

4. Legal Representatives (continued)

| | | |
|---|---|---|
| TROUTMAN PEPPER HAMILTON SANDERS LLP: | Douglas D. Salyers | Puja Patel Lea |
| Christopher J. Forstner | Laura Anne Kuykendall | Robert Armistead Angle |
| Dabney J. Carr, IV | Lindsay Mitchell Henner (formerly) | |

| | | |
|---|---|---|
| POLYGROUP HOLDINGS LIMITED: | Eric Szweda | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..... xii

JURISDICTIONAL STATEMENT ..... 1

INTRODUCTION ..... 1

STATEMENT OF THE ISSUES ..... 4

STATEMENT OF THE CASE ..... 5

A. Internally Powered, Pre-Lit Artificial Christmas Trees and Coaxial Barrel Connectors Were Well Known in the Prior Art ..... 5

1. The Loomis GKI Tree ..... 5

2. Common Coaxial Barrel Connectors ..... 8

B. Mr. Chen Examined the Loomis GKI Tree Before Working on the Alleged Invention of the ’186 Patent and Willis’s One Plug Trees ..... 10

C. Polygroup Develops “Quick Set” Features ..... 14

D. This Litigation and the Parallel IPR Proceedings ..... 15

1. Willis Asserted over 100 Claims Against Polygroup ..... 15

2. This Court’s Review of Polygroup’s Parallel IPR Proceedings Drastically Reduced Willis’s Asserted Claims ..... 16

3. Willis Proceeded to Trial on Only Claim 15 of the ’186 Patent ..... 18

a. Obviousness ..... 19

b. Damages ..... 23

c. Verdict ..... 26

4. Post-Trial Proceedings ..... 27

SUMMARY OF THE ARGUMENT ..... 32

STANDARD OF REVIEW ..... 36

ARGUMENT ....................................................................................... 37

I. The District Court Legally Erred in Denying Polygroup Judgment as a Matter of Law that Claim 15 of the ’186 Patent Would Have Been Obvious ....................................................................................... 37

A. The District Court Legally Erred by Requiring an Express Motivation to Make the Specific Modifications Necessary to Bodily Incorporate a Common Coaxial Barrel Connector into the Loomis GKI Tree....................................................................................... 37

B. Willis’s Alleged Evidence of Secondary Considerations Is Immaterial Because Willis Failed to Establish a Nexus to Claim 15 ........45

C. Estoppel Does Not Apply to the Physical Loomis GKI Tree ....................48

II. The District Court Abused Its Discretion in Denying Polygroup’s Motion for a New Trial on Damages ................................................ 50

A. Ms. Riley’s Income Approach Failed to Apportion the Incremental Value of Claim 15 from Unpatented Features ........................................... 52

1. Ms. Riley’s Inapt Comparison of Willis’s Trees With and Without “One Plug” Did Not Satisfy Her Obligation to Apportion............................................................................ 52

2. Ms. Riley’s Alleged Profit Margins for Polygroup’s Trees Featuring “Quick Set” Were Fatally Skewed and Did Not Satisfy Her Obligation to Apportion .................................................. 54

B. Ms. Riley’s Market Approach Relied on Agreements that Are Not Comparable and Do Not Feature “Built-In” Apportionment..................... 57

C. The District Court’s Refusal to Exclude Ms. Riley’s Unreliable Methodology Violated Its Gatekeeping Obligation Under Federal Rule of Evidence 702 ......................................................................... 63

CONCLUSION ....................................................................................... 67

COSTS ....................................................................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016) ....................41, 42

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) .................... 58, 62-63

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ....................50, 63

*Barrett v. Rhodia, Inc.*,
606 F.3d 975 (8th Cir. 2010) ....................37

*Blair v. Wills*,
420 F.3d 823 (8th Cir. 2005) ....................37

*Bos. Sci. Scimed, Inc. v. Cordis Corp.*,
554 F.3d 982 (Fed. Cir. 2009) ....................36

*Cancer Rsch. Tech. Ltd. v. Barr Labs., Inc.*,
625 F.3d 724 (Fed. Cir. 2010) ....................37

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ....................30, 60, 66

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................64

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ....................50, 66

*In re Etter*,
756 F.2d 852 (Fed. Cir. 1985) (en banc) ....................41

*Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*,
879 F.3d 1332 (Fed. Cir. 2018) ....................54

*Garretson v. Clark*,
111 U.S. 120 (1884)....................50

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d
295 (2d Cir. 1971)....................56

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996)....................64

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
572 U.S. 559 (2014)....................37

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013)....................47

*Intel Corp. v. PACT XPP Schweiz AG*,
No. 2022-1038, 2023 WL 2198649 (Fed. Cir. Feb. 24, 2023)..........42, 43, 44

*In re Keller*,
642 F.2d 413 (CCPA 1981)....................41

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007)....................40

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009)....................36

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....................62

*Medline Indus., Inc. v. C.R. Bard, Inc.*,
No. 17 C 7216, 2020 WL 5512132 (N.D. Ill. Sept. 14, 2020)....................48

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012)....................2, 41

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021)....................57, 58, 59

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006)....................45, 47

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ....................................................................41

*Polaris Indus., Inc. v. Arctic Cat Inc.*,
No. 15-4475, 2019 WL 3824255 (D. Minn. Aug. 15, 2019).............................48

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
758 F. App'x 943 (Fed. Cir. 2019) ..............................................................16, 17

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
759 F. App'x 934 (Fed. Cir. 2019) ...................................................................16

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
780 F. App'x 880 (Fed. Cir. 2019) .......................................................16, 17, 42

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
No. IPR2016-01610, 2020 WL 5985472 (PTAB Oct. 8, 2020)..................16, 17

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
Nos. 2021-1401, -1402, 2022 WL 1183332 (Fed. Cir. Apr. 20,
2022) ........................................................................................................*passim*

*Prolitec Inc. v. ScentAir Techs., LLC*,
No. 20-984-WCB, 2023 WL 8697973 (D. Del.
Dec. 13, 2023)........................................................................51, 54, 56, 63

*Quiles v. Union Pac. R.R. Co.*,
4 F.4th 598 (8th Cir. 2021) ..........................................................................36

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ....................................................................45

*In re Sneed*,
710 F.2d 1544 (Fed. Cir. 1983) ....................................................................32

*Summit 6, LLC v. Samsung Electronics Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ....................................................................64

*Uber Techs., Inc. v. X One, Inc.*,
957 F.3d 1334 (Fed. Cir. 2020) ....................................................................40

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ..............................................................57, 65

*VLSI Tech. LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ....................................................................53

*Volvo Penta of the Ams., LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023) ....................................................................47

*Wasica Fin. GmbH v. Schrader Int'l, Inc.*,
432 F. Supp. 3d 448 (D. Del. 2020)..............................................................49

*Yita LLC v. MacNeil IP LLC*,
69 F.4th 1356 (Fed. Cir.), *cert. denied*, 144 S. Ct. 499 (2023) ..........................46

*Zitovault, LLC v. Int'l Bus. Machs. Corp.*,
No. 3:16-cv-0962-M, 2018 WL 2971178 (N.D. Tex. Apr. 4, 2018)........... 48-49

**Statutes**

28 U.S.C. § 1295(a)(1)........................................................................................1

28 U.S.C. § 1331 ................................................................................................1

28 U.S.C. § 1338(a) ............................................................................................1

35 U.S.C. § 311(b) ............................................................................................48

35 U.S.C. § 315(e)(2)...............................................................................19, 33, 48

Minn. Stat. § 549.09..........................................................................................27

**Rules**

Fed. R. App. P. 4(a)(4)(A) ....................................................................................1

Fed. R. App. P. 39(a)(3)......................................................................................67

Fed. R. App. P. 39(a)(4)......................................................................................67

Fed. R. App. P. 39(e)(3)..................................................................................28, 67

Fed. R. Civ. P. 50 ..............................................................................................36

Fed. R. Evid. 104(a)............................................................................................66

Fed. R. Evid. 702 ........................................................................................*passim*

Fed. R. Evid. 702(c), (d) ....................................................................................36, 65

Fed. R. Evid. 702 advisory committee's note to 2023 amendment...................65, 66

## STATEMENT OF RELATED CASES

There have been no other appeals from the underlying district court action here. Defendants-Appellants Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd., and Polygroup Trading Limited (collectively, Polygroup) and their counsel are unaware of any cases pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in this case.

There have been other appeals to this Court from inter partes review (IPR) proceedings involving U.S. Patent No. 8,454,186 (the '186 patent) at issue in this appeal. *See Polygroup Ltd. MCO v. Willis Elec. Co.*, Appeal Nos. 2018-1745, -1746, -1747, heard by Judge Dyk, Judge Reyna, and Judge Hughes, decided on January 28, 2019, modified on March 28, 2019, 759 F. App'x 934 (Fed. Cir. 2019); *Polygroup Ltd. MCO v. Willis Elec. Co.*, Appeal Nos. 2021-1401, -1402, heard by Judge Dyk, Judge Hughes, and Judge Stoll, decided on January 19, 2022, modified on April 20, 2022, 2022 WL 1183332 (Fed. Cir. Apr. 20, 2022).

Additionally, there have been other appeals to this Court involving other patents that were previously asserted by Willis Electric Co., Ltd. (Willis), in the underlying district court action. *See Polygroup Ltd. MCO v. Willis Elec. Co.*, Appeal Nos. 2018-1748, -1749, -1750, heard by Judge Dyk, Judge Reyna, and Judge Hughes, decided on January 28, 2019, 758 F. App'x 943 (Fed. Cir. 2019);

*Polygroup Ltd. MCO v. Willis Elec. Co.*, Appeal No. 2018-2137, heard by Judge Prost, Judge Lourie, and Judge Dyk, decided on July 1, 2019, 780 F. App'x 880 (Fed. Cir. 2019).

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Minnesota asserted jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and entered final judgment resolving all claims. Appx1. The court issued an order resolving all remaining post-trial motions on June 24, 2024. Appx2-44. Polygroup timely filed its notice of appeal on July 16, 2024. Appx4705-4707; *see* Fed. R. App. P. 4(a)(4)(A). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

This appeal involves artificial Christmas trees and a $42.5 million jury verdict made possible only by a series of legal errors by the district court. Plaintiff-Appellee Willis originally asserted over 100 claims across six patents against Polygroup. But after multiple IPR proceedings and several appeals to this Court, Willis had to narrow its claims to just one—dependent claim 15 of the ’186 patent. This Court has already held that the internally powered and rotationally independent artificial tree recited in claim 10 of the ’186 patent—from which claim 15 depends—is unpatentable. And claim 15 does nothing more than swap out an off-the-shelf two-prong plug in a prior art tree for an off-the-shelf coaxial connector. This is not inventive. Nevertheless, the district court permitted Willis to stretch this single claim covering an obvious design choice to obtain an unapportioned damages windfall.

It is undisputed that internally powered, pre-lit artificial Christmas trees were well known in the art at the time of the ’186 patent. Nor is there any dispute that skilled artisans had two options for lighting—incandescent or LED. In fact, the industry was already trending towards using LED lights in artificial trees. And both sides’ experts agreed that when using LED lighting, a coaxial barrel connector was a common plug for providing low-voltage DC current. But in denying Polygroup’s motion for judgment as a matter of law (JMOL), the district court agreed with Willis that claim 15 would not have been obvious because there was no express motivation to make the specific modifications necessary to physically replace a standard two-prong plug with a common coaxial connector.

The district court applied the wrong legal standard. “It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements.” *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012). Instead, Polygroup only needed to show that a person skilled in the art would have been motivated to combine the prior art to arrive at the claimed invention, and Polygroup did. Compounding its legal error, the court also found that the jury could have relied on secondary considerations even after correctly finding that Willis had failed to establish any nexus to claim 15. Under the proper legal standard, the district court’s denial of JMOL should be reversed because claim 15 would have been invalid for obviousness.

If this Court reaches damages, it should vacate the district court's judgment and remand for a new trial. The district court abandoned its gatekeeping role in allowing Willis to present an unreliable—and exorbitant—damages model to the jury. For her income approach, Willis's damages expert relied on hopelessly skewed profit margins that did not apportion the incremental value of claim 15, which was limited to the use of a common coaxial connector. And for her market approach, the expert relied on only one agreement that actually included rights to the '186 patent. But that agreement—which set a royalty *only half* of what the jury awarded here—also included a worldwide license to all the claims of two additional patents and five pending patent applications spanning three patent families. Yet Willis's damages expert did nothing to apportion the value of the agreement attributable solely to the '186 patent, much less the portion attributable to only dependent claim 15.

In fact, the district court admitted that it had "some doubts about the comparability of the licenses that [Willis's damages expert] considered," Appx23-24, and that she "did little to address how the inclusion of additional patents . . . affected . . . comparability to the hypothetical negotiation," Appx25. These doubts notwithstanding, the court allowed Willis's damages expert to present her flawed methodology to the jury, believing that any deficiencies could be addressed through cross-examination. Recently amended Federal Rule of Evidence 702 exists

to prevent this exact scenario: the admission of fundamentally unreliable expert opinions that a jury is ill-equipped to scrutinize.

This Court should reverse the district court's denial of JMOL that claim 15 is invalid for obviousness. Alternatively, this Court should vacate the judgment and remand for a new trial on damages.

## STATEMENT OF THE ISSUES

1. Whether the district court legally erred in denying JMOL that claim 15 is invalid for obviousness, where the court: (a) required an express motivation to make the specific modifications necessary to bodily incorporate a common coaxial barrel connector into the prior art Loomis GKI Tree; and (b) concluded that the jury could have reasonably credited the existence of secondary considerations despite correctly determining that Willis failed to establish any nexus to the claimed invention.

2. Whether the district court abused its discretion in denying Polygroup a new trial on damages, where the court allowed Willis to present an unreliable damages theory that failed to apportion between patented and unpatented features and relied on noncomparable agreements.

# STATEMENT OF THE CASE

## A. Internally Powered, Pre-Lit Artificial Christmas Trees and Coaxial Barrel Connectors Were Well Known in the Prior Art

### 1. The Loomis GKI Tree

It is undisputed that internally powered, pre-lit artificial Christmas trees were well known in the art by September 2010, the earliest priority date of Willis's '186 patent. Appx2652(1652:19-22) (Willis's expert agreeing "a hundred percent" that Mr. Chen, the sole inventor listed on the '186 patent, "did not invent the first internally powered artificial pre-lit tree"). These prior art, pre-lit artificial trees typically had multiple sections for assembly into a single tree and hinged branches attached to those sections. Appx2652-2653(1652:23-1653:24). Pre-lit artificial trees at this time also used two different types of lighting: incandescent or LED. Appx2653-2654(1653:25-1654:4); Appx2293(1293:6-14).

Take the Loomis GKI Tree—an internally powered, pre-lit artificial Christmas tree created by Jason Loomis and sold to the QVC shopping network in January 2010. Appx4768; Appx1813-1815(813:22-815:7); Appx1862-1864(862:12-864:5); Appx1866-1867(866:17-867:15); Appx1870-1871(870:10-871:2); Appx4761. The Loomis GKI Tree featured pole or trunk sections with internal power provided by a common, off-the-shelf NEMA plug (i.e., a type of regular pronged plug that connects to standard household electrical sockets) that was placed in the poles to make an electrical connection when the various pole sections are connected to one

another. Appx1813-1815(813:22-815:7); Appx1862-1864(862:12-864:5). The tree was marketed and sold to consumers on QVC in July 2010 to much success. Appx1800(800:7-11). The Loomis GKI Tree garnered 30,000 tree sales in the first *18 hours* after its QVC debut and was awarded QVC's Best New Product of the Year. Appx1807-1808(807:11-808:13).

The Loomis GKI Tree has three poles with hinged branches adorned with incandescent light strings attached to each pole. Appx1813-1814(813:22-814:17).



Appx4766; Appx2298(1298:7-12). Each pole also contains fixed connectors that allow the poles to be physically and electrically connected to each other. Appx1814(814:3-7); Appx1814-1815(814:23-815:7). As shown below, the end of one pole contains a standard two-prong NEMA plug and the end of another pole contains a corresponding socket that, when pressed together, allows the poles to be connected in a fixed position, creating a "power pole design." Appx1814-1815(814:23-815:7); Appx1799-1800(799:7-800:19); *see also* Appx1796-1797(796:22-797:6).





Appx4773 (exhibit (left) showing Loomis GKI Tree pole end with a fixed two-prong NEMA plug); Appx4772 (exhibit (right) showing Loomis GKI Tree pole end with a fixed socket).

Because the two-prong NEMA plugs must be aligned with the socket, the Loomis GKI Tree poles included a slot and a dimple to aid with aligning the poles. Appx1937(937:4-11). When the poles are inserted together, the slot will stop at the dimple when the correct alignment is reached and drop into place to make the electrical connection. Appx1937(937:4-11); *see also* Appx1563-1564(563:25-564:17); Appx1814(814:10-13); Appx2295(1295:2-12). If the slot and dimple are not aligned, the pole will not drop into place. Appx1564(564:11-14).






Appx4771 (annotated exhibit (left) highlighting dimple in alignment slot); Appx4767 (annotated exhibit (right) highlighting alignment slot); Appx2298-2299(1298:19-1299:8).

### 2. Common Coaxial Barrel Connectors

Coaxial barrel connectors—sometimes called "barrel plug[s]"—were also well known and readily available in the prior art. Appx2654-2655(1654:25-1655:5); *see also* Appx2301-2302(1301:25-1302:19); Appx2313(1313:2-9). They were commonly used for connecting low-voltage devices, such as laptops or LED lights, to power sources. Appx2301-2302(1301:25-1302:9); Appx2294(1294:1-5); Appx2654(1654:8-21). A common coaxial barrel connector is shown below.



Appx4837.

A German prior art patent that issued to an inventor named Otto in 1985 demonstrated the use of a common coaxial barrel connector to electrically connect the branches and trunk of an artificially lighted Christmas tree. Appx4719-4744; Appx4734(1:13-21); Appx4736(3:18-28); Appx4739(6:4-30); Appx2305(1305:11-15); Appx2619(1619:4-10). Otto's Figure 2 shows a branch with a coaxial barrel connector having an outer barrel contact (38) and an inner pin (36). Appx4732(Fig. 2). During connection, the inner pin and outer barrel contact mate with the hole (32) and ring (34) of the trunk to electrically connect the branch and trunk. *Id.*; Appx2304-2305(1304:24-1305:10); *see also* Appx4739(6:4-22).






Appx4732 (Otto Fig. 2 (left)); Appx4839 (Polygroup's expert's demonstrative (right) demonstrating how Otto's inner pin mates with hole (shown in blue) and outer barrel contact mates with ring (shown in yellow)).

### B. Mr. Chen Examined the Loomis GKI Tree Before Working on the Alleged Invention of the '186 Patent and Willis's One Plug Trees

Johnny Chen is the only named inventor of the '186 patent and the designer of Willis's artificial pre-lit Christmas tree, the "One Plug" Tree. Appx1555-1556(555:25-556:11); Appx1517(517:12-17); Appx123. It is undisputed that before working on the alleged invention of the '186 patent and the One Plug Tree, Mr. Chen examined a trunk section of the Loomis GKI Tree. Appx1558(558:4-16). As noted above, the Loomis GKI Tree trunk section had a standard two-prong

NEMA plug and socket in the trunk's ends and the notch-and-dimple alignment feature to align the trunk sections. Appx1562-1564(562:20-564:17).

The Loomis GKI Tree was the foundation for Mr. Chen's development of the alleged invention in the '186 patent, as evidenced by the August 2010 CAD drawing that Mr. Chen sent to his patent attorney. *Compare* Appx4767, *with* Appx4711 *and* Appx4718. In that CAD drawing, which Mr. Chen described as being "very close to the finalized stage," Appx1574-1575(574:22-575:25), he even copied the notch alignment feature from the Loomis GKI Tree—which, having substituted the two-prong NEMA plug for a common coaxial barrel connector, he had no reason to include, Appx2313-2314(1313:24-1314:8); Appx4718.



**Loomis GKI Tree Pole**



**CAD Drawing for Willis's One Plug Tree**

Appx4767 (annotated); Appx4718 (annotated). The coaxial barrel connector that Mr. Chen used in place of the two-prong NEMA plug was not only common, but

also the only low-voltage connector Mr. Chen could source. Appx1586-1587(586:12-587:5).

Mr. Chen filed the provisional application to which the ’186 patent claims priority in September 2010, asserting that he had been the first to invent an internal-power tree that formed an electrical connection when the pole sections were mechanically connected. Appx123; Appx1585(585:8-17). During prosecution of the ’186 patent, Mr. Chen never disclosed the Loomis GKI Tree to the U.S. Patent and Trademark Office (PTO), let alone that he had examined the Loomis GKI Tree before developing the alleged invention in the ’186 patent. Appx1565(565:1-17). Moreover, the PTO did not consider the Loomis GKI Tree during prosecution or reexamination of the ’186 patent. Appx2296-2297(1296:14-1297:20).

The ’186 patent relates to pre-lit artificial trees with separable trunk portions that have internal wiring and are connected to provide electricity to lights attached to the tree’s branches. Appx123(Abstract); Appx139(1:14-18). The only claim of the ’186 patent at issue in this appeal is claim 15, which depends from claim 10. Independent claim 10 and dependent claim 15 recite:

10. A lighted artificial tree, comprising:

> a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string, the first trunk portion having a first trunk body and a trunk connector, at

> least a portion of the trunk connector housed within the first trunk body and electrically connected to the first light string;
>
> a second tree portion including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string, the second trunk portion having a trunk body and a trunk connector, at least a portion of the trunk connector housed within the second trunk portion and electrically connected to the second light string; and
>
> wherein the second tree portion is mechanically and electrically connectable to the first tree portion by coupling a lower end of the second trunk body to an upper end of the first trunk body along a common vertical axis at a rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis, thereby causing the trunk connector of the first trunk portion to make an electrical connection with the trunk connector of the second trunk portion within an interior of the lighted artificial tree, the electrical connection being made independent of the rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis.
>
> 15. The lighted artificial tree of claim 10, wherein the trunk connectors of the first and second tree portions form *coaxial trunk connectors*.

Appx149(22:34-60); Appx150(23:8-10) (emphasis added).

Willis began marketing One Plug Trees in October 2010, but only sold about 30,000 trees in the first two years on the market. Appx1523(523:10-12); Appx2514(1514:9-18). One Plug Trees come with several high-end features, but the common core feature among all One Plug Trees is fixed internal power, like the fixed internal power of the Loomis GKI Tree. Appx1487(487:12-24); Appx1563(563:9-21); Appx2241(1241:9-21); Appx2201-2202(1201:12-1202:5). Not all of Willis's One Plug Trees, however, used coaxial connectors—some used

non-coaxial connectors (e.g., two-prong plugs). Appx1538(538:5-18); Appx7; Appx22. Only Willis's trees with LED lighting used coaxial connectors in the first years; non-coaxial two-prong plugs were used for trees with incandescent lights. Appx1538-1539(538:5-539:3).

### C. Polygroup Develops "Quick Set" Features

Polygroup started making artificial Christmas trees 35 years ago. Appx2083(1083:8-11). Today, Polygroup employs over 14,000 people worldwide and supplies artificial trees to some of the biggest retailers across the country. Appx2043-2044(1043:21-1044:10); Appx2101-2103(1101:4-1103:9).

In July 2011—several months before ever seeing a Willis internally powered artificial tree—a team at Polygroup began developing several distinctive features for its own internally powered artificial tree with fixed connectors inside the trunk. Appx1888-1890(888:11-890:3); Appx4769-4770; Appx1895(895:10-13); Appx1904-1905(904:24-905:4); Appx1910(910:7-21). The team was led by Alan Leung, Polygroup's lead tree designer and engineer with 25 years of experience. Appx1878(878:16-22); Appx1889(889:20-22). Drawing upon Polygroup's existing intellectual property, Mr. Leung and his team improved on the Loomis GKI Tree using a slip ring to transmit power. Appx1890-1891(890:4-891:22). They also added a clutch mechanism to prevent the tree sections from turning after an electrical connection was made and a plastic sleeving system to prevent the metal

poles from rubbing against each other. Appx1891-1893(891:24-893:23); *see also* Appx4764; Appx4769-4770; Appx1895-1898(895:14-898:24); Appx1916-1918(916:12-918:6).

Polygroup implemented these features—known as "Quick Set"—in a variety of different tree designs, including trees with high-voltage incandescent lights and low-voltage LED lights. Appx1922(922:16-22); *see also* Appx1300(300:3-8). For its low-voltage LED design, Polygroup used an off-the-shelf coaxial barrel connector because it was "very common," "convenient," and "easy to find." Appx1924(924:1-19). In fact, Polygroup had used common coaxial barrel connectors on nearly all its optical fiber trees and already had them in its warehouse. Appx1914(914:1-4); Appx1924(924:1-7).

### D. This Litigation and the Parallel IPR Proceedings

#### 1. Willis Asserted over 100 Claims Against Polygroup

Willis filed this lawsuit in August 2015, originally accusing Polygroup of infringing four patents—U.S. Patent Nos. 8,454,187 (the '187 patent); 8,936,379 (the '379 patent); 9,044,056 (the '056 patent); and the '186 patent. Appx4000-4007. Several months later, Willis amended its complaint to add two more patents—U.S. Patent Nos. 9,066,617 (the '617 patent) and 8,974,072 (the '072 patent)—and specifically accuse several Polygroup trees with Quick Set features. Appx4008; Appx4012; Appx4014. Willis eventually asserted *over 100 claims*

against Polygroup across the six patents, including claims 1, 3-4, 6-11, 15-22, 25-26, and 28 of the ’186 patent. Appx4056-4057; *see also Polygroup Ltd. MCO v. Willis Elec. Co.*, No. IPR2016-01610, 2020 WL 5985472, at *1 (PTAB Oct. 8, 2020).

### 2. This Court’s Review of Polygroup’s Parallel IPR Proceedings Drastically Reduced Willis’s Asserted Claims

Given the number of claims implicated by Willis’s scattershot infringement allegations, Polygroup filed IPR petitions challenging the patentability of the asserted claims before the Patent Trial and Appeal Board. Appx4056-4057. The parties agreed to stay the district court action, Appx4132-4135, and the Board ultimately instituted twelve IPRs and consolidated them by patent. *See Polygroup Ltd. MCO v. Willis Elec. Co.*, 759 F. App’x 934, 936, 938 (Fed. Cir. 2019) (*Polygroup I*) (reviewing consolidated IPRs for the ’186, ’187, and ’056 patents); *Polygroup Ltd. MCO v. Willis Elec. Co.*, 758 F. App’x 943, 945, 947 (Fed. Cir. 2019) (*Polygroup II*) (reviewing consolidated IPRs for the ’379 patent); *Polygroup Ltd. MCO v. Willis Elec. Co.*, 780 F. App’x 880, 881 (Fed. Cir. 2019) (*Polygroup III*) (reviewing consolidated IPRs for the ’072 patent). Although the Board initially determined that Polygroup had not established unpatentability for any challenged claim, this Court vacated the Board’s final written decisions on over 70 claims and remanded back to the Board for further consideration. *See Polygroup I*, 759 F. App’x at 944 (affirming Board’s determination as to dependent claim 15 of the

’186 patent but vacating and remanding as to all other challenged claims of the ’186 patent); *Polygroup II*, 758 F. App’x at 951; *Polygroup III*, 780 F. App’x at 885.

Before the Board could consider this Court’s guidance on remand, the district court granted Willis’s request to lift its stay. Appx4136-4138. But Polygroup’s IPRs—and this Court’s review of those proceedings—ultimately confirmed Willis’s overreach. Indeed, after this Court’s initial remands, Willis agreed to withdraw multiple asserted claims with prejudice. *See* Appx4139-4140. And on remand, the Board determined that claims 1, 3-4, 6, and 8-9 of the ’186 patent are unpatentable. *Polygroup*, 2020 WL 5985472, at *1, *16.

Polygroup appealed the Board’s final written decision on remand as to the remaining challenged claims of the ’186 and ’187 patents, and this Court held that claims 10-11, 16, 18-22, 25-26, and 28 of the ’186 patent and twelve claims of the ’187 patent are also unpatentable. *Polygroup Ltd. MCO v. Willis Elec. Co.*, Nos. 2021-1401, -1402, 2022 WL 1183332, at *1, *5 (Fed. Cir. Apr. 20, 2022) (*Polygroup IV*). Specifically, this Court held that “Miller teaches every limitation” of claim 10 of the ’186 patent, including the “independent of the rotational orientation” limitation.[1] *Id.*; Appx149(22:57-60).

[1] U.S. Patent No. 4,020,201 to Miller—granted in 1977—was the primary reference at issue in *Polygroup IV* and “disclose[d] an artificial tree ‘wherein the

### 3. Willis Proceeded to Trial on Only Claim 15 of the ’186 Patent

Unable to credibly maintain most of its remaining infringement allegations, Willis continued dropping claims through the eve of trial until only one remained—claim 15 of the ’186 patent. Appx4616-4617; Appx4626-4627. Yet Willis failed to tie its case—including alleged evidence of secondary considerations and damages—to the narrow scope of claim 15.

Instead, Willis—a Taiwanese company—opened trial along nationalist lines by brandishing a Taiwanese flag and highlighting that “Polygroup is located in Hong Kong, *in China*, not in Taiwan.” Appx1108(108:4-5) (emphasis added); Appx1105(105:7-8) (“Willis Electric is based in Taipei, Taiwan.”); *see also* Appx1108(108:11-18) (pejoratively describing the various Polygroup defendants as “shell companies”).

---

lighting system wiring is essentially housed and concealed within the trunk members that are removably sleeved together.’” 2022 WL 1183332, at *2 (citation omitted). In particular, “Miller uses a traditional plug and socket electrical connector within its hollow trunk to form an electrical connection between light strings.” *Id.*




Appx4891.

### a. Obviousness

Willis conceded at trial that the Loomis GKI Tree, common coaxial barrel connectors, and Otto are all prior art to the '186 patent.[2] Appx2619(1619:4-10); Appx2654-2655(1654:25-1655:5). According to Willis, the only limitations missing from the Loomis GKI Tree were "independent of the rotational orientation" (independent claim 10) and "coaxial trunk connectors" (dependent

[2] The district court denied Willis's motion for summary judgment on estoppel, finding that 35 U.S.C. § 315(e)(2) did not prevent Polygroup from relying on the Loomis GKI Tree at trial. Appx84-89. The court held that because the Loomis GKI Tree was a physical product, it was not a prior art reference that could have been raised as a "ground" in an IPR. Appx87. Additionally, the court found that Willis "has not demonstrated that the [Loomis] GKI Tree is materially identical to or entirely cumulative of the Loomis ['042] [p]atent." Appx88 n.5.

claim 15). *See* Appx2307-2329(1307:2-1329:14); Appx2687-2692(1687:8-1692:9). Both limitations had been construed by the district court:

| Term | District Court's Construction |
|---|---|
| "the electrical connection being made independent of the rotational orientation of the first trunk portion relative the second trunk portion" (claim 10) | "an electrical connection that can be made at any available arrangement of the first tree/trunk portion relative to the second tree/trunk portion about a common vertical axis between the tree-trunk portions" (Appx4150-4155) |
| "coaxial trunk connectors" (claim 15) | "connectors capable of making an electrical connection between trunk sections and that include a set of electrical contacts that permit the electrical connection to be made about a common vertical axis of the trunk sections" (Appx4155-4159) |

But neither Willis nor its expert, Dr. James Dickens, disputed that the Loomis GKI Tree combined with Otto or a common coaxial barrel connector disclosed each limitation of claim 15 as construed by the court. *See* Appx2632(1632:9-17); Appx2635-2636(1635:4-1636:20).

The evidence at trial showed that claim 15 does no more than swap the two-prong plug in the Loomis GKI Tree for a common coaxial barrel connector. *See, e.g.*, Appx2288-2289(1288:23-1289:3); Appx2289-2300(1289:8-1300:16); Appx2301-2315(1301:7-1315:12); Appx2326-2334(1326:18-1334:2). A person skilled in the art would have considered this to be a well-known and predictable substitution—one encouraged by the undisputed industry trend toward LED lights over incandescent lights. Appx2329-2331(1329:18-1331:8); Appx2672-

2673(1672:25-1673:14). Indeed, both sides' experts agreed that common coaxial barrel connectors would have been a standard low-voltage DC option available for LED lights. Appx2329-2331(1329:18-1331:8); Appx2654-2655(1654:25-1655:5) (Willis's expert admitting "that as of January 2010, coaxial barrel connectors were typical low[-]voltage power plugs" that "were well-known" and "readily available"); Appx2668(1668:19-21) (Willis's expert admitting that "a barrel connector is a standard low[-]voltage DC plug"); Appx2672-2673(1672:25-1673:4) (Q: "If you were to make a tree with LED lights, it would be a design incentive to use the power plug that would power those LED lights, correct?
A: It would be required. I mean, it's not an incentive. It's just you have to do it." (Dr. Dickens)).

Nevertheless, Willis's expert testified that skilled artisans would not have been motivated to make this substitution because the prior art did not expressly teach removing the two-prong plug, alignment slot, and dimple from the Loomis GKI Tree to physically incorporate a common coaxial barrel connector into its pole. Appx2635-2636(1635:13-1636:18). He did not dispute, however, that skilled artisans would have been able to swap the two-prong plug in the Loomis GKI Tree for a common coaxial barrel connector with a reasonable expectation of success. Appx2635-2636(1635:25-1636:18) ("Now, to say that couldn't be done, that's not what I'm saying."). After all, Willis's expert admitted that molding processes—

including 3-D printing—would have been available to skilled artisans in January 2010. Appx2655(1655:6-18); *see also* Appx2670-2671(1670:22-1671:13) (Willis's expert agreeing that "[t]he known function" of the molding in the Loomis GKI Tree "is to hold the plug in place"). He further admitted that because tree poles are initially manufactured as plain, hollow poles, the alignment slot and dimple found in the Loomis GKI Tree actually required *additional* machining steps. Appx2664-2665(1664:21-1665:13); *see also* Appx2330-2331(1330:22-1331:3); Appx2313-2314(1313:2-1314:14).

Willis's expert also encouraged the jury to rely on secondary considerations, including alleged evidence of industry praise for Willis's "One Plug" internal-power feature, commercial success, copying by others, and long-felt but unmet needs. Appx2637-2638(1637:13-1638:2); App2640(1640:8-24); Appx2642-2643(1642:11-1643:1). But at most, this alleged evidence pertained to internal power, which was already taught by the Loomis GKI Tree. Willis did not provide any evidence of industry praise, commercial success, or long-felt but unmet needs related to the coaxial trunk connectors of claim 15. Nor did Willis provide any evidence that others had replicated anything beyond the unpatented coaxial barrel plugs commonly available in the market for low-voltage connections—just as Mr. Chen had. Appx1586-1587(586:23-587:7).

Willis further argued—over Polygroup's objection, Appx2621(1621:14-22)—that the Loomis GKI Tree was cumulative of U.S. Patent No. 8,053,042 to Loomis (the Loomis '042 patent). Appx2628-2629(1628:12-1629:9); Appx4789-4795. Willis even told the jury that claim 15 was "gold plated" because it had survived PTO proceedings. Appx2829(1829:1-9). And while the district court prohibited Polygroup from responding with the details of the PTO proceedings themselves, Appx4632-4633, Polygroup presented evidence—including testimony from Jason Loomis—establishing that the physical Loomis GKI Tree included many features that were not disclosed in the Loomis '042 patent. Appx1820-1822(820:20-822:9); *see also* Appx1570-1571(570:15-571:21); *compare* Appx4789-4795, *with* Appx4765, Appx4766, *and* Appx4768.

**b. Damages**

Polygroup filed a *Daubert* motion to exclude the opinions of Willis's damages expert, Michele Riley, as unreliable and untethered to the facts of the case under Federal Rule of Evidence 702. Appx4208-4218; Appx48; Appx64-68. But the district court denied Polygroup's motion, Appx67-68, allowing Ms. Riley to present a damages model to the jury that failed to apportion down to the incremental value added by claim 15 alone.

In fact, after this Court issued its decision in *Polygroup IV* invalidating multiple claims—including claim 10 of the '186 patent—the parties jointly

requested additional time to file opening expert reports, Appx4185-4189, which the district court granted, Appx4190. Yet despite the additional time to consider the changed landscape of the case, Ms. Riley's reasonable royalty rate for practicing 32 claims across four patents—including the now invalid independent claim 10 of the '186 patent—was the same as the reasonable royalty rate she presented at trial for practicing *just claim 15*. Appx4210-4214; Appx4288(¶ 10); Appx4293(¶ 27); Appx4402-4403(¶¶ 304-305); Appx1638(638:4-12).

Ms. Riley devised two approaches for arriving at a $5 royalty per tree and over $53 million in damages. Under her "income approach," Ms. Riley used the alleged profit margin for Willis's relatively low sales of overpriced trees in 2012 and 2013 featuring "One Plug" internal power—$20 per tree. Appx1652(652:8-21); Appx1646(646:5-18); Appx2231(1231:8-15); *see also* Appx2513-2515(1513:16-1515:6); Appx1487(487:12-24). In addition to this skewed starting point, Ms. Riley's profit margin did not account for One Plug trees typically including other high-value features that non-One Plug trees did not have. Appx1681-1682(681:8-682:6); Appx1687-1689(687:19-689:10); *see also* Appx2241(1241:9-21) (explaining that "[s]hape, size, number of tips, number of lights, et cetera," determine differences in cost between One Plug and non-One Plug trees). That is, Ms. Riley's methodology did not reflect the incremental value attributable to just the One Plug fixed connection. Nor did Ms. Riley attempt to apportion the

incremental value of One Plug attributable to just claim 15. In fact, not all One Plug trees even practiced claim 15. Appx1421-1422(421:18-422:1); Appx1538-1539(538:5-539:14); Appx4708-4710.

Ms. Riley's income approach also relied on the alleged profit margin for Polygroup trees featuring "Quick Set"—$4.30 per tree. Appx1652(652:8-21). To get there, Ms. Riley relied on pricing *quotes*, not the actual prices that customers paid for Polygroup's Quick Set features. Appx1649-1652(649:7-652:7). Aside from these quotes being just a starting point for negotiation, Appx2134(1134:14-20), Ms. Riley did not account for a variety of other features—including shape, height, tips, and lighting—that impacted profit premiums for trees with Quick Set. Appx2106-2113(1106:22-1113:23); Appx1300(300:3-8) (Willis's expert admitting that "[t]here's many differences" between Polygroup trees with Quick Set). The evidence at trial showed that Polygroup's actual incremental profit margins on trees with Quick Set versus a comparable tree without Quick Set ranged from $0.25-$0.35 per tree. Appx2135(1135:7-24); Appx2131(1131:19-25); Appx2511-2513(1511:18-1513:15). And regardless of the margins, Ms. Riley never attempted to apportion the incremental value of the Quick Set features attributable solely to the coaxial connector feature of claim 15.

Ms. Riley relied on five agreements for her "market approach," none of which represented the incremental value of claim 15. Appx1652-1654(652:22-654:15).

Only one—the 2015 H.S. Craft agreement—even included a license to the ’186 patent. Appx4775-4777; Appx1653(653:7-12). But that agreement also provided for a worldwide license to all the claims of two additional patents and five pending patent applications spanning three patent families. Appx1597-1600(597:21-600:10); Appx4775-4777. Ms. Riley did not account for the other claims and patents covered by the H.S. Craft agreement, much less grapple with the agreement lasting only twenty months until H.S. Craft changed designs to avoid continuing royalty payments. Appx4775-4776; Appx2525(1525:13-23). Yet even if she had properly accounted for these circumstances, the royalty rate in the H.S. Craft agreement was only *$2 per tree*. Appx4775-4776; Appx1653(653:7-12); Appx1638(638:4-12).

Ms. Riley did not explain how the other four agreements she relied on satisfied principles of apportionment either—none included rights to the ’186 patent, and there was no evidence that the technology they did cover was a reliable proxy for the incremental value of claim 15. Appx1653-1655(653:21-655:8). In fact, some were not even patent license agreements. Appx1686(686:9-23); Appx2524-2525(1524:19-1525:12).

**c. Verdict**

Willis closed trial with the same nationalistic strategy it had used in opening—“Don’t let them invade U.S. patent law.” Appx2824(1824:20-21); *see also*

Appx2794(1794:23-25) ("We're here because Polygroup . . . will not respect the United States patent laws no matter what."); Appx2835(1835:5-9) ("[W]hen Judge Ericksen reads your verdict, right after you leave[,] Lewis Cheng is going to make a phone call. He's going to call his brother back in Asia . . . . One message is going to be we got away with it."). And Willis again accused the Polygroup defendants of playing "a shell game." Appx2827(1827:14-15) ("It's all a shell game, folks."); Appx2801(1801:14-25).

The jury returned a verdict in favor of Willis on all liability issues, including infringement and invalidity. Appx199-201. And the jury awarded Willis $42,494,772 in damages, amounting to a royalty of $4 per tree. Appx201; Appx27.

#### 4. Post-Trial Proceedings

The district court also awarded Willis $28,983,677 in pre-judgment interest calculated at the 10% Minnesota statutory rate from June 4, 2013, through the date of final judgment, as well as post-judgment interest. Appx1; Appx4658; Appx4663-4665 (citing Minn. Stat. § 549.09). Given the high costs associated with obtaining a supersedeas bond—over 1.5% or over $1 million per year, Appx4678(¶ 3); Appx4679(¶ 5)—Polygroup moved to stay execution of the judgment without posting a supersedeas bond, or alternatively, with a partial bond. Appx4669; Appx4700. Willis opposed Polygroup's motion, acknowledging that "Polygroup may seek to recoup the bond premium costs after appeal." Appx4696

(citing Fed. R. App. P. 39(e)(3)). The court denied Polygroup's motion, requiring a supersedeas bond of $78,626,294.74, representing the judgment of $71,478,449.76 plus 10%. Appx4704.

The district court also denied Polygroup's motion for JMOL, a new trial, or remittitur. Appx44. Describing this as "a close case" for obviousness, Appx8, the court determined that modifying the Loomis GKI Tree to use coaxial connectors would not have been obvious to a skilled artisan. Although the court acknowledged "the known use of coaxial connectors with LED lights," Appx5-6; Appx8, the only "substantial evidence cutting the other way" that the court pointed to was the testimony of Willis's technical expert, Dr. Dickens, that "adapting the GKI tree's specific design to use coaxial connectors would not have been as straightforward as Polygroup suggests, due to the need to eliminate the existing alignment feature and extensively redesign the connector housings." Appx8. That is, the court faulted the unmodified Loomis GKI Tree for not being readily physically combinable with a common coaxial barrel connector.

As for secondary considerations, the district court found that they were entitled "to little weight because [Willis] fails to establish a nexus to the novel features of claim 15." Appx7. Specifically, the court found that "[t]he commercial success of One Plug trees in general says little about the non-obviousness of claim 15's

specific coaxial connector limitations." Appx7. In fact, the court found that "not all One Plug trees practiced claim 15—some used non-coaxial connectors." Appx7.

The district court found that "[t]he same flaw undermines Willis Electric's evidence of industry praise and copying." Appx7. "At most," Willis's evidence suggested praise or copying of "the unpatented concept of an internally-powered tree, which cannot support non-obviousness." Appx7. And Willis provided "no evidence that the use of coaxial connectors in artificial trees produced any unexpected results." Appx8.

Based on these findings, the district court determined that Willis's secondary-considerations evidence "cannot support a finding of non-obviousness" because there was no "clear nexus to the merits of the claimed invention." Appx8. Yet paradoxically, the court concluded that "the jury reasonably credited . . . the *existence of secondary considerations* supporting non-obviousness." Appx32 (emphasis added). The court did not explain how the jury could have "reasonably credited" alleged secondary considerations with no nexus to claim 15.

Turning to damages, the district court held that "Ms. Riley performed an income-based apportionment," even though many One Plug trees were not even covered by claim 15. Appx22-23. According to the court, "Ms. Riley was not required to dissect profits on a claim-by-claim basis," Appx23, even though

dependent claim 15 only covers the addition of coaxial connectors to the unpatentable combination of features in independent claim 10.

The district court also credited Ms. Riley's "market-based approach," which considered "royalty rates in purportedly comparable licenses." Appx23-24. And although the court candidly acknowledged that it had "some doubts about the comparability of the licenses that Ms. Riley considered," it still determined that her market approach featured "indirect or 'built in' apportionment." Appx23-24 (citing *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303-04 (Fed. Cir. 2015)).

Starting with the H.S. Craft agreement—"[t]he most significant license Ms. Riley relied on," Appx25—the district court found that "Ms. Riley did little to address how the inclusion of additional patents . . . affected its comparability to the hypothetical negotiation." Appx25. Nevertheless, the court overlooked Ms. Riley's faulty analysis of the H.S. Craft agreement because "it was not the sole basis for Ms. Riley's opinion"—she "also considered several other licenses and business agreements." Appx25. But those other agreements had their own problems. For one, they "did not specifically cover the '186 [p]atent." Appx25-26. And the court recognized that Ms. Riley had repeated the same mistake she made with the H.S. Craft agreement—she "could have provided a more fulsome explanation of why she viewed these licenses as comparable." Appx25-26.

Yet none of that mattered because, according to the district court, Ms. Riley's failure to explain comparability "was not *so* egregious as to invalidate her analysis entirely." Appx25-26 (emphasis added). Despite these core defects in her methodology, the court "[could not] conclude that Ms. Riley's analysis is *so* fundamentally flawed as to provide no reasonable basis for the jury's award." Appx24 (emphasis added). Nor could the court "say that Ms. Riley's consideration of the H.S. Craft license and other agreements as guideposts for the hypothetical negotiation was *so* unreliable or prejudicial as to render the damages verdict improper." Appx26-27 (emphasis added). In the court's view, all these flaws in her unreliable and prejudicial methodology could be cured by "a full and fair opportunity to cross-examine Ms. Riley about the differences between the licenses she considered and the technology at issue." Appx26.

The district court also found that "some of Willis Electric's counsel's comments, such as references to Polygroup's nationality and insinuations about its business practice, could be viewed as potentially problematic." Appx29; *see also* Appx12 (finding that "passing 'gold plated' reference was not literally true"). But the court held that "[t]hese isolated statements, while improper, were not so egregious or pervasive as to infect the entire trial with unfairness or mislead the jury into basing its damages award on inappropriate factors." Appx30.

## SUMMARY OF THE ARGUMENT

The district court legally erred in denying Polygroup's motion for JMOL that claim 15 is invalid for obviousness. The facts here were largely undisputed. Internally powered, pre-lit artificial trees—like the Loomis GKI Tree—were well known in the art. LED lights were also well known, and there was an industry trend toward using LED lights over incandescent lights. And coaxial barrel connectors were commonly used as low-voltage plugs for LED lights. That is, there was an undisputed motivation to use LED lights on artificial trees and a finite number of identified, predictable solutions for doing so. This should have been a straightforward case of obviousness. Instead, the court determined that this was "a close case" for a single reason: in its view, there was no motivation to make the specific modifications to the Loomis GKI Tree necessary to physically incorporate a coaxial connector. Appx8.

That is not the correct standard. Bodily incorporation is not required to prove obviousness. *See In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("What appellants overlook is that it is not necessary that the inventions of the references be physically combinable to render obvious the invention under review."). Instead, Polygroup was only required to demonstrate that a person skilled in the art would have been motivated to combine the prior art references with a reasonable

expectation of success. And modifying the Loomis GKI Tree to include a coaxial barrel connector was undisputedly within the ability of a skilled artisan.

The district court's erroneous obviousness analysis was compounded by its inconsistent findings as to Willis's alleged secondary considerations. The court correctly found that Willis's offered secondary considerations of industry praise, commercial success, copying by others, and long-felt but unmet needs were all tied to the already known internal-power feature of Willis's One Plug Tree. Appx7-8. Yet the court ultimately concluded that the jury could have credited Willis's secondary considerations in making its nonobviousness finding. Appx32. That contradiction cannot be squared with the requirement that secondary considerations must have a nexus to the claimed invention—here, the addition of coaxial connectors—to be relevant.

Under the correct standard, the Loomis GKI Tree combined with Otto or a common coaxial barrel connector made claim 15 obvious. As the district court correctly held, Polygroup was not estopped under 35 U.S.C. § 315(e)(2) from relying on the Loomis GKI Tree; it was a *physical artificial tree* that could not have been raised in an IPR before the Board. Appx84-89. And regardless, Willis failed to show that it was materially identical or entirely cumulative of the Loomis '042 patent. *See* Appx88 n.5.

As for damages, the district court abused its discretion in denying Polygroup's motion for a new trial. Willis's damages case rested entirely on unreliable and prejudicial methodologies that never should have reached the jury. Willis's damages expert, Ms. Riley, devised two pathways for leading the jury to its $42.5 million verdict: she called one an "income" approach and the other a "market" approach. Appx1643(643:9-10). But neither apportioned the incremental value attributable solely to claim 15.

For her income approach, Ms. Riley started with a skewed profit margin for Willis's trees with One Plug. Yet as the district court recognized, "not all One Plug trees practiced claim 15—some used non-coaxial connectors." Appx7. Ms. Riley never grappled with One Plug not being coextensive with claim 15, nor did she account for the impact of other premium features like shape, size, number of tips, and number of lights. Ms. Riley's analysis of Polygroup's Quick Set features was similarly flawed. She started from a skewed profit margin and made no attempt to apportion the incremental value attributable to adding coaxial connectors, which is all that claim 15 covers.

For her market approach, Ms. Riley relied on five agreements. But none were comparable to the hypothetical negotiation, much less featured built-in apportionment down to the incremental value of claim 15. Only one agreement—H.S. Craft—even included a license to the '186 patent. Appx4775-4777;

Appx1653(653:7-12). Ms. Riley, however, failed to account for the H.S. Craft agreement also providing for a worldwide license to all the claims of two additional patents and five pending patent applications across three patent families. Appx1597-1600(597:21-600:10); Appx4775-4777. Nor did she account for the agreement lasting only twenty months until H.S. Craft changed designs to avoid continuing royalty payments. Appx4775-4776; Appx2525(1525:13-23). What is more, the royalty rate for the entire portfolio of patent rights in the H.S. Craft agreement was only *$2 per tree*—half the rate that the jury awarded for claim 15 alone. Appx4775-4776; Appx1653(653:7-12); Appx1638(638:4-12). Ms. Riley did not show that the other four agreements she relied on satisfied principles of apportionment either; none included rights to the '186 patent, and Ms. Riley made no effort to explain how they provided any guidance on the incremental value of claim 15. Appx1653-1655(653:21-655:8); Appx25-26.

The district court expressly recognized many of the problems with Ms. Riley's methodology. *See* Appx25 (finding that Ms. Riley "did little to address how the inclusion of additional patents in the H.S. Craft license affected its comparability to the hypothetical negotiation"); Appx25-27. Nevertheless, the court determined that these fundamental flaws could be cured through cross-examination. Appx26. But that is not how Federal Rule of Evidence 702 works. The court had an obligation to ensure that any expert opinion presented to the jury "is the product of

*reliable principles and methods*" and "reflects a *reliable application of the principles and methods of the facts of the case*." Fed. R. Evid. 702(c), (d) (emphases added). Only after the proponent of expert testimony clears these hurdles is the jury permitted to consider weight. The court erred in abandoning this gatekeeping obligation and allowing Ms. Riley to present the jury with unreliable methodologies that completely failed to apportion the incremental value of claim 15.

## STANDARD OF REVIEW

The Eighth Circuit reviews the denial of JMOL de novo. *Quiles v. Union Pac. R.R. Co.*, 4 F.4th 598, 604 (8th Cir. 2021). JMOL should be granted when "a party has been fully heard on an issue and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Id.* (quoting Fed. R. Civ. P. 50).

"Obviousness is a question of law based on underlying findings of fact." *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). This Court reviews the jury's determination of underlying findings of fact for substantial evidence and reviews the ultimate conclusion on obviousness de novo. *Bos. Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009) ("When we consider that, even in light of a jury's findings of fact, the references demonstrate an invention to have been obvious, we may reverse its obviousness determination.").

The Eighth Circuit reviews the denial of a motion for a new trial for an abuse of discretion. *Blair v. Wills*, 420 F.3d 823, 829-30 (8th Cir. 2005). Likewise, the district court's evidentiary rulings, including those related to the admissibility of damages-expert evidence, are reviewed for an abuse of discretion. *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010). Under abuse-of-discretion review, a district court's legal conclusions are reviewed de novo. *Cancer Rsch. Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 728-29 (Fed. Cir. 2010). An "erroneous view of the law" is "necessarily" an abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014) (citation omitted).

## ARGUMENT

### I. The District Court Legally Erred in Denying Polygroup Judgment as a Matter of Law that Claim 15 of the '186 Patent Would Have Been Obvious

#### A. The District Court Legally Erred by Requiring an Express Motivation to Make the Specific Modifications Necessary to Bodily Incorporate a Common Coaxial Barrel Connector into the Loomis GKI Tree

The facts establishing obviousness here are undisputed. Neither side's technical experts disputed that the Loomis GKI Tree with a common coaxial barrel connector and/or the teachings of Otto satisfy every limitation of claim 15. *See, e.g.*, Appx2307(1307:2-23); Appx2308-2311(1308:19-1311:20); Appx2312-2314(1312:12-1314:14); Appx2326(1326:18-24); Appx2327-2328(1327:14-1328:18); Appx2329(1329:8-14); Appx2632-2637(1632:9-1637:12); Appx2652-

2655(1652:14-1655:5). Indeed, this Court has already determined that claim 10—which claim 15 depends from—is invalid over the prior art. *Polygroup IV*, 2022 WL 1183332, at *5. For claim 15, Willis challenged only the "coaxial trunk connector" and "independent of" limitations as not being disclosed by the Loomis GKI Tree. *See* Appx2307-2329(1307:2-1329:14); Appx2687-2692(1687:8-1692:9). But there is no dispute that the Loomis GKI Tree combined with Otto satisfies each limitation.[3] *See, e.g.*, Appx8.

What is more, both sides' experts agreed that as of January 2010, there were two lighting choices for pre-lit artificial Christmas trees—incandescent lights and LED lights. Appx2653-2654(1653:25-1654:7); Appx2292-2294(1292:21-1294:5). They further agreed that, while incandescent lights used high-voltage power and typically featured a two-prong NEMA plug, LED lights were being used with low-voltage power. Appx2654-2655(1654:5-1655:5); Appx2292-2294(1292:21-1294:5). And for low-voltage LED lights, both experts agreed that a coaxial barrel connector—a common type of coaxial connector—would have been "well-known" and "readily available." Appx2653-2655(1653:25-1655:5); *see also* Appx2292-

[3] At trial, Willis's expert, Dr. Dickens, faced the impossible task of reconciling Willis's infringement theory with its validity arguments. He eventually admitted that, under his interpretation of the district court's construction of "independent of," the Loomis GKI Tree alone met that limitation. Appx2689-2690(1689:11-1690:1).

2294(1292:21-1294:5); Appx2301-2303(1301:25-1303:11); Appx2635(1635:4-12). In fact, the district court expressly recognized "the known use of such connectors with LED lights." Appx8. And both sides' experts agreed that in January 2010, there was a market trend toward using more LED lights. Appx2672-2673(1672:25-1673:14) (Willis's expert: "Q. [W]ould you also agree that the trend in lighting on trees in [the] 2010 time frame was toward more LED lights? A. Yes, I would agree with that, yes."); Appx2329-2331(1329:18-1331:3) (Polygroup's expert explaining that LED lights "were becoming more popular").

Any person skilled in the art would have been motivated to follow this market trend towards using LED lights on artificial trees. With the teachings of the Loomis GKI Tree on internal power, skilled artisans would have made the same simple and predictable substitution of the two-prong plug for a low-voltage coaxial barrel connector that Mr. Chen did. Appx2329-2331(1329:18-1331:8); Appx2672-2673(1672:25-1673:4) (Willis's expert stating that "[i]t would be required [to use a connector compatible with LED lights]. I mean, it's not a [design] incentive. It's just you have to do it."); Appx2673(1673:6-14). And there is no dispute that a common coaxial barrel connector—what any skilled artisan would have used with LED lights—would predictably allow an electrical connection independent of rotational orientation. *See* Appx2642-2643(1642:1-1643:1); Appx2682(1682:9-24) (Willis's expert stating that "[i]n this case[,] because we do have a coaxial

connector, we can come down and make that connection at any available orientation"). That is the definition of obviousness: "the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417, 421 (2007) (determining that a patent claim can be "obvious to try" where "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions"); *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1341 (Fed. Cir. 2020) (reversing Board's finding that motivation was lacking where two prior art references taught "two known, finite, predictable solutions for solving the same problem which, consistent with precedent, renders obvious the challenged limitation").

Notwithstanding this straightforward motivation to follow the LED market trend using a simple and predictable solution from the prior art, the district court described this as "a close case" for obviousness. Appx8. Yet the only "substantial evidence cutting" against obviousness that the court identified was the testimony of Willis's technical expert, Dr. Dickens, that "adapting the GKI tree's specific design to use coaxial connectors would not have been as straightforward as Polygroup suggests, due to the need to eliminate the existing alignment feature and extensively redesign the connector housings." Appx8; *see also* Appx2635-2636(1635:13-1636:18). And the court faulted Polygroup's expert, Dr. John Martens, for allegedly not providing "any detailed explanation of how the

connector housings could have been modified" to incorporate a common coaxial barrel connector. Appx6.

Willis's inapposite focus on physically adapting the Loomis GKI Tree to physically incorporate a common coaxial barrel connector led the district court to apply the wrong legal standard. "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)). Instead, the question is whether "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Id.* (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)); *see also Mouttet*, 686 F.3d at 1332 ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements."); *In re Etter*, 756 F.2d 852, 859-60 (Fed. Cir. 1985) (en banc) (explaining that whether one reference can be incorporated in another is "basically irrelevant" since the test for obviousness is "not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole").

In fact, this Court has already rejected a similar bodily incorporation rationale in reviewing a decision from the Board regarding the obviousness of Willis's

related ’072 patent. *See Polygroup III*, 780 F. App’x at 882. In that case, the Board had expressed concern with Polygroup’s proposed modification to the prior art because it “require[d] pushing the compression-fit connectors into the trunk sections,” which “diverge[d] from the [prior] art.” *Id.* at 883 (citation omitted). But this Court rejected the Board’s rationale and vacated its conclusion of nonobviousness, holding instead that “the prior art inventions need not be physically combinable to render a claim obvious.” *Id.* at 884-85 (citing *Allied*, 825 F.3d at 1381). The same holds true for claim 15 of the ’186 patent—bodily incorporation was not required to make the claim obvious.

According to the district court, “[t]he jury could reasonably have credited Dr. Dickens’ explanation of why *adapting* [the Loomis GKI Tree] to use coaxial connectors would not have been as simple or obvious as Polygroup suggests.” Appx6 (emphasis added). But that only highlights the court’s legal error: under the correct standard, “merely stat[ing] that combining the relevant aspects of the two references requires a modification that the references did not teach and that [Polygroup] did not provide” does nothing to undermine obviousness. *Intel Corp. v. PACT XPP Schweiz AG*, No. 2022-1038, 2023 WL 2198649, at *3 (Fed. Cir. Feb. 24, 2023) (holding that “the Board legally erred in requiring evidence” that prior art features could be “bodily incorporated” (citation omitted)). Rather, it is enough that a skilled artisan would have been motivated by the market trend in

LED lighting to combine the teachings of the Loomis GKI Tree and common coaxial barrel connectors like the ones described in Otto to achieve the claimed invention.

"To be sure," this Court has explained that evidence indicating "that the teachings and concepts of the prior art were (either actually or apparently) incompatible such that a skilled artisan would not have reasonably expected to succeed in combining those teachings is relevant to the obviousness analysis." *Id.* Here, however, there is no dispute that a skilled artisan would have reasonably expected to succeed in combining the Loomis GKI Tree with a common coaxial barrel connector. Appx2635-2636(1635:13-1636:9) (Dr. Dickens describing modification to bodily incorporate a coaxial barrel connector into the Loomis GKI Tree and admitting: "Now, to say that couldn't be done, that's *not* what I'm saying. It is would you have done it, you know, is there motivation to do that." (emphasis added)). Dr. Dickens agreed that "[m]olding processes were available to companies" in January 2010, and that "3-D printing was pretty commonplace as well." Appx2655(1655:6-18). He also agreed that tree poles are initially manufactured as plain, hollow poles, and that adding an alignment slot requires an *additional* machining step. Appx2664-2665(1664:21-1665:13). In other words, redesigning the Loomis GKI Tree to include a common coaxial barrel connector actually *reduces* steps by eliminating the need to add an alignment slot. Appx2666-

2667(1666:15-1667:9); *see also* Appx2330-2331(1330:22-1331:3). Regardless, claim 15 does not recite molding as a claim limitation, further demonstrating that Polygroup was not required to show a motivation to remove a superfluous slot from the Loomis GKI Tree and adapt the molding for a physical combination. *E.g.*, Appx1556-1557(556:25-557:20) (named inventor of the '186 patent admitting that he "do[es]n't know how to open molds" and that "opening the molds isn't part of the invention").

Any contention that the district court did not erroneously require bodily incorporation—or that its error was harmless—is belied by the fact that the only "substantial evidence" that the court identified as "cutting the other way" against obviousness was "the need to eliminate the existing alignment feature and extensively redesign the connector housings" in the Loomis GKI Tree to accommodate a coaxial barrel connector. Appx8; *see also Intel*, 2023 WL 2198649, at *3 (reversing where "[t]he Board's only explanation" for nonobviousness was that petitioner "had not shown a sufficient 'rationale' for modifying" a primary reference to incorporate a feature from a secondary reference (citation omitted)). Since bodily incorporation is not required to prove the obviousness of claim 15 and the district court did not cite any other substantial evidence to support the jury's verdict, this Court should reverse the district court's denial of Polygroup's motion for JMOL of invalidity of claim 15 for obviousness.

### B. Willis's Alleged Evidence of Secondary Considerations Is Immaterial Because Willis Failed to Establish a Nexus to Claim 15

The district court correctly determined that Willis failed to establish a nexus between the claimed invention and any evidence of secondary considerations. Appx6-8. While Willis relied heavily on the alleged success of its One Plug trees, the court found that "not all One Plug trees practiced claim 15—some used non-coaxial connectors." Appx7. And even the One Plug trees that did practice claim 15 were not coextensive with the claim; they typically included various other unclaimed, high-end features. Appx2201-2202(1201:12-1202:5); Appx2241(1241:9-21). Thus, "[t]he commercial success of One Plug trees in general says little about the non-obviousness of claim 15's specific coaxial connector limitations." Appx7.

Willis's secondary-considerations evidence merely illustrates the success of what was unquestionably in the prior art: internal power. This Court has held that "objective evidence of nonobviousness lacks a nexus if it exclusively relates to a feature that was 'known in the prior art.'" *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257-58 (Fed. Cir. 2013) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). Here, the entire combination of features in claim 10—which covers every aspect of claim 15 except coaxial trunk connectors—has

been conclusively held unpatentable over the prior art. *Polygroup IV*, 2022 WL 1183332, at *5.

Yet Willis presented no evidence assessing internal-power trees with coaxial connectors against internal-power trees with non-coaxial connectors. Appx1644(644:5-15); Appx1658-1659(658:12-659:7); *see also* Appx7 ("At most, the evidence suggests that others sought to emulate the unpatented concept of an internally-powered tree, which cannot support non-obviousness."). Any objective evidence directed to the unpatented concept of an internally powered tree—or even the unpatented concept of an electrical connection "made independent of the rotational orientation," Appx149(22:34-60)—cannot support nonobviousness. *Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1364-65 (Fed. Cir.) ("denying force" to secondary-considerations evidence related entirely to limitation disclosed in the prior art), *cert. denied*, 144 S. Ct. 499 (2023); *see also* Appx2705(1705:9-13) (Willis's expert admitting that comments of alleged praise in the industry did not reference coaxial connectors); Appx4943; Appx1487(487:12-24) (Lowe's representative describing benefits of One Plug with no mention of coaxial connectors).

The district court correctly determined that Willis's secondary-considerations evidence "cannot support a finding of non-obviousness" because there was no "clear nexus to the merits of the claimed invention." Appx8. Yet notwithstanding

this seemingly definitive determination, the court went on to conclude in its denial of Polygroup's motion for JMOL that "the jury reasonably credited . . . the existence of secondary considerations supporting non-obviousness." Appx32. *Any* reliance on secondary considerations here, however, cannot support nonobviousness as a matter of law. This Court has held that, "[f]or objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence." *Volvo Penta of the Ams., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210 (Fed. Cir. 2023) (citation omitted). Affording Willis's faulty secondary-considerations evidence even a "little weight," Appx7; Appx9, cannot be squared with the requirement that objective indicia "*must* be tied to the *novel* elements of the claim at issue." *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013) (emphases added); *see also Ormco*, 463 F.3d at 1312 ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

Secondary considerations cannot save the district court's erroneous reliance on bodily incorporation to uphold the jury verdict. Under a proper application of the obviousness standard, this Court should reverse the denial of JMOL of obviousness.

### C. Estoppel Does Not Apply to the Physical Loomis GKI Tree

To the extent Willis asserts that estoppel under 35 U.S.C. § 315(e)(2) bars Polygroup from asserting that claim 15 is invalid for obviousness over the Loomis GKI Tree and Otto, Willis is incorrect. The Loomis GKI Tree is a physical product and not a patent or printed publication. Therefore, the physical Loomis GKI Tree was not available to be used in "any ground that [Polygroup] raised or reasonably could have raised during [an IPR]." 35 U.S.C. § 315(e)(2); *see also* 35 U.S.C. § 311(b) (stating that, in an IPR, a petitioner may challenge a claim as unpatentable "only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications"). On this basis alone, and as the district court determined in rejecting Willis's motion for partial summary judgment of Polygroup's obviousness defense, Polygroup should not be estopped from challenging claim 15 for obviousness based on the *physical* Loomis GKI Tree. Appx84-89; *see also Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *3-5 (N.D. Ill. Sept. 14, 2020) (finding invalidity grounds based on physical products themselves "outside the reach of IPR estoppel under 35 U.S.C. § 315(e)(2)"); *Polaris Indus., Inc. v. Arctic Cat Inc.*, No. 15-4475 (JRT/TNL), 2019 WL 3824255, at *2-3 (D. Minn. Aug. 15, 2019) (rejecting application of § 315(e)(2) estoppel to obviousness combinations that include products); *Zitovault, LLC v. Int'l Bus. Machs. Corp.*, No. 3:16-cv-0962-M, 2018

WL 2971178, at *4 (N.D. Tex. Apr. 4, 2018) ("Defendants . . . could not have raised prior art systems, such as products and software, during IPR proceedings.").

But even if this Court were to apply a "cumulative[ness]" test for determining whether a physical prior art product is "materially identical" or "entirely cumulative" of a patent or printed publication, *see, e.g.*, *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 453, 455 (D. Del. 2020), Willis failed to meet its burden of demonstrating that the Loomis GKI Tree is materially identical or entirely cumulative of the Loomis '042 patent, *see* Appx88 n.5. Indeed, the evidence at trial showed that the physical Loomis GKI Tree was not cumulative of the Loomis '042 patent. *See, e.g.*, Appx1820-1822(820:20-822:9) (Mr. Loomis testifying that the Loomis '042 patent is "lacking a full representation" of the Loomis GKI Tree because it does not show the NEMA plug, molding, branches, or lighting of the Loomis GKI Tree); Appx1570-1571(570:15-571:21) (Mr. Chen testifying that the Loomis '042 patent does not clearly describe, among other things, lights or attached branches); Appx2402-2403(1402:9-1403:17) (Polygroup's expert testifying that the Loomis '042 patent lacks certain details present in the physical Loomis GKI Tree); Appx2404-2405(1404:24-1405:24) (same); *compare* Appx4789-4795, *with* Appx4765, Appx4766, *and* Appx4768.

## II. The District Court Abused Its Discretion in Denying Polygroup's Motion for a New Trial on Damages

For 140 years, the Supreme Court has made clear that the patent owner "must in *every case* give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (emphasis added). This Court has similarly held that damages for patent infringement "must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226, 1233 (Fed. Cir. 2014) (when accused products have both patented and unpatented features, "the patent holder should only be compensated for the approximate incremental benefit derived from his invention").

Here, the "unpatented features," *Garretson*, 111 U.S. at 121, included an internally powered, pre-lit artificial tree where an electrical connection between trunk portions is made "independent of the rotational orientation" as recited in invalid claim 10. Appx149(22:34-60). Thus, Willis was obligated to apportion the value attributable to adding a coaxial connector in that tree, which is all that claim 15 protects. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) ("When a patent covers the infringing product as a whole, and the claims recite both conventional elements and unconventional elements, the [fact-finder] must determine how to account for the relative value of the patentee's invention in

comparison to the value of the conventional elements recited in the claim, standing alone." (citation omitted)); *Prolitec Inc. v. ScentAir Techs., LLC*, No. 20-984-WCB, 2023 WL 8697973, at *12-13 (D. Del. Dec. 13, 2023) (Bryson, J., sitting by designation) (holding that "the damages stemming from infringement of the dependent claims are confined to the value added by those claims, excluding the value associated with the invalidated [independent] claims").

Yet the words "apportion" or "apportionment" were never uttered by Willis during trial. The jury first learned of "apportionment" during jury instructions. Appx2862(1862:3-16). Whether in her income approach or her market approach, Willis's damages expert, Ms. Riley, made no attempt to assess the value attributable to the alleged improvement in claim 15. In fact, her opinion on a reasonable royalty for practicing 32 claims across four patents, including the now invalid independent claim 10, was the same as her opinion on a reasonable royalty for practicing just dependent claim 15. Appx4220-4222; Appx4288(¶ 10); Appx4293(¶ 27); Appx4402-4403(¶¶ 304-305). The district court abandoned its gatekeeping role in allowing Ms. Riley to present her unreliable—and exorbitant—damages model at trial.

### A. Ms. Riley's Income Approach Failed to Apportion the Incremental Value of Claim 15 from Unpatented Features

#### 1. Ms. Riley's Inapt Comparison of Willis's Trees With and Without "One Plug" Did Not Satisfy Her Obligation to Apportion

Cherry picking from Willis's overpriced trees in 2012 and 2013—which had underperformed in the market, Appx2514(1514:9-18)—Ms. Riley testified that Willis's profit premium for its One Plug trees as compared to its non-One Plug trees was $20. Appx1652(652:8-21); Appx1646(646:5-18); Appx2231(1231:8-15); *see also* Appx2513-2517(1513:16-1517:9); Appx1487(487:12-24); Appx2608(1608:2-19) (Willis's vice president, Emily Chen, explaining "how hard it is to have a profit" in the industry and that Willis often works on 1-2% margins). Ms. Riley then used this alleged profit premium to skew the damages horizon for the jury. Appx1652(652:8-21). But nothing about Ms. Riley's $20 profit premium for One Plug trees reflects the incremental value attributable to claim 15.

As an initial matter, Willis's One Plug feature is not coextensive with coaxial connectors—One Plug simply encompasses the unpatented concept of an internally powered tree. The district court acknowledged this, finding that "[t]he Lowe's representative" at trial—Ms. Rodgers—"praised the One Plug design in general terms, not the coaxial connectors in particular." Appx7; *see also* Appx7 (differentiating between the "unpatented concept of an internally-powered tree" and "the coaxial connectors" of claim 15); Appx1487(487:12-24) (Ms. Rodgers

describing the One Plug feature in terms of internal power without mentioning coaxial connectors).

And that makes sense; after all, the district court also found that "not all One Plug trees practiced claim 15—some used non-coaxial connectors." Appx7; *see also* Appx1421-1422(421:18-422:1); Appx1538-1539(538:5-539:14); Appx4708-4710. Apportionment cannot be premised on the incremental value of products where some of those products do not practice the patented invention. *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1347-49 (Fed. Cir. 2023) (remanding for new trial on damages where damages expert's apportionment analysis was overinclusive of technology that did not practice the asserted claim). Willis presented no evidence that customers were willing to pay more for One Plug trees that practiced claim 15 than for otherwise identical One Plug trees that used non-coaxial connectors. Appx1643-1644(643:11-644:24). For at least the same reasons that "[t]he commercial success of One Plug trees in general says little about the non-obviousness of claim 15's specific coaxial connector limitations," Appx7, it also says little about the incremental value of those limitations.

Ms. Riley's flawed comparison of One Plug trees to non-One Plug trees cannot satisfy apportionment for another reason: many One Plug trees have other features or technology that non-One Plug trees lacked. Appx1681-1682(681:8-682:6); *see also* Appx1646(646:5-18); Appx1687-1689(687:19-689:10). One Plug trees

usually included other high-end features that commanded their own profit premiums. *See, e.g.*, Appx2241(1241:9-21) (explaining that "[s]hape, size, number of tips, number of lights, et cetera," determine differences in cost between One Plug and non-One Plug trees); Appx2201-2202(1201:12-1202:5). Thus, Ms. Riley's calculations failed to isolate the value associated with One Plug's internal power, much less the incremental value of claim 15's coaxial connectors.

The district court pointed to *Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332 (Fed. Cir. 2018), in concluding that "Ms. Riley was not required to dissect profits on a claim-by-claim basis." Appx22-23 (citing *Exmark*, 879 F.3d at 1348). But *Exmark* only highlights why the court's anything-goes approach to apportionment is wrong—"the patent owner must apportion or separate the damages" "between patented and unpatented features of a multicomponent product." *Exmark*, 879 F.3d at 1348 (citation omitted). And where an independent claim has been invalidated, apportionment requires determining the incremental value of the surviving dependent claim, excluding the value associated with the invalidated claim. *Prolitec*, 2023 WL 8697973, at *12-13.

### 2. Ms. Riley's Alleged Profit Margins for Polygroup's Trees Featuring "Quick Set" Were Fatally Skewed and Did Not Satisfy Her Obligation to Apportion

Ms. Riley's reliance on the alleged profit margins for Polygroup's Quick Set trees fares no better. She testified that Polygroup's average incremental profit

margin for adding Quick Set features to trees was $4.30 per tree. Appx1674-1675(674:9-675:19); Appx1650-1651(650:17-651:10); Appx1652(652:8-21). But Ms. Riley's calculation relied on *quotes*, not on Polygroup's actual revenue on trees equipped with Quick Set features, much less the actual profit margin of adding the Quick Set features to the pole. Appx1649(649:7-13); Appx1651(651:11-20). Her reliance on these quotations as a proxy for Quick Set profits was particularly unreliable given that Polygroup's customers routinely negotiated the price *downward*. Appx1650-1651(650:3-651:10); Appx4780-4781; Appx2105(1105:6-17); Appx2131-2135(1131:19-1135:6); Appx4778-4779; Appx2134(1134:14-20) ("Q. Did you always get the prices that you quoted? A. No, we did not. Q. And why not? A. It's a negotiation process." (Ricky Tong, Polygroup's chief marketing officer)); Appx2169-2170(1169:22-1170:23).

Ms. Riley's $4.30 purported average profit margin was fatally skewed not only because she relied on mere quotes, but also because she failed to weigh sales volumes in determining her so-called "average" margin. Specifically, Ms. Riley treated trees of varying heights equally, even though the evidence showed that Polygroup sold millions of 7.5-foot trees (with low profit margins) but only a few 15-foot trees (with higher profit margins). Appx2131-2132(1131:14-1132:4); Appx2170(1170:5-13); Appx2171(1171:12-16); *see also* Appx1650-1651(650:18-651:10).

The only reliable evidence of record on Polygroup's incremental margins for adding the Quick Set features to its trees was that the margin ranged from $0.25-$0.35 per tree. Appx2135(1135:11-24); Appx2512-2513(1512:9-1513:15). But the damages awarded by the jury—which equate to $4 per tree, Appx27—effectively disgorge Polygroup's *entire* profits on the *entire* trees it sold with the Quick Set features. Appx1689-1690(689:21-690:10) (Ms. Riley conceding that evidence shows Polygroup's total profit per entire tree was approximately $4 to $5). No "prudent licensee" would "reasonably and voluntarily" agree to a royalty capturing its profit on the entire product for adding an off-the-shelf component part (i.e., a common coaxial barrel connector). *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

Even setting aside that Ms. Riley's alleged $4.30 average profit margin for Polygroup's trees with Quick Set features was entirely unreliable for a hypothetical negotiation, she made no effort to show that her entire profit margin was specifically attributable to the coaxial connector feature of claim 15 and nothing more. Nor could she have made that showing. Internal power and making an electrical connection "independent of the rotational orientation" are both features of invalid claim 10. *Polygroup IV*, 2022 WL 1183332, at *5; *see also Prolitec*, 2023 WL 8697973, at *12-13. And Ms. Riley ignored the value contribution of

other Quick Set features: the clutch system to prevent the tree from turning and the plastic sleeving system to prevent the metal poles from rubbing against each other. *See supra* Statement of the Case, Section C; Appx1890-1893(890:4-893:23); Appx1926(926:3-24). Moreover, Ms. Riley did not account for other features—including shape, height, number of branch tips, memory wire, and an array of different lighting options—that impacted profit premiums for trees with Quick Set. Appx2106-2113(1106:22-1113:23); Appx1300(300:3-8) (Willis's expert admitting that "[t]here's many differences" between Polygroup trees with Quick Set features).

Ms. Riley's failure to apportion the incremental value attributable solely to the coaxial connectors of claim 15 makes her analysis of Polygroup's Quick Set features entirely unreliable. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021) ("[N]o matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014))).

### B. Ms. Riley's Market Approach Relied on Agreements that Are Not Comparable and Do Not Feature "Built-In" Apportionment

Ms. Riley's market approach does not satisfy apportionment either. While Ms. Riley pointed to five agreements, she considered one—the H.S. Craft agreement, Appx4775-4777—as the "most significant" agreement to her analysis. Appx1653(653:2-6); Appx25. But the H.S. Craft agreement is fundamentally

different from the hypothetical negotiation here, and Ms. Riley made no effort to account for those differences. *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971-74 (Fed. Cir. 2022) ("[W]e require a party to 'account for differences in the technologies and economic circumstances of the contracting parties.'" (citation omitted)). The other four agreements do nothing to shore up her erroneous analysis.

Start with the "most significant" H.S. Craft agreement. Appx25. While it included the '186 patent, it also provided a worldwide license to two other patents and five pending patent applications across three patent families. Appx4775; Appx1597-1600(597:21-600:10). The district court found "that Ms. Riley did little to address how the inclusion of additional patents in the H.S. Craft license affected its comparability to the hypothetical negotiation." Appx25. Actually, Ms. Riley did nothing to address these additional rights. Nevertheless, the court "presumed" that Ms. Riley's approach "incorporate[d] apportionment." Appx23-24 (concluding that Ms. Riley's use of "comparable licenses" featured "a form of indirect or 'built-in' apportionment" (citation omitted)).

That presumption was legally wrong. "For built-in apportionment to apply[,] the license must be '*sufficiently comparable*' in that 'principles of apportionment were effectively baked into' the purportedly comparable license." *Omega*, 13 F.4th at 1377 (emphasis added) (citation omitted). Ms. Riley, however, did nothing to

establish that the negotiators of the H.S. Craft agreement "settled on a royalty rate and royalty base combination embodying the value of the ['186] patent," much less claim 15 specifically. *Id.* (citation omitted). That the H.S. Craft agreement covered two other patents and five pending patents shows otherwise. Besides, the agreement lasted only twenty months, after which H.S. Craft changed designs rather than continuing to pay a royalty, indicating that the rate in that agreement was too high and that noninfringing alternatives were available. Appx4775-4776; Appx2525(1525:13-23). While Ms. Riley conceded that the H.S. Craft agreement was "a little bit different" because H.S. Craft sells trees under the GE brand, she did not explain how these differences impacted her analysis. Appx1653(653:13-20). Nor did she account for the specific impact of other patent rights covered by the agreement.

Even if the H.S. Craft agreement were sufficiently comparable to feature built-in apportionment down to the incremental value of claim 15 and nothing more, the royalty rate in that agreement was only *$2* per tree. Appx1653(653:7-12); Appx4775-4776. That is, the only executed license of record that included, but was not limited to, rights to practice claim 15 provides no support for a verdict of $4 per tree. The district court brushed aside this troubling discrepancy by surmising that "the H.S. Craft license was not the sole basis for Ms. Riley's opinion and would not have resulted in a materially different royalty even if she had assigned

the ’186 [p]atent only a fraction of the $2 rate.” Appx25. But that hypothesis cannot be squared with the H.S. Craft agreement being “[t]he *most significant* license Ms. Riley relied on.” Appx25 (emphasis added). And it only highlights the court’s error in supposing that *any* of the allegedly “comparable licenses” somehow featured “‘built-in’ apportionment” supporting the jury’s $4 per tree royalty. Appx23-24 (citing *Commonwealth*, 809 F.3d at 1303-04).

Indeed, the other four agreements that Ms. Riley considered do not make up for the lack of apportionment in the H.S. Craft agreement. None of the other agreements included rights to the ’186 patent. And there was no evidence that the technology they did cover was technically comparable to the incremental value of claim 15.

Take the Master Agreement for Product Design between GKI and Loominocity, which was not limited to any specific technology. Appx4782-4788. This agreement included a 5% royalty rate for developing entirely new products, as opposed to small improvements on existing products. Appx4788; Appx1853(853:5-24) (Mr. Loomis explaining that the agreement “was about developing new products . . . [,] which requires a lot of time and effort”); Appx1855(855:2-16). At the time of that agreement, Mr. Loomis had not yet invented the internal power pole, making it wholly inapplicable to a hypothetical negotiation for an incremental improvement on a power pole, which is the most

claim 15 can purport to be. Appx1116(116:2-5); Appx1854(854:12-21). Ms. Riley did not explain why the agreement was comparable to the hypothetical negotiation here, or how the royalty rate informed her opinion as to the incremental value of claim 15. Appx1653-1654(653:21-654:2).

Similarly, Ms. Riley relied on two agreements between Polygroup and Jason Loomis that were concept option agreements—not patent licenses—under which Mr. Loomis could develop new product concepts and would receive a royalty only if a concept was developed. Appx1824-1825(824:17-825:12); Appx1686(686:9-23); Appx2524-2525(1524:19-1525:12). But Ms. Riley never explained how these development agreements were comparable to the hypothetical negotiation for claim 15 here, resulting in her royalty analysis being skewed upwards.

Ms. Riley also relied on a noncomparable agreement between Loominocity and Boston Warehouse that had a 5% royalty. Appx1654(654:3-15); Appx4796-4813; Appx4798. But again, Ms. Riley failed to account for the dissimilar circumstances between that agreement and the hypothetical negotiation here, much less explain how the agreement has built-in apportionment down to the incremental value of claim 15. As Mr. Loomis explained, the Boston Warehouse agreement was not a new agreement, but rather a continuation of his existing business relationship with GKI, on the same historical terms. Appx1843-1844(843:14-844:21); Appx1856-1857(856:1-857:8). In other words, Boston Warehouse was

acquiring an established product with a price point that accounted for the royalty historically charged. Neither Willis nor Polygroup was a party to that agreement. Yet Ms. Riley made no attempt to account for these dissimilarities. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327-29 (Fed. Cir. 2009) (remanding for new damages trial where expert gave only "superficial testimony" about a "vastly different situation" for agreements to multiple patents by failing to account for need to license narrower technology).

That Polygroup's damages expert, Julie Davis, also addressed these agreements does not save Ms. Riley's market approach. Ms. Davis was a rebuttal expert; her assignment necessarily required her to assess the evidence on which Ms. Riley relied. Willis had the burden of proving damages, and where licenses are at issue, that includes "the burden to prove that the licenses were sufficiently comparable." *Id.* at 1329. Moreover, Ms. Davis did what Ms. Riley failed to do: account for fundamental dissimilarities and explain how they affected her analysis. Appx2524-2526(1524:11-1526:24). For example, Ms. Davis explained how the Boston Warehouse and GKI agreements arose out of different circumstances, encompassed a different scope of technology, and thus were not particularly informative. Appx2524-2525(1524:19-1525:12); Appx2535-2536(1535:2-1536:8).

Ms. Riley's reliance on these agreements was completely "untethered to the facts of this case" and warrants a new trial on damages. *See Wi-LAN*, 25 F.4th at

973, 976 (remanding for new trial on damages where damages expert presented "no basis upon which to conclude based upon the evidence presented that either [allegedly comparable] license is a meaningful proxy for the royalty rate of the [asserted] patent").

### C. The District Court's Refusal to Exclude Ms. Riley's Unreliable Methodology Violated Its Gatekeeping Obligation Under Federal Rule of Evidence 702

The district court frankly noted that it had "some doubts about the comparability of the licenses that Ms. Riley considered." Appx23. The court's doubts were unsurprising given its finding that Ms. Riley "did little to address how the inclusion of additional patents in the H.S. Craft license affected its comparability to the hypothetical negotiation." Appx25. The court also found that Ms. Riley "could have provided a more fulsome explanation of why she viewed [four other agreements] as comparable." Appx25-26. And the court did not require her to "dissect profits on a claim-by-claim basis," Appx23, even though dependent claim 15 only covers the addition of coaxial connectors to the unpatentable combination of features in independent claim 10. *But see AstraZeneca*, 782 F.3d at 1338; *Prolitec*, 2023 WL 8697973, at *12-13.

Notwithstanding all this, the district court concluded that Ms. Riley's damages model was not "so fundamentally flawed as to provide no reasonable basis for the jury's award." Appx24. The court "[could not] say that Ms. Riley's consideration

of the H.S. Craft license and other agreements as guideposts for the hypothetical negotiation was so unreliable or prejudicial as to render the damages verdict improper." Appx26-27. Nor could it conclude that Ms. Riley's "failure" to explain the comparability of four other agreements was "so egregious as to invalidate her analysis entirely." Appx25-26. Instead, pointing to *Summit 6, LLC v. Samsung Electronics Co.*, 802 F.3d 1283 (Fed. Cir. 2015), the court determined that "[t]he factual disputes and methodological critiques raised by Polygroup go to the weight of [Ms. Riley's] testimony, not its admissibility or legal sufficiency." Appx24 (citation omitted). In the court's view, whatever doubts it had about reliability and prejudice could be brushed aside because "Polygroup had a full and fair opportunity to cross-examine Ms. Riley about the differences between the licenses she considered and the technology at issue." Appx26.

That is not the correct legal standard for admitting expert testimony. A district court has an *obligation* to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The jury is allowed to consider the weight of an expert's testimony only "[w]here the methodology is sound and the evidence relied upon is sufficiently related to the case." *Summit 6*, 802 F.3d at 1299; *see also Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("We encourage exercise of the

trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, but markedly incorrect law." (citation omitted)).

Federal Rule of Evidence 702 was recently amended to underscore this gatekeeping obligation. Before the jury may consider weight, the proponent of expert testimony bears the burden of establishing "that it is more likely than not that: . . . the testimony is the product of *reliable principles and methods*," and "the expert's opinion reflects a *reliable application of the principles and methods to the facts of the case*." Fed. R. Evid. 702(c), (d) (emphases added). The district court's approach here, however, falls into the very trap that these recent amendments were adopted to avoid. As the committee notes explain, "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. *These rulings are an incorrect application of Rules 702 and 104(a)*." Fed. R. Evid. 702 advisory committee's note to 2023 amendment (emphasis added); *VirnetX*, 767 F.3d at 1328 (explaining that a district court must exercise "its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment were allowed to reach the jury").

This "[j]udicial gatekeeping is essential" for at least two reasons—"just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert

opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. While "perfection" is not the standard, Rules 702 and 104(a) do "not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.*

This Court has explained that "today, given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award." *Commonwealth*, 809 F.3d at 1301. And "'[t]he essential requirement' for reliability under [Rule 702] 'is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.' In short, apportionment." *Id.* (first alteration in original) (quoting *Ericsson*, 773 F.3d at 1226). As explained above, Ms. Riley's damages model—including her income approach and market approach—completely failed to apportion the incremental value of claim 15. And the district court abused its discretion in allowing her unreliable damages model to reach the jury.

## CONCLUSION

This Court should reverse the district court's denial of JMOL that claim 15 is invalid for obviousness. Alternatively, this Court should vacate the judgment and remand for a new trial on damages.

## COSTS

If the Court reverses the denial of JMOL and holds that claim 15 is invalid, then costs should be awarded to Polygroup under Fed. R. App. P. 39(a)(3). Recoverable costs include the premiums Polygroup paid for a bond, which are taxable in the district court. *See* Fed. R. App. P. 39(e)(3).

If the Court vacates the judgment and orders a new trial on damages, the Court should award costs under Fed. R. App. P. 39(a)(4). The cost of the bond in this case was substantial at nearly $1.2 million per year. Appx4679(¶ 5). Polygroup moved to stay execution of the judgment without a bond pending appeal because of this extreme and unnecessary expense. Appx4674-4675.

In seeking damages, Willis argued that Polygroup had significant assets, including $500 million in annual sales, which should have made a bond unnecessary to secure the judgment. Appx1129(129:20-23); Appx2793-2794(1793:25-1794:1); Appx2796(1796:2-5); Appx2802(1802:1-3) ("They do half a billion dollars of sales a year . . . ."). Willis nevertheless opposed a stay without a bond, *see* Appx4681-4699, causing Polygroup to pay nearly $100,000 a month in

bond premiums, which will continue through the end of this appeal. Appx4679(¶ 5). As to which party should bear this cost if the judgment is vacated, Willis should—the bond was a wasted expense that benefited neither party.

Date: September 20, 2024

Respectfully submitted,

/s/ J. Michael Jakes

J. Michael Jakes
Jason L. Romrell
Ryan V. McDonnell
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Rachel Zimmerman Scobie
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300

*Counsel for Defendants-Appellants*

# ADDENDUM

# UNITED STATES DISTRICT COURT
## District of Minnesota

Willis Electric Co., Ltd.,

Plaintiff,

v.

Polygroup Limited (Macao Commercial Offshore); Polygroup Macau Limited (BVI); Polytree (H.K.) Co. Ltd.; and Polygroup Trading Limited,

Defendants.

**THIRD AMENDED JUDGMENT IN A CIVIL CASE**

Case Number: 15-cv-3443 (JNE/DTS)

---

☒ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

Judgment is entered in favor of Plaintiff Willis Electric Co., Ltd. and against Defendants Polygroup Limited (Macao Commercial Offshore); Polygroup Macau Limited (BVI); Polytree (H.K.) Co. Ltd.; and Polygroup Trading Limited in the amount of $42,494,772, plus prejudgment interest in the amount of $28,983,677.76. Willis Electric is entitled to post-judgment interest at the simple rate of 5.00%, accruing from March 8, 2024, until the judgment is satisfied. This amount does not include statutory attorneys' fees or other taxable costs. Willis Electric Co. holds valid U.S. Patent No. 8,484,186. The jury found that Defendants infringed U.S. Patent No. 8,484,186 owned by Willis Electric Co. Based on the jury's finding of patent infringement, judgment is entered in favor of Willis Electric Co., establishing Defendants' liability for damages.

Date: March 8, 2024

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

KATE M. FOGARTY, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Willis Electric Co., Ltd.,<br><br>Plaintiff,<br><br>v.<br><br>Polygroup Limited et al,<br><br>Defendants. | Case No. 15-cv-3443 (JNE/DTS)<br><br>**ORDER** |

---

This matter comes before the Court on Defendants Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd., Polygroup Trading Limited's (collectively, "Defendants" or "Polygroup") motion for judgment as a matter of law, a new trial, or remittitur, (Dkt. 1011), and Plaintiff Willis Electric Co., Ltd.'s ("Willis Electric") motion for attorneys' fees, (Dkt. 1002.) For the reasons addressed below, the Court denies the motions.

## BACKGROUND

The full factual background of this litigation is set forth in previous orders and will not be repeated here. Briefly, Willis Electric filed this patent infringement action in 2015 alleging that Polygroup infringed various claims of several patents, including U.S. Patent No. 8,454,186 ("'186 Patent"), which relates to an artificial holiday tree with multiple trunk segments that include internal trunk wiring to provide electrical power to light strings attached to the branches, utilizing a "coaxial coupling" design. Polygroup asserted defenses of non-infringement and invalidity of these patents. After motion practice and

inter partes review proceedings challenging the validity of the asserted patents, *see*, *e.g.*, *Polygroup Ltd. MCO v. Willis Elec. Co., Ltd.*, 2021-1401, 2021-1402, 2022 WL 1183332 (Fed. Cir. Apr. 20, 2022), the sole claim tried to the jury was claim 15 of the '186 Patent.

The jury trial commenced on January 8, 2024, and on January 17, 2024, the jury returned a unanimous verdict finding that Polygroup willfully infringed claim 15 of the '186 Patent and awarded $42,494,772 in damages. On March 11, 2024, the Court entered judgment against Polygroup for over $71.4 million, including pre-judgment interest. Post-trial, Willis Electric moved for attorneys' fees on March 22, 2024, and Polygroup moved for judgment as a matter of law, new trial or remittitur on April 8, 2024.

## ANALYSIS

### I. Motion for Judgment as a Matter of Law, New Trial or Remittitur

Judgment as a matter of law ("JMOL") is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). The Federal Circuit has held that JMOL may be granted by the trial court only if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that [a] reasonable [person] could not arrive at a contrary verdict . . . ." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356 (Fed. Cir. 2012) (quotation omitted). On the other hand, "if there is substantial evidence opposed to the [grant of JMOL] . . . [it] should be denied." *Id.*

Under Rule 59, the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Grounds for a new trial include a verdict that is against the weight of the evidence, legal errors at trial, or when the proceeding was influenced by prejudice or bias. *See 01 Communique Lab., Inc. v. Citrix Sys.*, 889 F.3d 735, 740 (Fed. Cir. 2018). A new trial should be granted only if the verdict is against the "great weight" of the evidence or to prevent a miscarriage of justice. *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012).

A court may remit a damages award only if it "is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009) (quoting *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1580 (Fed. Cir. 1992)). If there is sufficient evidence presented to support the jury's finding of patent infringement, the Court must defer to the jury's determination. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010).

**A. Invalidity – Obviousness**

A patent claim is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103. The obviousness inquiry entails consideration of the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any secondary considerations of non-obviousness. *See Graham v. John Deere Co.*, 383 U.S.

1, 17-18 (1966). Obviousness is a question of law based on underlying factual determinations. *Kinetic Concepts*, 688 F.3d at 1356-57. The movant bears the burden of proving obviousness by clear and convincing evidence. *Id.* at 1360.

### 1. Motivation to Combine Prior Art

The key issue is whether a person of ordinary skill in the art would have been motivated to modify the prior art GKI tree to use coaxial connectors as claimed in the '186 Patent. Polygroup argues that the use of coaxial connectors to power LED lights was well-known in the art, and that adapting the GKI tree to use such connectors would have been an obvious solution to the problem of powering LEDs. It contends that the mechanical and electrical modifications required would have been simple and straightforward to a skilled artisan.

Willis Electric disagrees, arguing that the evidence shows a skilled artisan would not have viewed coaxial connectors as an obvious replacement for the GKI tree's two-prong connector design. Its expert, Dr. James Dickens, testified that the two-prong connectors were integral to the GKI tree's alignment feature, which ensured proper mechanical and electrical connection between the tree sections. Dr. Dickens opined that replacing the two-prong connectors with coaxial connectors would have required eliminating this alignment feature and extensively redesigning the connector housings, a process that would not have been apparent or obvious.

The Court finds Dr. Dickens' testimony more persuasive on this factual issue. While Polygroup's argument has some surface appeal given the known use of coaxial connectors with LED lights, it fails to grapple with the specific design challenges posed by

the GKI tree. The jury could reasonably have credited Dr. Dickens' explanation of why adapting that particular tree to use coaxial connectors would not have been as simple or obvious as Polygroup suggests.

Polygroup argues that any necessary design changes would have been within the skill of an ordinary artisan, but it offers little concrete evidence to support that assertion. Its own expert, Dr. John Martens, did not directly address the impact of removing the GKI tree's alignment feature or provide any detailed explanation of how the connector housings could have been modified. The jury was not required to accept Polygroup's conclusory argument that the changes would have been easy or obvious, particularly in light of Dr. Dickens' more specific testimony to the contrary.

Viewing the record in the light most favorable to Willis Electric, the Court finds that substantial evidence supports the jury's presumed factual finding that a skilled artisan would not have been motivated to combine the prior art in the manner claimed. While a factfinder could perhaps have reached the opposite conclusion, it is not the Court's role to reweigh the evidence or second-guess the jury's determination. The motivation to combine is a factual issue best left to the jury where, as here, it is supported by substantial evidence. *See id.* at 1357.

**2. Secondary Considerations**

Secondary considerations of non-obviousness must be considered as part of the overall obviousness analysis, not merely as rebuttal evidence. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1076-77 (Fed. Cir. 2012) (rejecting a formal burden-shifting framework that would consider objective

evidence only after a prima facie obviousness showing). Courts should exercise care in assessing such evidence, considering whether the objective indicia are attributable to the inventive characteristics of the claimed invention. *See id.* at 1079 n.6 (noting that courts must give such evidence weight when attributable to the inventive characteristics). The patentee bears the burden of producing evidence sufficient to establish the requisite nexus. *GrafTech Int'l Holdings, Inc. v. Laird Techs. Inc.*, 652 F. App'x 973, 979 (Fed. Cir. 2016).

The Court finds that Willis Electric's secondary considerations evidence is entitled to little weight because it fails to establish a nexus to the novel features of claim 15. Willis Electric relies primarily on the commercial success of its One Plug trees, contending that they garnered higher profits and replaced sales of non-One Plug trees. But not all One Plug trees practiced claim 15—some used non-coaxial connectors. The commercial success of One Plug trees in general says little about the non-obviousness of claim 15's specific coaxial connector limitations.

The same flaw undermines Willis Electric's evidence of industry praise and copying. The Lowe's representative praised the One Plug design in general terms, not the coaxial connectors in particular. And while Willis Electric argues that Polygroup and others copied its patented design after seeing the One Plug tree's success, it offers no evidence tying that alleged copying to claim 15's novel features. At most, the evidence suggests that others sought to emulate the unpatented concept of an internally-powered tree, which cannot support non-obviousness.

Willis Electric also cites no evidence that the use of coaxial connectors in artificial trees produced any unexpected results. The purported benefits of such connectors were already known in the art.

In sum, Willis Electric's secondary considerations evidence is largely disconnected from the features that differentiate claim 15 from the prior art. Without a clear nexus to the merits of the claimed invention—as opposed to other, unrecited features—this evidence cannot support a finding of non-obviousness. *See MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1264-65 (Fed. Cir. 2013).

**3. Conclusion on Obviousness**

This is a close case, as evidenced by the parties' competing arguments and expert testimony. Ultimately, however, the Court cannot conclude that Polygroup has met its high burden of establishing obviousness as a matter of law.

The key issue is whether modifying the GKI tree to use coaxial connectors would have been obvious to a skilled artisan. While there are reasons to think it might have been—given the known use of such connectors with LED lights—there is also substantial evidence cutting the other way. Dr. Dickens' cogently explained why adapting the GKI tree's specific design to use coaxial connectors would not have been as straightforward as Polygroup suggests, due to the need to eliminate the existing alignment feature and extensively redesign the connector housings. The jury was entitled to credit this testimony and find it more persuasive than Polygroup's less detailed assertions to the contrary.

The Court is mindful that it must view the evidence in the light most favorable to Willis Electric and resist the temptation to substitute its own judgment for that of the jury.

Where, as here, there is substantial evidence to support the jury's implied findings on the factual aspects of obviousness, the Court may not overturn its ultimate legal conclusion lightly. *See Kinetic Concepts*, 688 F.3d at 1356-57.

The secondary considerations do not alter this conclusion. As discussed above, Willis Electric's evidence lacks a clear nexus to the novel features of claim 15 and is therefore entitled to little weight. This weak, tangentially relevant evidence cannot overcome the jury's presumed finding that Polygroup failed to make a sufficient prima facie obviousness case.

In sum, the Court finds that Polygroup has not met its burden of demonstrating obviousness as a matter of law. Substantial evidence supports the jury's verdict when the record is viewed in the light most favorable to Willis Electric. The Court therefore denies Polygroup's renewed motion for judgment as a matter of law on obviousness.

**B. Invalidity – New Trial**

Under Rule 59, the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Grounds for a new trial include when the verdict is against the weight of the evidence, damages are excessive, the trial was unfair, or prejudicial error was committed. *EcoFactor, Inc. v. Google LLC*, 2023-1101, 2024 WL 2807318, at *4 (Fed. Cir. June 3, 2024). A new trial should be granted "only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." *Rush v. Smith*, 56 F.3d 918, 922 (8th Cir. 1995) (citing *Fleming v. Harris*, 39 F.3d 905, 908 (8th Cir. 1994)).

**1. Imbalanced Presentation of Prosecution History**

Polygroup argues that a new trial is warranted because Willis Electric presented evidence and argument about the '186 Patent's prosecution history that was prejudicially imbalanced. It contends that Willis Electric was permitted to argue that the asserted prior art was merely cumulative of what the United States Patent and Trademark Office ("Patent Office") had already considered, while Polygroup was improperly restricted in its efforts to rebut those arguments by delving into the details of the prosecution history. Polygroup claims this unfairly suggested to the jury that the Patent Office's conclusions deserved deference and that a higher burden of proof applied.

Willis Electric responds that the Court properly allowed it to present evidence of the prior art's purported cumulativeness, including through cross-examination of Polygroup's expert, Dr. Martens. It argues that Polygroup had ample opportunity to explore the prosecution history and explain any differences between the prior art and the references before the Patent Office. Willis Electric contends that the Court did not abuse its discretion by excluding minute details about the prosecution of unasserted claims, which could have confused the jury.

Upon review of the arguments presented, the Court finds no basis for a new trial on this ground. Polygroup opened the door to evidence about the prosecution history by relying on prior art references that were similar to those the Patent Office had already considered. This made the question of cumulativeness relevant to the weight and credibility of Polygroup's invalidity case. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 111 (2011) (jury may consider whether evidence of invalidity is materially new and give it more weight if so). While the Court limited the depth of this inquiry to avoid

Case: 24-2143 Document: 12 Page: 95 Filed: 09/20/2024

confusion and waste of time, it did not preclude Polygroup from presenting its side of the story. The record shows that Polygroup's counsel cross-examined Willis Electric's expert and sought to elicit testimony supporting its position that the GKI tree was materially different from anything before the Patent Office. That the jury ultimately found Willis Electric's evidence more persuasive does not mean the trial was unfairly imbalanced.

Nor did the Court's evidentiary rulings prejudicially suggest that a higher burden of proof applied or that the jury should defer to the Patent Office's conclusions. The jury was properly instructed on the presumption of validity and the clear and convincing evidence standard. *See* 35 U.S.C. § 282(a); *Microsoft*, 564 U.S. at 95. It was also instructed that it must decide the question of obviousness for itself, based on the evidence presented at trial. Polygroup cites no legal authority suggesting that a patentee is barred from arguing that the prior art mirrors the prosecution history, so long as the jury is properly instructed on the burden of proof.

In sum, the Court finds no abuse of discretion or legal error in its evidentiary rulings that would warrant a new trial on obviousness. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014) (evidentiary rulings reviewed for abuse of discretion). Polygroup had a fair opportunity to present its invalidity case and rebut Willis Electric's evidence within the proper scope of the issues for trial. The jury was correctly instructed on the law and was not misled about the burden of proof or the weight to give the Patent Office's conclusions.

**2. Prejudicial Arguments by Willis Electric**

Polygroup next contends that Willis Electric's obviousness arguments at trial were improper and prejudicial. It points to statements in Willis Electric's opening and closing arguments suggesting that the Patent Office had "gold plated" the '186 Patent and that Polygroup would need to prove invalidity to a virtual certainty.

Willis Electric responds that its arguments were not improper when viewed in context. It notes that the "gold plated" comment was isolated and that it never argued for a "beyond a reasonable doubt" standard. Willis Electric contends that the Court properly instructed the jury on the law and that Polygroup waived any objection to counsel's arguments by failing to raise them at trial.

Upon review of the arguments and evidence presented, the Court finds that Polygroup has not shown grounds for a new trial. The passing "gold plated" reference was not literally true but was unlikely to have misled the jury in light of the correct legal instructions it received. Similarly, while Willis Electric's burden of proof analogy was inapt, its actual argument was that Polygroup's burden was "just short of" the reasonable doubt standard, which is not a material misstatement of the law. Viewed in context, these isolated comments did not so permeate the proceedings with prejudice as to deprive Polygroup of a fair trial. *See Selective Ins. Co. of Am. v. Heritage Constr. Co., LLC*, No. 19-3174, 2024 WL 2728073, at *5 (D. Minn. May 28, 2024) (finding that the Heritage Parties' problematic statements were insufficient to warrant a new trial) (citing *Celltrust Corp. v. Ionlake, LLC*, No. 19-2855, 2023 WL 8448792, at *6-7 (D. Minn. Dec. 6, 2023) (holding that isolated statements, even if uncured, would not have changed the outcome or resulted in a miscarriage of justice).

Case: 24-2148 Document: 12 Page: 97 Filed: 09/20/2024

Moreover, Polygroup did not object to these arguments at trial, which indicates that the error was not so prejudicial as to require a new trial. *See Billingsley v. City of Omaha*, 277 F.3d 990, 997 (8th Cir. 2002). The lack of any contemporaneous objection limited the Court's ability to evaluate the potential prejudice and intervene if necessary. While the Court has discretion to grant a new trial even for unpreserved errors in extreme cases, this is not such a case. Polygroup's post-hoc complaints are insufficient to show that the fairness of the trial was undermined or that a new trial is required to prevent a miscarriage of justice.

**3. Objections and Preservation of Error**

Finally, Willis Electric argues that Polygroup failed to preserve any objection to the Court's evidentiary rulings or the scope of evidence presented on obviousness. It contends that Polygroup was required to object to the Court's pretrial orders and jury instructions to preserve these issues for a new trial motion.

The Court finds it unnecessary to resolve this preservation issue because, as explained above, Polygroup's new trial arguments fail on the merits. Polygroup has not shown that the Court's evidentiary rulings were an abuse of discretion or that any legal error in the presentation of obviousness evidence prejudiced its substantial rights. The complained-of errors, to the extent they occurred at all, were not so severe as to warrant a new trial even under a plain error standard. *See Selective Ins.*, 2024 WL 2728073, at *5.

**4. Conclusion on New Trial for Invalidity**

Polygroup has not established that the Court's evidentiary rulings on obviousness resulted in an unfairly imbalanced or prejudicial presentation of the issues to the jury. The

Court did not improperly restrict Polygroup's ability to present its invalidity case or rebut Willis Electric's evidence on the prior art and prosecution history. Nor did Willis Electric's arguments at trial so infect the proceedings with unfairness as to require a new trial. The jury was correctly instructed on the law and was not misled about the burden of proof or the deference owed to the Patent Office.

At its core, Polygroup received a fair trial on obviousness in which the jury simply found Willis Electric's evidence and arguments more persuasive. That is not grounds for a do-over. The Court therefore denies Polygroup's alternative motion for a new trial on invalidity.

**C. Infringement**

To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents. *See Seal-Flex, Inc. v. Athletic Track & Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999). Claim construction is a question of law for the Court, while infringement is a question of fact for the jury. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). On a post-trial motion for judgment as a matter of law, the Court must view the evidence in the light most favorable to the non-moving party and may grant the motion only if there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. *See* Fed. R. Civ. P. 50; *Reeves*, 530 U.S. at 150-51.

**1. Claim Construction Disputes**

The parties dispute the proper construction of two claim limitations relevant to infringement: the "independent of" limitation and the "coupling" limitation.

**a. "Independent of" Limitation**

The asserted claim requires "the electrical connection being made independent of the rotational orientation of the first trunk portion relative the second trunk portion." The Court construed this term to mean "an electrical connection that can be made at any available arrangement of the first tree/trunk portion relative to the second tree/trunk portion about a common vertical axis between the tree-trunk portions."

Polygroup argues that the Court should reconsider its construction and adopt Polygroup's original proposal that the term requires maintaining an electrical connection while the trunk portions are rotated. It contends that this is required by the plain claim language and that Willis Electric's expert applied the Court's construction incorrectly.

Willis Electric responds that the Court properly rejected Polygroup's construction because it improperly imports limitations from the specification into the claims. It argues that Polygroup waived any objection to the Court's construction by not objecting to the jury instructions.

Upon review, the Court finds no basis to alter its claim construction ruling. The Court carefully considered the parties' competing constructions and found that Polygroup's proposal departed from the plain and ordinary meaning of the claim language by adding a requirement of maintaining the electrical connection during rotation. The Court's construction properly focused on the ability to make an electrical connection at multiple rotational positions, without requiring the connection to be maintained while rotating between those positions. Polygroup identifies no new evidence or arguments warranting reconsideration of this ruling.

Polygroup's objection to Willis Electric's application of the Court's construction also lacks merit. Contrary to Polygroup's assertion, Dr. Dickens did not treat the claim language as a meaningless tautology but explained how it describes a specific type of connector allowing for rotationally independent electrical connection. The jury was entitled to credit this testimony as consistent with the Court's construction.

Finally, Polygroup was required to raise any objection to the Court's claim construction and its application in the jury instructions before the jury retired. By failing to do so, Polygroup waived these arguments for purposes of JMOL and a new trial. *See* Fed. R. Civ. P. 51(c); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1308 (Fed. Cir. 2002).

**b. "Coupling" Limitation**

The asserted claim also requires "coupling a lower end of the second trunk body to an upper end of the first trunk body along a common vertical axis." The Court found that this term should be given its plain and ordinary meaning and that no further construction was required.

Polygroup argues that the Court should adopt its originally proposed construction that coupling requires securely attaching the ends such that they are in physical contact with each other. It contends that Willis Electric's expert and fact witnesses admitted that such direct physical contact does not occur in the accused products.

Willis Electric responds that the Court properly rejected Polygroup's narrow construction because "coupling" does not require direct contact between the trunk ends themselves but may be accomplished through intermediate components that connect them.

It argues that Polygroup identifies no authority requiring reconsideration of the Court's ruling.

Upon further review, the Court finds no reason to depart from its previous claim construction. As the Court previously explained, the claim language does not limit coupling to direct physical contact between the trunk ends but allows for the possibility that other components such as a connector assembly could be involved. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (courts should not limit claims to preferred embodiment absent clear disclaimer). The specification discloses embodiments using connectors between trunk portions and does not clearly disclaim or limit the ordinary meaning of coupling. Polygroup's arguments for a narrower construction are no more persuasive now than they were at the Markman stage. *See Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1364-65 (Fed. Cir. 2015).

The fact that some of Willis Electric's witnesses may have described the trunk ends as not directly contacting each other is immaterial, as the Court's construction does not require direct contact. Under the plain and ordinary meaning, a reasonable jury could find that the trunk ends are "coupled" with the assistance of intervening connector assemblies, even if not directly touching each other. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (affirming that it is up to the jury to determine infringement based on the plain and ordinary meaning of claim terms, without importing additional limitations into the claims).

**2. Application of Constructions to Accused Products**

Applying the Court's claim constructions, the Court finds that substantial evidence supports the jury's infringement verdict. Willis Electric's expert, Dr. Dickens, provided a detailed, limitation-by-limitation analysis of how the accused products meet each element of the asserted claim, including the "independent of" and "coupling" limitations as the Court construed them.

On the "independent of" limitation, Dr. Dickens explained that the accused products have coaxial connectors allowing the trunk portions to be electrically connected at multiple rotational positions. Additionally, Mr. Alan Leung, Polygroup's engineer, testified that the "clutch" or "fin" features of the connectors were irrelevant to infringement of the patent. This testimony further supports a finding that the accused products meet the "independent of" limitation under the Court's construction.

On the "coupling" limitation, Dr. Dickens testified that the accused products couple the trunk end bodies together as required by the claim, even if the trunk ends do not directly contact each other. He explained that the coupling is accomplished by connector assemblies residing partially inside the trunk ends. This fits within the plain meaning of coupling the trunk ends.

In response, Polygroup largely relies on attorney argument and a few snippets of cross-examination testimony that are taken out of context or fail to grapple with the Court's construction. For example, Polygroup cites testimony by its expert witness, Dr. Martens, that the trunk ends are separated by an intentional gap in the accused products. But as explained above, direct contact is not required under the plain meaning of "coupling," so the existence of a gap is not dispositive.

Polygroup's reliance on Dr. Martens' expert testimony carries little weight in view of Dr. Dickens' detailed infringement analysis. The jury was entitled to credit Dr. Dickens' testimony over that of Dr. Martens, who simply assumed that coupling required direct contact without analyzing the Court's construction. It is not the Court's role on JMOL to re-weigh the competing expert testimony or make credibility determinations. *Reeves*, 530 U.S. at 150-51.

In sum, when the evidence is viewed in the light most favorable to Willis Electric, the Court finds that substantial evidence supports the jury's verdict that the accused products literally infringe the asserted claim as the Court construed it. Polygroup's contrary arguments are based on an unduly narrow view of the Court's construction and impermissible credibility judgments that the Court may not make. The Court therefore rejects Polygroup's arguments for JMOL of non-infringement.

### 3. Direct and Indirect Infringement by Polygroup Macau

Polygroup briefly argues that Polygroup Macau cannot be liable for infringement because it is a mere holding company that does not make, sell, or import the accused products. However, Willis Electric presented substantial evidence from which a reasonable jury could conclude that Polygroup Macau was involved in the infringing activities, either directly or indirectly.

Polygroup's Chairman, Mr. Lewis Cheng, testified that "Polygroup is a group of companies that designs, manufactures and sells seasonal Christmas products," suggesting that all defendants are involved in the production and sale of the accused trees. Similarly, the CEO, Mr. Elmer Cheng, testified that "[t]he defendants' trees are sold" by retailers in

the U.S. Viewed in the light most favorable to Willis Electric, these statements support a finding that Polygroup Macau was engaged in selling the accused products as part of the unified Polygroup enterprise.

Moreover, even if Polygroup Macau did not directly sell the accused products, a jury could reasonably find it liable for indirect infringement. The evidence showed that Polygroup is a web of closely related companies all owned and controlled by the same small group of family members. The management of all defendants overlapped, and executives were well aware of the operational activities and importation of accused products for sale in the U.S.—the source of Polygroup's revenue.

Importantly, the jury also heard that the Polygroup executive leadership was aware of the '186 Patent and Willis Electric's infringement allegations, yet continued to sell the accused products. From this evidence, a reasonable jury could infer that even if Polygroup Macau did not directly sell the accused products, it induced other Polygroup entities and customers to engage in infringing sales that it knew were infringing. *See Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379-80 (Fed. Cir. 2017) (defendant's knowledge of the patent and assistance in installing infringing product was sufficient to plausibly support liability for induced infringement).

Polygroup cites no contrary evidence that compels a different conclusion as a matter of law. Instead, it argues only that one Polygroup employee gave contradictory testimony about Polygroup Macau's status as a holding company. But assessing witness credibility and resolving conflicts in testimony are quintessential jury functions that the Court may not usurp on JMOL. *Reeves*, 530 U.S. at 151. The jury was not required to credit the

description of Polygroup Macau as a mere holding company, particularly given the evidence of its involvement in the larger Polygroup enterprise. Drawing all reasonable inferences in favor of Willis Electric, the Court cannot say that a reasonable jury would have lacked a legally sufficient basis to find Polygroup Macau liable for at least indirect infringement.

#### 4. Conclusion on Non-Infringement

Viewing the trial evidence in the light most favorable to Willis Electric, the Court finds that substantial evidence supports the jury's verdict that all of the accused Polygroup products and entities infringe the '186 Patent. Willis Electric's expert provided a detailed infringement analysis applying the Court's claim constructions to the accused products. The jury was entitled to credit this testimony over Polygroup's contrary evidence and attorney arguments. Polygroup's motion for JMOL of non-infringement is denied.

### D. Damages

A patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty . . . ." 35 U.S.C. § 284. A reasonable royalty is defined as the amount that the patentee and the infringer would have agreed upon at a hypothetical negotiation just before infringement began. *See Lucent, Inc.*, 580 F.3d at 1324. The patentee bears the burden of proving damages by a preponderance of the evidence. *Id.*

When a patentee seeks damages based on an infringer's sales of multi-component products, it must apportion damages to reflect only the value attributable to the patented feature. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

Apportionment can be addressed through proper claim construction, the royalty base, the royalty rate, or a combination thereof. *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018).

**1. Apportionment**

Polygroup argues that Willis Electric's damages expert, Ms. Michele Riley, failed to properly apportion damages to the value of the patented feature—the coaxial connectors—as opposed to unpatented features of the accused artificial trees. It contends that Ms. Riley improperly used the entire value of the accused trees as her royalty base without accounting for the trees' many unpatented features. Polygroup also argues that Ms. Riley erred by comparing profits on trees with and without the One Plug feature because not all One Plug trees are covered by the asserted claim.

Willis Electric responds that Ms. Riley performed a proper apportionment analysis under the governing principles. It argues that she apportioned the value of the patented feature through both an "income approach" comparing profitability of patented and unpatented trees, and a "market approach" analyzing comparable license agreements. Willis Electric contends that Ms. Riley did not use the entire market value of the accused trees but properly isolated the incremental profit premium attributable to the patented feature.

**a. Willis Electric's Expert's Approach**

Ms. Riley performed an income-based apportionment comparing the profits of Willis Electric's patented One Plug trees to unpatented trees without the One Plug feature. She also compared the profit premium of Polygroup's allegedly infringing Quick Connect

trees to its non-Quick Connect trees. Mr. Riley further accounted for apportionment in her "market approach" by considering the royalty rates in what she deemed comparable license agreements.

Polygroup argues that Ms. Riley's analysis is flawed because she assumed all One Plug trees were covered by the asserted claim, when in fact many were not. But Ms. Riley was not required to dissect profits on a claim-by-claim basis. She properly focused on the profits attributable to the One Plug feature that embodies the patented coaxial connector technology. *See id.* at 1348 (apportionment may consider value added by the patented invention as a whole, not just the inventive features, in comparison to the conventional features recited in the patent claim).

Ms. Riley's market-based approach also accounts for apportionment by considering the royalty rates in purportedly comparable licenses, which necessarily reflect the market value of the licensed technology. While the Court has some doubts about the comparability of the licenses that Ms. Riley considered (as discussed below), her general approach of using comparable licenses to frame a reasonable royalty is widely accepted and presumed to incorporate apportionment. *See Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303-04 (Fed. Cir. 2015).

Importantly, Ms. Riley did not simply apply an unapportioned royalty rate to the entire value of the accused trees. *Cf. Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-20 (Fed. Cir. 2011) (rejecting patentee's use of 25% "rule of thumb" without tying royalty to incremental value of patented feature). Instead, she used the comparable licenses

to inform her analysis of the profits attributable to the patented technology—a form of indirect or "built-in" apportionment. *See Commonwealth*, 809 F.3d at 1303-04.

**b. Conclusion on Apportionment**

In sum, while not perfect, Ms. Riley's income- and market-based approaches reflect a serious effort to apportion the value of the patented technology and thus satisfy the basic requirements for reliability. The factual disputes and methodological critiques raised by Polygroup go to the weight of her testimony, not its admissibility or legal sufficiency. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (noting defendants' quarrels with expert's damages analysis go to the weight of her testimony, not its admissibility). The Court cannot conclude that Ms. Riley's analysis is so fundamentally flawed as to provide no reasonable basis for the jury's award.

**2. Comparable Licenses**

**a. Accounting for Differences**

Polygroup next argues that Ms. Riley's damages analysis improperly relied on non-comparable license agreements without accounting for key economic and technological differences between those agreements and the hypothetical negotiation in this case. It contends that the H.S. Craft license covered six different patents beyond the one at issue here, yet Ms. Riley failed to explain how this affected her analysis. Polygroup also argues that Ms. Riley made no serious effort to account for differences between the various lump-sum and running-royalty licenses she considered.

Willis Electric responds that the degree of comparability between license agreements is a factual issue properly resolved by the jury. It contends that Ms. Riley's

testimony and other record evidence sufficiently explained the similarities and differences between the licenses she considered and the hypothetical negotiation. Willis Electric argues that Polygroup had a full opportunity to cross-examine Ms. Riley and present contrary evidence on the comparability of the licenses.

**b. Specific Licenses Relied Upon**

The most significant license Ms. Riley relied on was Willis Electric's agreement with H.S. Craft, which granted rights to the '186 Patent along with several others. Ms. Riley acknowledged that this broad license was "a little bit different" from a hypothetical license to only the '186 Patent.

Polygroup is correct that Ms. Riley did little to address how the inclusion of additional patents in the H.S. Craft license affected its comparability to the hypothetical negotiation. An expert must generally account for "distinguishing facts" between actual licenses and the hypothetical negotiation. *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320-22 (Fed. Cir. 2010). Here, however, the H.S. Craft license was not the sole basis for Ms. Riley's opinion and would not have resulted in a materially different royalty even if she had assigned the '186 Patent only a fraction of the $2 rate.

Ms. Riley also considered several other licenses and business agreements, including Willis Electric's licenses of related technology with GKI and Boston Warehouse, and Polygroup's own agreements with Loominocity and others. While these agreements dealt with artificial tree technology generally, they did not specifically cover the '186 Patent. Ms. Riley thus had to draw inferences about how similar the licensed technology was to the hypothetical negotiation. Her testimony could have provided a more fulsome

explanation of why she viewed these licenses as comparable, but the failure to do so in this case was not so egregious as to invalidate her analysis entirely. *See ActiveVideo*, 694 F.3d at 1333 (holding that courts may allow expert damages testimony even if there are disagreements regarding the degree of comparability of license agreements relied upon or the expert's methodology, as such issues go to the weight of the testimony rather than admissibility).

Importantly, Polygroup had a full and fair opportunity to cross-examine Ms. Riley about the differences between the licenses she considered and the technology at issue. The jury also heard testimony from Polygroup's own expert, Ms. Julie Davis, critiquing Ms. Riley's choice of licenses and her failure to make certain adjustments. The proper vehicle to challenge the comparability of licenses relied on by a damages expert is through cross-examination and the presentation of contrary evidence, not exclusion. *Id.* Polygroup availed itself of that opportunity here.

**c. Conclusion on Comparable Licenses**

The degree of comparability between license agreements and the hypothetical negotiation is a factual issue best resolved by the jury. *See Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). Where, as here, the patentee's expert provides some explanation of why she viewed certain licenses as comparable, and the accused infringer has an opportunity to challenge that testimony through cross-examination and contrary evidence, the jury's damages award should not be disturbed simply because it rests in part on licenses that are not perfectly analogous. *See id.*; *ActiveVideo*, 694 F.3d at 1333. The Court cannot say that Ms. Riley's consideration of the H.S. Craft license and other

agreements as guideposts for the hypothetical negotiation was so unreliable or prejudicial as to render the damages verdict improper.

**3. Other Damages Issues**

**a. Disgorgement of Profits**

Polygroup briefly argues that the jury's award of $4 per unit amounts to an impermissible disgorgement of profits rather than a reasonable royalty. It contends this rate would have left Polygroup with no profit on the accused products.

The Court disagrees. Ms. Riley expressly testified that she was offering an opinion on a reasonable royalty, not lost profits or disgorgement. She properly focused on the anticipated profitability and value of the patented technology that the parties would have considered at the hypothetical negotiation. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001). While she noted Polygroup's purported profits as one data point, her opinion was not tied to or limited by those profits.

Moreover, the Federal Circuit has repeatedly held that the law does not require that an infringer be permitted to make a profit. *See, e.g.*, *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989). A reasonable royalty may exceed the infringer's actual profits without being improper, as it is based on the parties' expectations at the time of the hypothetical negotiation, not an after-the-fact accounting. *See Interactive Pictures*, 274 F.3d at 1385. The Court cannot conclude that the jury's choice of a $4 per unit royalty improperly equates to a disgorgement of profits rather than a reasonable royalty.

**b. Marking and Date of First Infringement**

Polygroup next argues that Willis Electric failed to comply with the marking statute, 35 U.S.C. § 287, and thus cannot recover damages before the date it provided actual notice of infringement on July 25, 2014. It contends that Willis Electric presented insufficient evidence of consistently and continuously marking its products with the ’186 Patent number.

The Court again disagrees. Willis Electric presented undisputed testimony from its CEO, Mr. Johnny Chen, that it began marking its patented products with the ’186 Patent number as soon as the patent issued in June 2013. Mr. Chen explained that Willis Electric marked both the product packaging and the trunk components themselves with the patent number. Willis Electric also presented several physical exhibits corroborating Mr. Chen’s testimony, including example product labels and a diagram showing where the company marked various components of its artificial trees. Even Polygroup’s counsel conceded that “I don’t think there is contrary evidence.”

Given this largely unrebutted evidence of substantial compliance with the marking statute, the Court finds no clear error in allowing the jury to award damages beginning on the date of the ’186 Patent’s issuance in June 2013. While Polygroup argues that Willis Electric’s evidence was insufficiently detailed, it points to no contrary evidence that Willis Electric actually failed to mark a significant number of products after June 2013. Polygroup also failed to raise any specific objection to Willis Electric’s marking evidence at trial. Under these circumstances, the Court cannot say that the jury’s implicit finding that Willis Electric complied with Section 287 is unsupported by substantial evidence. *See*

*Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373-74 (Fed. Cir. 2010) (compliance with marking statute is a question of fact).

### c. Prejudicial Statements by Willis Electric in Trial

Finally, Polygroup argues that Willis Electric's counsel made several prejudicial and inflammatory statements that incited the jury to award excessive damages based on improper considerations. It points to repeated references to Polygroup's status as a Chinese company and accusations that it was playing litigation "shell games."

While some of Willis Electric's counsel's comments, such as references to Polygroup's nationality and insinuations about its business practices, could be viewed as potentially problematic, the Court need not make a definitive ruling on their propriety. Importantly, Polygroup did not raise any contemporaneous objections to these statements at trial, and the comments do not ultimately affect the validity of the verdict. "A failure to object to statements made during closing argument waives such an objection." *Billingsley*, 277 F.3d at 997. The lack of any objections suggests that Polygroup did not view the comments as sufficiently prejudicial in context to warrant a new trial. *See Innovation Scis., LLC v. Amazon.com, Inc.*, 2021-2111, 2022 WL 2824675, at *3 (Fed. Cir. July 20, 2022) (citing *Novo Nordisk A/S v. Becton Dickinson & Co.*, 304 F.3d 1216, 1220 (Fed. Cir. 2002) ("[C]ounsel . . . cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were prejudicial." (citation omitted))), *cert. denied*, 143 S. Ct. 779 (2023).

Moreover, the Court instructed the jury at the outset of trial that counsel's statements were not evidence and again in the final instructions that the jury must not be influenced

by any improper considerations or biases. "Jurors are presumed to follow the court's instructions." *Farrington v. Smith*, 707 F.3d 963, 972 (8th Cir. 2013) (quoting *United States v. Patterson*, 684 F.3d 794, 799 (8th Cir. 2012). Polygroup offers no concrete evidence that the jury disregarded these instructions or that its damages verdict was actually influenced by Willis Electric's improper comments. The size of the award alone does not demonstrate that the jury acted out of passion or prejudice rather than based on the evidence presented. *See Taken Alive v. Litzau*, 551 F.2d 196, 198 (8th Cir. 1977).

While some of Willis Electric's counsel's comments could be viewed as potentially problematic, Polygroup points to only a handful of such instances in the context of a two-week trial. These isolated statements, while improper, were not so egregious or pervasive as to infect the entire trial with unfairness or mislead the jury into basing its damages award on inappropriate factors. *See I-Sys., Inc. v. Softwares, Inc.*, No. 02-1951 (JRT/FLN), 2005 WL 1430323, at *8 (D. Minn. Mar. 7, 2005) (*cf. Morrissey v. Welsh Co.*, 821 F.2d 1294, 1304 (8th Cir.1987) (holding that a new trial was necessary where counsel's improper statements, viewed collectively, were sufficiently inflammatory and prejudicial to undermine the fairness of the trial and the reliability of the verdict)). Viewing the record as a whole, the Court cannot say that these comments alone warrant overturning the jury's damages verdict.

**d. Conclusion on Damages**

Ultimately, while Polygroup has identified various potential flaws and weaknesses in Willis Electric's damages case, the Court cannot conclude that these defects are so severe as to render the jury's award unsupported by substantial evidence or infected by prejudicial

error. Ms. Riley's damages opinion, while not bulletproof, incorporated reliable apportionment methodologies and was grounded in sufficiently comparable licenses and financial data to provide a reasonable basis for the jury's award. The jury's decision to credit her testimony over Polygroup's expert and other contrary evidence was within its proper fact-finding role and does not warrant overturning the verdict.

Polygroup's arguments about non-compliance with the marking statute and prejudicial statements by Willis Electric's counsel are also unavailing. The Court finds no clear error in the jury's presumed finding that Willis Electric complied with the marking statute as of June 2013, given the largely unrebutted evidence on that issue. And while some of Willis Electric's counsel's comments were improper, they were not so pervasive or prejudicial in context as to warrant a new trial, particularly given Polygroup's failure to raise any objections at the time.

In sum, the Court cannot say that the damages verdict is clearly not supported by the evidence or that it shocks the conscience. *See Taken Alive*, 551 F.2d at 198 (stating the court will overturn a damages verdict "only in those rare situations where [the Court is] pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result" (citation omitted)). Nor has Polygroup shown that any evidentiary errors or misconduct at trial had "substantially influence[d] the jury's verdict." *See Thapa v. St. Cloud Orthopedic Associates, Ltd.*, No. 19-2568 (TNL), 2023 WL 7039651, at *5 (D. Minn. Oct. 26, 2023). Accordingly, the Court denies Polygroup's motion for a new trial or remittitur on damages. The jury's damages award is supported by substantial evidence and will not be disturbed.

**F. Conclusion**

Polygroup has moved for judgment as a matter of law, a new trial, or remittitur on issues of patent invalidity, infringement, willfulness, and damages following a jury trial. The Court must view the evidence in the light most favorable to Willis Electric and may only grant judgment as a matter of law if no reasonable jury could have reached the verdicts on these issues. *See Reeves*, 530 U.S. at 150-51. A new trial is only warranted if the verdict is against the great weight of the evidence or to prevent a miscarriage of justice. *Leader Techs.*, 678 F.3d at 1305. And remittitur is only appropriate if the damages award is clearly not supported by the evidence or shocks the conscience. *See Triton Corp. v. Hardrives, Inc.*, 85 F.3d 343, 347 (8th Cir. 1996).

**1. JMOL**

On invalidity, the Court concludes that substantial evidence supports the jury's verdict that Polygroup failed to prove obviousness by clear and convincing evidence. While there are certainly similarities and overlapping elements between the asserted claim and the prior art, the jury reasonably credited Willis Electric's expert testimony on the differences between the prior art and the claimed invention, as well as the existence of secondary considerations supporting non-obviousness. The Court cannot say that the evidence points so overwhelmingly in Polygroup's favor that no reasonable jury could have reached the verdict here.

On infringement, the Court again finds that substantial evidence supports the jury's verdict that Polygroup's accused products meet all elements of the asserted claim, as properly construed. Willis Electric's expert provided a detailed, limitation-by-limitation analysis applying the Court's constructions. Polygroup's contrary arguments rest on an

overly narrow view of those constructions that the Court has already rejected. Viewed in the light most favorable to Willis Electric, the evidence is not so one-sided as to require overturning the infringement verdict.

On willfulness, the Court concludes that substantial evidence supports the jury's finding that Polygroup's infringement was willful. The record contains evidence that Polygroup knew about the '186 Patent, had concerns about infringement, but continued to sell the accused products anyway without developing or memorializing any good-faith non-infringement positions. While Polygroup presented some evidence of its engineers' beliefs about non-infringement, the jury was entitled to disbelieve or discount that testimony in light of the other evidence of Polygroup's conduct. The willfulness verdict is not unreasonable on this record.

On damages, the Court finds that the $4 per unit royalty awarded by the jury is supported by substantial evidence in the form of Willis Electric's expert testimony and the comparable licenses she analyzed. While Polygroup has identified arguably valid critiques of that testimony and evidence, the proper recourse for such weaknesses was through cross-examination and contrary evidence, not JMOL. Viewed in the light most favorable to Willis Electric, the damages evidence is not so sparse or speculative as to render the jury's award improper as a matter of law.

For these reasons, the Court denies Polygroup's renewed motion for judgment as a matter of law on invalidity, infringement, willfulness, and damages.

### 2. New Trial

As for Polygroup's alternative request for a new trial, the Court again finds no grounds to disturb the jury's verdicts.

On invalidity, Polygroup has not shown that the Court's evidentiary rulings restricting the depth of the parties' presentations on the '186 Patent's prosecution history resulted in any unfair prejudice or miscarriage of justice. Both sides had an adequate opportunity to present their key evidence and arguments on obviousness within the proper scope of the issues for trial. Nor did the Court's rulings or Willis Electric's arguments improperly suggest that a higher burden of proof applied.

On infringement, Polygroup largely relies on an incorrect claim construction position that the Court has already considered and rejected, both at the Markman stage and in the jury instructions. No new trial is warranted based on these arguments.

On damages, while Polygroup has raised valid questions about the degree of apportionment and comparability of licenses in Willis Electric's expert's analysis, these are factual matters that were properly left to the jury. The arguments raised by Polygroup go to the weight and credibility of the expert testimony, not its fundamental admissibility or legal sufficiency. The Court cannot say that the jury's damages award is so excessive or shocking as to require a new trial.

The Court also finds that Polygroup has not shown sufficient prejudice from any of Willis Electric's counsel's challenged comments to justify a new trial. The comments were isolated rather than pervasive, and the jury was properly instructed not to base its decision on improper factors. Polygroup's failure to raise contemporaneous objections to most of the comments further undercuts its claims of incurable prejudice.

Ultimately, this was a hard-fought case with competing evidence on both sides of the key factual issues. The jurors' unanimous verdicts suggest they carefully considered that evidence and found Willis Electric's proofs more persuasive in the end. The Court cannot say that those verdicts are against the clear weight of the evidence, based on erroneous legal principles, or a miscarriage of justice. Accordingly, the Court denies Polygroup's motion for a new trial on invalidity, infringement, willfulness, and damages.

### 3. Remittitur

Finally, the Court finds no basis to remit the jury's damages award. As discussed above, the $4 per unit royalty is supported by substantial evidence in the record, even if that evidence had arguable flaws and was not uncontroverted. The Court cannot say that this award is "clearly not supported by the evidence", exceeds the maximum limit of a reasonable range, or "shocks the conscience." *See Lucent Techs.*, 580 F.3d at 1310; *Hudson v. United Sys. of Ark., Inc.*, 709 F.3d 700, 705 (8th Cir. 2013). The fact that the award is higher than what Polygroup believes is appropriate does not justify substituting the Court's judgment for that of the jury. Accordingly, the Court denies Polygroup's motion for remittitur.

## II. Motion for Attorneys' Fees

Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The Supreme Court has explained that an "'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness,*

*LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.*

Relevant factors for consideration include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). However, no single factor is determinative, and "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 555.

A party need only establish its entitlement to fees under Section 285 by a preponderance of the evidence. *Id.* at 557. And even if a court finds a case to be exceptional, it must still determine whether an award of attorneys' fees is justified under the circumstances. *See Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, 576 F. App'x 1002, 1005 (Fed. Cir. 2014) ("The Supreme Court's decision in *Octane* did not, however, revoke the discretion of a district court to deny fee awards even in exceptional cases.").

While a finding of willful infringement may support a determination that a case is exceptional, it does not require one. *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020). Rather, the willfulness determination is just one factor in the totality-of-the-circumstances analysis. *See Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1375 (Fed. Cir. 2020) ("[T]here is 'no precise rule or formula' for deciding whether a case is 'exceptional.'" (quoting *Octane Fitness*, 572 U.S. at 554)).

CASE 0:15-cv-03443-JNE-DTS Doc. 1041 Filed 06/24/24 Page 36 of 43

### A. "Exceptional Case"

The Court must determine whether this case is "exceptional" under 35 U.S.C. § 285, which would allow for an award of attorneys' fees to Willis Electric as the prevailing party. The Supreme Court has explained that an exceptional case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 572 U.S. at 554. This is a holistic inquiry that requires considering the totality of the circumstances. *Id.*

Willis Electric argues that three factors make this case exceptional: (1) the jury's finding of willful infringement; (2) the purported weakness of Polygroup's litigation positions on infringement, invalidity, and damages; and (3) Polygroup's alleged litigation misconduct. Polygroup responds that the willfulness verdict alone does not make the case exceptional, that its positions were reasonable and non-frivolous, and that it did not engage in any litigation misconduct.

The Court recognizes that the willfulness finding, standing alone, does not require a finding of exceptionality. The Federal Circuit has repeatedly held that "[w]hile willfulness is 'among the reasons that a court may find a case to be exceptional, an attorney fee award is not mandatory when willful infringement has been found.'" *Sionyx*, 981 F.3d at 1355 (citation omitted). Instead, willfulness is just one factor in the totality-of-the-circumstances analysis. *Id.* Here, while the Court upholds the willfulness verdict, other factors weigh against a finding that this case "stands out" from others.

In particular, the Court is not persuaded that Polygroup's litigation positions were so unreasonable or frivolous as to make this case exceptional. Polygroup succeeded in invalidating many of the asserted claims before trial and in obtaining summary judgment of non-infringement on several others. These successes suggest that Polygroup's defenses were not objectively baseless. *See Checkpoint Sys. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017). And while Willis Electric criticizes Polygroup for re-raising certain invalidity arguments rejected in IPR proceedings, Polygroup also relied on prior art, such as the GKI Tree product, that was not before the PTAB. The Court cannot say that Polygroup's invalidity defense, as a whole, was exceptionally meritless.

As for litigation misconduct, the Court concurs with its prior finding, in the context of enhanced damages, that Willis Electric's allegations "do not clearly show extraordinary malfeasance." This case lacks the sort of egregious behavior or "gross injustice" that has supported exceptionality findings based on litigation conduct. *See Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013).

Finally, the Court's denial of enhanced damages further counsels against an exceptional case finding here. The standard for enhanced damages under Section 284 significantly overlaps with the Section 285 inquiry, as both look to the strength of the parties' litigating positions and the reasonableness of the accused infringer's conduct. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1384 (Fed. Cir. 2014). And courts routinely decline to award attorneys' fees where, as here, they have denied enhanced damages. *See, e.g.*, *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1373 (Fed. Cir. 2004); *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). The

Court's determination that this case did not involve "egregious infringement behavior" or "misconduct beyond typical infringement" strongly suggests that it is not "exceptional" under Section 285 either.

In sum, considering the totality of the circumstances, the Court concludes that this case does not "stand out" from other patent infringement disputes in terms of either the strength of Polygroup's litigating position or the manner in which it litigated the case. *See Octane Fitness*, 572 U.S. at 554. Willis Electric's motion for attorneys' fees and costs is therefore denied.

**B. Limits on Any Potential Fee Award**

Even if the Court were to find this case exceptional under Section 285, any award of attorneys' fees would be subject to several important limitations. Polygroup argues that (1) fees must be causally related to the misconduct that renders the case exceptional; (2) fees should be limited to those incurred in connection with the sole claim on which Willis Electric prevailed; (3) expert fees cannot be recovered under Section 285; and (4) a detailed accounting would be necessary to properly apportion fees. Willis Electric does not directly address these limitations in its opening brief, instead stating that it will submit itemized support for its fee request if the Court finds the case exceptional.

The Court notes that any hypothetical fee award would need to be limited in several respects. First, Federal Circuit precedent is clear that Section 285 only allows a prevailing party to recover fees that are causally related to the misconduct that renders the case exceptional. In cases that have been deemed exceptional only in part, the fee award must bear some relation to the extent of the misconduct. *Beckman Instruments, Inc. v. LKB*

*Produkter AB*, 892 F.2d 1547, 1553-54 (Fed. Cir. 1989). "A fee award under § 285 may only 'compensate a party for the extra legal effort to counteract the [] misconduct.'" *Carter v. Alamo Grp., Inc.*, 561 F. App'x 958, 963 (Fed. Cir. 2014) (emphasis omitted) (quoting *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1316 (Fed. Cir. 2012)). Thus, even if the Court found some portion of Polygroup's conduct to be exceptional, Willis Electric could only recover fees specifically traceable to that conduct.

Second, any fee award would need to be apportioned to account for Willis Electric's limited success in this litigation. "The amount of fees awarded to the 'prevailing party' should bear some relation to the extent to which that party actually prevailed." *Beckman Instruments*, 892 F.2d at 1554. Here, Willis Electric's initially asserted over 100 patent claims but ultimately prevailed on only one—claim 15 of the '186 Patent. Under these circumstances, it would be inappropriate to award Willis Electric fees for time spent on claims and issues on which it did not prevail. *See id.* at 1553-54 (stating that fee awards should relate to the extent of actual success); *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 475 (Fed. Cir. 1985) (emphasizing that fee awards in patent cases should be limited to exceptional circumstances and require careful consideration of all relevant factors). Willis Electric's fee request would need to be limited accordingly.

Third, expert fees cannot be recovered under Section 285. *See Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 377 (Fed. Cir. 1994). The Federal Circuit has held that Section 285 does not override the American Rule for expert fees. *Id.* Expert fees exceeding statutory limits are potentially recoverable only under the court's inherent power to sanction in cases involving "fraud or abuse of the judicial process." *Id.* at 378. No such

fraud or abuse findings have been made here. Thus, even if attorneys' fees were awarded under Section 285, expert fees would not be recoverable under that provision, and could only be awarded up to the limits set by 28 U.S.C. § 1821(b) or potentially in full under the court's inherent sanctioning power if fraud or abuse were found.

Finally, the Court concurs that a detailed accounting would be necessary to properly apportion any fee award consistent with the above limitations. Willis Electric's opening brief did not provide the requisite "itemized accounting of the attorneys' fees requested," instead proposing to submit that information only after an exceptional case finding. But without that itemized accounting, the Court would be unable to determine which fees, if any, were incurred in connection with the misconduct that rendered the case exceptional, or to apportion fees based on Willis Electric's degree of success. *See, e.g., OSSO-OVCH AXP v. Maxwell*, No. 21-2212, 2022 WL 2291691, at *9 (N.D. Ohio June 24, 2022) (denying without prejudice plaintiff's request for attorney fees where plaintiff failed to provide sufficient documentation). Any renewed request for fees following an exceptional case finding would need to be supported by detailed records and be limited as set forth above.

In sum, while the Court ultimately concludes that this case is not "exceptional" under Section 285, any potential fee award would be subject to significant limitations even if that threshold finding were made. Recoverable fees would be limited to those caused by the adjudged misconduct, apportioned to account for Willis Electric's success on only one of more than 100 asserted claims, and would not include expert fees absent a finding of fraud or abuse of judicial process. A detailed, itemized accounting would be necessary to

permit the required apportionment and ensure that only permissible fees were awarded. Willis Electric's opening brief did not provide the information needed to conduct this inquiry, instead improperly deferring it until after an exceptional case finding. For this additional reason, Willis Electric's fee motion is denied.

**C. Conclusion**

In light of the foregoing analysis, the Court concludes that this case is not "exceptional" within the meaning of 35 U.S.C. § 285 and that Willis Electric's motion for attorneys' fees and costs must therefore be denied.

The Court has carefully considered the totality of the circumstances, including the specific factors identified by the parties. On balance, those factors do not support a finding that this case "stands out from others with respect to the substantive strength of [Polygroup's] litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness*, 572 U.S. at 554.

The jury's finding of willful infringement, while certainly relevant, is not dispositive on the issue of exceptionality. *See Sionyx*, 981 F.3d at 1355. And the other factors discussed above—including Polygroup's successes in invalidating and defeating infringement of many of the originally asserted claims, the absence of egregious litigation misconduct, and the Court's prior denial of enhanced damages—all weigh against an exceptional case determination. Ultimately, the Court cannot say that Polygroup's defense of this action was so unreasonable that it would be grossly unjust for the prevailing party to bear its own attorney fees. *See J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1050

(Fed. Cir. 1987) (discussing the framework for awarding attorney fees under 35 U.S.C. § 285 in patent cases, including the court's discretion and factors considered).

The Court is not persuaded otherwise by Willis Electric's arguments in favor of an exceptional case finding. While Willis Electric puts substantial emphasis on the jury's willfulness verdict, the Court has explained why that factor alone is not enough to render a case exceptional under the governing totality-of-the-circumstances standard. And while Willis Electric criticizes various aspects of Polygroup's litigation conduct, it has not shown the sort of objective unreasonableness or "gross injustice" required to support an exceptional case finding and justify overriding the American Rule. *See id.* at 1050-52.

This was undoubtedly a hard-fought case. But it was not an "exceptional" one. Many patent cases involve hard-fought and even bitterly fought disputes where, at the end of the day, one side turns out to be correct and prevails. But that alone does not usually make a case "exceptional" for fee award purposes under Section 285. *See Octane Fitness*, 572 U.S. at 555 (explaining that an exceptional case is one that "sufficiently set itself apart from mine-run cases" due to "subjective bad faith or exceptionally meritless claims"). So too here.

For all of these reasons, the Court concludes, in its discretion, that the circumstances of this case do not warrant a deviation from the baseline "American Rule" that each party bears its own attorneys' fees. Willis Electric's motion for attorneys' fees and non-taxable costs is denied.

This conclusion renders it unnecessary for the Court to reach the various arguments raised by Polygroup about the appropriate amount of any fee award. Because no fees will

be awarded, the Court need not consider whether Willis Electric's request was adequately supported or appropriately limited. Those issues are moot in light of the Court's threshold determination that this case is not "exceptional."

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd., and Polygroup Trading Limited's motion for judgment as a matter of law, new trial, or remittitur, (Dkt. 1011), is **DENIED**.

2. Plaintiff Willis Electric Co., Ltd.'s motion for attorneys' fees, (Dkt. 1002), is **DENIED**.

Dated: June 24, 2024

s/Joan N. Ericksen
Joan N. Ericksen
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Willis Electric Co., Ltd.,

Plaintiff,

v.

Polygroup Macau Limited (BVI), Polytree (H.K) Co. Ltd., and Polygroup Trading Limited,

Defendants.

Case No. 15-cv-3443 (WMW/DTS)

**ORDER**

---

In this patent-infringement action, Plaintiff alleges that certain products sold by Defendants infringe claims in five United States patents owned by Plaintiff. This matter is now before the Court on the parties' cross-motions to exclude expert testimony and for summary judgment. (Dkts. 648, 657, 666, 675 and 689.) For the reasons addressed below, the Court grants in part and denies in part the parties' motions.

## BACKGROUND

Plaintiff Willis Electric Co., Ltd. (Willis Electric) and Defendants Polygroup Macau Limited (BVI), Polytree (H.K) Co. Ltd. and Polygroup Trading Limited (collectively, Polygroup) are competitors in the field of artificial holiday trees. Manufacturers in this field compete based on price, product quality and product innovation. Willis Electric began manufacturing holiday lights in 1993 and expanded its business to include pre-lit artificial holiday trees in 2008.

In 2009, Jason Loomis, an expert in the field of decorative lighting, designed an artificial holiday tree for GKI/Bethlehem Lighting Company. Loomis's design had multiple trunk segments that included internal trunk wiring to provide electrical power to light strings attached to the branches. Loomis filed a non-provisional patent application on July 14, 2010, which issued as United States Patent No. 8,053,042 (Loomis Patent) on November 8, 2011. The Loomis Patent describes trunk segments that mechanically and electrically connect using a conventional plug and socket connector. In mid-2010, GKI/Bethlehem produced and sold trees embodying the technology described in the Loomis Patent (GKI Tree).

Willis Electric alleges that, until 2010, its pre-lit holiday trees were "typical of the industry," as they were "big, bulky, complex, and difficult to assemble." But in 2010, Willis Electric began selling a "One Plug Tree." The One Plug Tree design involves "coaxially coupling" tree trunk portions. Willis Electric filed patent applications pertaining to the One Plug Tree and other related pre-lit artificial holiday tree designs. Subsequently, Polygroup began selling an alleged "knockoff design" and applied for its own patents.

Willis Electric commenced this patent-infringement lawsuit against Polygroup in August 2015 and filed a first amended complaint in December 2015. The first amended complaint alleges that Polygroup has infringed five of Willis Electric's United States patents pertaining to pre-lit artificial holiday trees.[1] Four of the asserted patents pertain

[1] Willis Electric also alleged infringement of a sixth patent, United States Patent No. 9,044,056, which Willis Electric no longer asserts at the time of this motion.

to Willis Electric's One Plug Tree design: United States Patent No. 8,454,186 (the '186 Patent); United States Patent No. 8,454,187 (the '187 Patent); United States Patent No. 8,936,379 (the '379 Patent); and United States Patent No. 8,974,072 (the '072 Patent) (collectively, the One Plug Tree Patents). A fifth asserted patent, United States Patent No. 9,066,617 (the '617 Patent), pertains to Willis Electric's multi-positional locking artificial tree trunk design.

The Court stayed these proceedings in November 2016 pending *inter partes* review (IPR) proceedings before the Patent Trial and Appeal Board (PTAB). In those proceedings, Polygroup filed more than a dozen IPR petitions challenging the validity of the One Plug Tree Patents. In several of its IPR petitions, Polygroup referenced the Loomis Patent. And Polygroup retained Loomis as a consultant and technical expert in the IPR proceedings.

After the conclusion of IPR proceedings, Willis Electric filed the now-operative second amended complaint in May 2019. The second amended complaint alleges that Polygroup has infringed and continues to infringe the One Plug Tree Patents and the '617 Patent.[2] In a December 2021 Order, the Court construed 10 disputed terms in the asserted patent claims: five terms that appear in the One Tree Plug Patents and five terms that appear in the '617 Patent.

The parties now cross-move to exclude expert testimony and for summary judgment. The Court addresses each motion in turn.

---

2 The second amended complaint also includes counts alleging anticompetitive conduct, all of which have been dismissed. Only the counts alleging patent infringement remain in dispute.

## ANALYSIS

### I. Cross-Motions to Exclude Expert Testimony

The parties cross-move for the exclusion of expert testimony. The admissibility of expert testimony is an issue of law for the district court to decide and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

"The proponent of expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion. *Id.* (internal quotation

marks omitted). Determinations as to the admissibility of expert testimony are within a district court's discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. When making this reliability determination, a court may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error and the method's general acceptance. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case. *Id.* A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted). When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that it is "so fundamentally unsupported that it can offer no

assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted). But disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544. The Court addresses, in turn, each challenged expert witness.

**A. Julie L. Davis**

Willis Electric moves to exclude the opinions and testimony of Polygroup's damages expert, Julie L. Davis. Polygroup intends to offer Davis to rebut the opinions of Willis Electric's damages expert and to opine about the damages, if any, suffered by Willis Electric if Willis Electric prevails on its patent-infringement claims. In particular, Davis opines that Willis Electric cannot prove that it is entitled to lost profits and that Willis Electric's total damages based on a reasonable royalty, hypothetically negotiated in 2013 and continuing until 2019, should be no more than $1,062,370.

If patent infringement is proved, "the court shall award the [patentee] damages adequate to compensate for the infringement." 35 U.S.C. § 284. The phrase "damages adequate to compensate" in Section 284 "includes any foreseeable lost profits the patent owner can prove." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). If a patentee cannot prove lost profits, the statute sets "a reasonable royalty" as the damages floor. *See* 35 U.S.C. § 284. A reasonable royalty typically is established "based on a hypothetical negotiation between the patentee and the infringer when the infringement began." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). The hypothetical negotiation is intended "to ascertain the

Case: 24-2118 Document: 12 Page: 135 Filed: 09/20/2024

royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (internal quotation marks omitted).

A hypothetical reasonable royalty is calculated using the fifteen *Georgia-Pacific* factors. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Notably, the United States Court of Appeals for the Federal Circuit has recognized that the *Georgia-Pacific* factors are "comprehensive (but unprioritized and often overlapping)." *Id.* Courts "do not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012). And failing to consider every relevant *Georgia-Pacific* factor is distinct from presenting weak evidence in support of a *Georgia-Pacific* factor, because the latter circumstance tends to implicate weight and credibility. *Cf. Wallace Comput. Servs., Inc. v. Uarco Inc.*, 887 F.2d 1095, 1 (Fed. Cir. 1989).

Here, when determining a reasonable royalty rate, Davis analyzed multiple licensing arrangements pertaining to the Loomis Patent and product designs involving the technology protected by the Loomis Patent. In doing so, Davis reviewed and considered, among other evidence, deposition transcripts and exhibits, expert reports, documents produced by the parties and publicly available information. Davis's reasonably royalty analysis also includes an extensive analysis of the *Georgia-Pacific* factors.

Willis Electric argues that Davis's reasonable royalty opinions nonetheless should be excluded as unreliable because they predominantly rely on an agreement between Loominocity, Inc. (Loominocity), and Belgravia Wood Limited (Belgravia), a Polygroup subsidiary. Pursuant to that agreement, Belgravia would pay Loominocity an ongoing royalty of $0.075 for each tree sold which contains a pole that practices the invention of the Loomis Patent. According to Willis Electric, the 2020 agreement between Loominocity and Belgravia is not comparable to the license agreement that Polygroup and Willis Electric hypothetically would have entered in 2013. Moreover, Willis Electric contends, Davis rejects as *incomparable* the license agreements between Loominocity and two other licensees—namely, GKI/Bethlehem Lighting Company (GKI) and Boston Warehouse Trading Corporation (Boston Warehouse). Davis's rejection of the GKI and Boston Warehouse agreements is contrary to the record, Willis Electric maintains.

Willis Electric's arguments largely implicate to the second *Georgia-Pacific* factor, which involves evaluating "the rates paid by the licensee for the use of other patents comparable to the patent in suit." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (internal quotation marks omitted). When a party relies on other licenses to establish a reasonable royalty, those other licenses must be "sufficiently comparable to the hypothetical license at issue." *VirnetX*, 767 F.3d at 1330 (internal quotation marks omitted). As such, the party relying on comparable licenses must "account for differences in the technologies and economic circumstances of the contracting parties." *Id.* "Sufficient comparability is a threshold requirement for licenses to be admissible." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971–72 n.5 (Fed. Cir. 2022).

When determining whether licenses are comparable, the Federal Circuit has "never required identity of circumstances; on the contrary, [the Federal Circuit has] long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *VirnetX*, 767 F.3d at 1330 (internal quotation marks omitted). Allegedly comparable licenses may be insufficient if they demonstrate "no relationship to the claimed invention," show no "discernible link to the claimed technology," involve "vastly different situations" or pertain to "subject matter . . . [that is] not even ascertainable from the evidence." *Id.* (internal quotation marks and brackets omitted). But absent such circumstances, "the degree of comparability of the license agreements" may instead be "a factual issue best addressed by cross examination and not by exclusion." *Id.* at 1331 (internal quotation marks and brackets omitted).

Willis Electric first argues that Davis's reasonable royalty analysis is flawed because it ignores the date—and the relevance of that date—of the hypothetical negotiation. The parties agree, and Davis opines, that the hypothetical negotiation would have occurred in or about June 2013. As such, Willis Electric's contention that Davis "ignores" the hypothetical negotiation date is contrary to the record. Nonetheless, Willis Electric argues that Davis improperly relies on a purportedly comparable agreement between Loominocity and Belgravia from 2020, more than six years after the date of the hypothetical negotiation.

"The key element in setting a reasonable royalty . . . is the necessity [to] return to the date when the infringement began." *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993) (internal quotation marks omitted). However, "the hypothetical

CASE 0:15-cv-03443-WMW-DTS Doc. 748 Filed 01/06/23 Page 10 of 77

negotiation analysis permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent*, 580 F.3d at 1333 (internal quotation marks omitted). Although a reasonable royalty analysis requires "consideration of a hypothetical negotiation on the date of first infringement," the analysis does not "automatically exclud[e] evidence of subsequent events." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005).

Under the "book-of-wisdom doctrine," evaluation of a hypothetical negotiation may involve "looking to future events to avoid undercompensating patentees." *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 913 (D. Minn. 2009), *vacated in part on other grounds by* 649 F.3d 1336 (Fed. Cir. 2011). And "the purpose of looking at future events is 'to bring out and expose to light the elements of value that were there from the beginning.' " *Id.* (quoting *Sinclair Refin. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933)). As such, a jury may be "told that the hypothetical negotiators would have employed the 'book of wisdom,' looking froward in time from the date of the first hypothetical negotiation to account for all information that would have been relevant to the parties in coming to and arriving at a deal." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1314 (Fed. Cir. 2017) (internal quotation marks omitted).

Here, Davis ties the 2020 agreement between Loominocity and Belgravia to the June 2013 hypothetical negotiation by asserting that certain facts underlying the 2020 agreement would have been known and relevant to Polygroup during a hypothetical negotiation in 2013. Specifically, Davis opines that the 2020 agreement represents the

amount that would be paid for a "bare patent license" of the patented technology, as opposed to unpatented features. Davis relies on evidence that product features unrelated to Willis Electric's patented technology are the primary factors that impact purchasing decisions with respect to artificial holiday trees. Davis also reasons that, at the time of the hypothetical negotiation, Polygroup had the ability to implement—at a cost of $100,000 to $200,000—a non-infringing design that Polygroup began selling in 2019. For these reasons, according to Davis, the amount that Polygroup would have been willing to pay in 2013 is comparable to the amount that Belgravia actually paid as part of its 2020 agreement with Loominocity to avoid the effort and costs associated with a re-design. On this record, there is a factual basis to support Davis's opinion that the 2020 agreement is probative of the reasonable royalty that the parties hypothetically would have negotiated in June 2013.[3] Willis Electric's disagreement with Davis's opinion reflects a dispute about the weight and credibility of the facts underlying her opinion. For these reasons, exclusion of Davis's opinions on this basis is unwarranted.

Willis Electric also argues that Davis's reliance on the 2020 agreement between Loominocity and Belgravia is improper because Davis "ignored the litigation taint underlying" that agreement. According to Willis Electric, the 2020 agreement is a "sham" transaction that is not comparable to the hypothetical negotiation because it occurred after this litigation commenced and conferred no benefit on Polygroup, which had already acquired the Loomis Patent. But potentially comparable licensing

---

[3] Notably, Willis Electric's damages expert also relies on three purportedly comparable agreements that post-date the hypothetical negotiation.

agreements "are almost never perfectly analogous to the infringement action," and "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). Absent specific circumstances, the degree of comparability between license agreements typically is a factual issue to be addressed by cross-examination. *See VirnetX*, 767 F.3d at 1330–31. Willis Electric's arguments do not suggest that the 2020 agreement involved unrelated technology or vastly different business considerations. To the contrary, the 2020 agreement involved the same licensee (Polygroup, via a subsidiary) agreeing to license similar patented technology. Any material differences between the circumstances of the 2020 agreement and the circumstances of the hypothetical negotiation in 2013 can be addressed through cross-examination and the presentation of contrary evidence, and the jury can "hear the expert testimony and decide for itself what to accept or reject." *Id.* at 1331 (internal quotation marks omitted). As such, exclusion of Davis's opinions on this basis is unwarranted.

Willis Electric also contends that Davis's reasonable royalty analysis improperly rejects comparable license agreements that Loominocity entered with GKI and Boston Warehouse. In her report, Davis characterizes these agreements as having "little relevance" to Polygroup's hypothetical negotiation with Willis Electric because the GKI and Boston Warehouse agreements involved "licenses to an entire tree design as opposed to licenses covering bare patent rights." With respect to the GKI agreement, Willis Electric identifies no evidence that fundamentally undermines the reliability of Davis's opinion that the GKI agreement is not comparable. The 2008 GKI agreement predates

the 2009 provisional application for the Loomis Patent. And the record reflects that the 2008 GKI agreement and the 2010 amendment to that agreement involved the licensing of "Product Designs," including but not limited to patented technology. The Boston Warehouse agreement, by comparison, provides for a royalty on products that would infringe the Loomis Patent. But the Boston Warehouse agreement nonetheless contemplates royalties based on "each Licensed Product sold," as opposed to royalties tied directly to the Loomis Patent or limited to patented features. The Boston Warehouse agreement also reflects that the royalty calculation was intended to "mirror[ ]" the royalties calculated under the GKI agreement, which involved the licensing of tree designs. Davis's opinions distinguishing the GKI agreement and the Boston Warehouse agreement have support in the record. Because the parties' disagreement about the comparability of the GKI agreement and the Boston Warehouse agreement are factual disputes, exclusion of Davis's opinions on this basis is unwarranted.

Willis Electric also argues that Davis should be precluded from offering any opinion about non-infringing alternatives. Davis opines that, "[a]t the time of the hypothetical negotiation, Polygroup had the ability to implement its new non-infringing design using the [Loomis Patent] that it began selling in October 2019." This opinion has no factual support, according to Willis Electric, because Loominocity had already granted GKI an exclusive license to the Loomis Patent. However, as addressed above, the 2008 GKI agreement predates the 2009 provisional application for the Loomis Patent. And both the 2008 GKI agreement and the 2010 amendment to that agreement involved the exclusive licensing of particular "Product Designs," not the licensing of the Loomis

Patent itself. Moreover, Davis's analysis considers other purportedly non-infringing alternatives that Polygroup could have adopted at the time of the hypothetical negotiation. For these reasons, Willis Electric has not established that exclusion of Davis's opinions on this basis is warranted.

In summary, Davis's report reflects that she expressly considered the date of the hypothetical negotiation and the relevant *Georgia-Pacific* factors, including the existence of comparable license agreements and the possible availability of non-infringing alternatives. Davis's opinions as to these factors are tethered to evidence in the record, and Willis Electric's disagreement with these aspects of Davis's opinions implicate the weight and credibility of her opinions rather than their admissibility. Because any purported flaws in Davis's reasonable-royalty analysis can be addressed through cross-examination and the presentation of contrary evidence, exclusion of Davis's expert opinions is unwarranted.

Accordingly, the Court denies Willis Electric's motion to exclude the opinions and testimony of Polygroup's damages expert.

**B. Michele Riley**

Polygroup moves to exclude the opinions and testimony of Willis Electric's damages expert, Michele Riley. Polygroup argues that Riley's opinions as to lost profits and a reasonable royalty are unreliable and untethered to the facts of the case.

To recover lost profits as opposed to a reasonable royalty, "a patent owner must prove a causal relationship between the infringement and its loss of profits." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993). In other

words, "[t]he patent owner must show that 'but for' the infringement, [the patent owner] would have made the infringer's sales." *Id.* The Federal Circuit has adopted the four-factor *Panduit* test as one method for a patentee to establish entitlement to lost profits damages. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Filore Works Inc.*, 575 F.2d 1152 (6th Cir. 1978)). This test requires the patentee to establish (1) demand for the patented product, (2) the absence of acceptable non-infringing alternatives, (3) the patentee's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that the patentee would have made. *Id.* If a patentee does not prove entitlement to lost profits, the patentee is entitled to a reasonable royalty, typically established based on a hypothetical negotiation. *Unisplay*, 69 F.3d at 517. The Court addresses Polygroup's challenges to Riley's lost profits and reasonable-royalty opinions in turn.

**1. Lost Profits Opinions**

Polygroup argues that Riley's lost profits analysis fails to properly account for available non-infringing alternatives.

When considering the *Panduit* factors, the "requirement that patentees prove demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and *ensures that damages are commensurate with the value of the patented features*." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1288 (Fed. Cir. 2017) (emphasis added). "Products lacking the advantages of the patented invention can hardly be termed a substitute acceptable to the customer who wants those advantages." *Id.* at 1285–86 (internal quotation marks and brackets omitted).

Determining whether a party has proven the absence of acceptable non-infringing alternatives typically is a fact question for the jury to resolve. *See id.* at 1287.

In a two-supplier market, "it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). Under the two-supplier market test, a patentee must show (1) that the relevant market contains only two suppliers, (2) that the patentee had the manufacturing and market capability to make the sales that were diverted to the infringer and (3) the amount of profit the patentee would have made from these diverted sales. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003). "In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor." *Id.*

The Federal Circuit has recognized other appropriate methods for proving lost profits, including the market-share approach. *State Indus.*, 883 F.2d at 1577. Under this approach, a patentee recovers lost profits on a percentage of infringing sales that is equal to the patentee's market share. *Id.* at 1578. If a patentee can establish its share of the market, combined with the other *Panduit* factors, the absence of acceptable substitutes may become a "neutral factor." *Id.*

Riley's lost profits analysis addresses the *Panduit* factors, and she limits her calculation to four specific customers. Applying the market-share approach, Riley's analysis accounts for sales lost to market competitors based on relative market share. But the market-share approach cannot be applied automatically, because a patentee must

CASE 0:15-cv-03443-WMW-DTS Doc. 748 Filed 01/05/23 Page 17 of 77

prove both its market share and that it would have captured the infringing sales. *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991) (affirming district court's refusal to award lost profits damages based on market-share approach because patentee failed to prove that consumers "specifically want a [product] having the advantages of the [asserted] patent"). To prove market share, a patentee must present "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing*, 185 F.3d at 1350.

Polygroup argues that Riley, when assessing non-infringing alternatives under the *Panduit* test, erroneously defines acceptable non-infringing alternative designs as designs that are "easily and quickly assembled." The market for a patented product typically "includes other devices or substitutes similar in physical and functional characteristics to the patented invention," but excludes "alternatives with disparately different prices or significantly different characteristics." *Micro Chem.*, 318 F.3d at 1124 (internal quotation marks omitted). According to Polygroup, ease of assembly is not an advantage of Willis Electric's patented features and, therefore, Riley's definition of acceptable alternatives (and, by extension, the relevant market) is incorrect. However, Riley provides detailed opinions, based on her examination of specific evidence, demonstrating a connection between ease of assembly and Willis Electric's patented inventions. Because this is a factual dispute for the jury to resolve, exclusion of Riley's opinions on this basis is unwarranted.

Polygroup seeks to avoid this result by framing this factual dispute as a legal error. According to Polygroup, on appeal from PTAB's final written decision in the IPR

proceedings, the Federal Circuit determined that ease of assembly is *not* a patented advantage of Willis Electric's patents. But Polygroup's argument is flawed for several reasons.

First, the Federal Circuit's decision in Polygroup's IPR appeal did not address the same patent claims that are asserted in this case. *See generally Polygroup Ltd. MCO v. Willis Elec. Co.*, 2021-1401, 2021-1402, 2022 WL 1183332 (Fed. Cir. Apr. 20, 2022). As each patent claim involves different features (and combinations thereof) that could impact the ease of assembling an artificial tree, the Federal Circuit's determinations do not necessarily apply to the patent claims at issue in this case. Indeed, the Federal Circuit affirmed PTAB's conclusion that Polygroup failed to establish the unpatentability of several patent claims that are asserted in this case. *See Polygroup Ltd. MCO v. Willis Electric Co.*, 759 F. App'x 934, 944 (Fed. Cir. 2019); *see also id.* at 936 (addressing patent claims with features that "simplify tree assembly").

Second, the Federal Circuit applied the "broadest reasonable interpretation" standard when concluding that that certain claims in the '186 Patent and the '187 Patent "permit the mechanical and electrical connections" between trunk portions to be "made independently" in two separate steps. *Polygroup Ltd. MCO*, 2022 WL 1183332, at *4–5. By contrast, district courts "do not assign terms their broadest reasonable interpretation." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016) (citing *Phillips v. Awtl Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)). Instead, district courts "seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out

in *Phillips*." *Id.* In the claim construction order, this Court applied *Phillips* when construing the disputed claim terms and observed that "an electrical connection can be made 'independent of' the rotational orientation of the trunk portions if, regardless of which of multiple rotational orientations is used to mechanically connect the tree trunk portions, an electrical connection is made." Unlike the Federal Circuit's "broadest reasonable interpretation" analysis in the IPR appeal, under this Court's claim construction, Willis Electric's patented invention requires an electrical connection and a mechanical connection to occur in a single step, which could impact the ease of assembling an artificial tree.

Third, the parties' respective damages experts agree that the patented features at issue provide ease-of-assembly benefits, and the experts disagree only as to the degree of those benefits. For instance, Polygroup's damages expert opines that "the limited benefits provided by the accused feature provide only minimal contribution to the success of the accused products" and "only seconds are saved when assembling" artificial trees with such features. These disagreements reflect factual disputes that implicate the weight and credibility, not the admissibility, of Riley's lost profits opinions.

Polygroup also contends that Riley's lost profits opinions fail to demonstrate that, but for any alleged infringement, Willis Electric would have captured Polygroup's profits at a rate equal to Willis Electric's proportionate market share. According to Polygroup, other factors—including Willis Electric's performance as a supplier, retailer-driven price competition and financial incentives to design around patents and economic conditions such as labor shortages—would impact Willis Electric's annual sales and profit margin.

But Riley's report accounts for various market conditions when purporting to reconstruct the relevant market "but for" Polygroup's alleged infringement. Polygroup's disagreement with Riley's analysis implicates the weight and credibility of the evidence rather than its admissibility.

For all of these reasons, the Court denies Polygroup's motion to exclude Riley's lost profits opinions and testimony.

### 2. Reasonable Royalty Opinions

Polygroup also argues that Riley's reasonable royalty opinions are unreliable and untethered to the facts of this case.

As addressed above, if a patentee does not prove entitlement to lost profits, the patentee is entitled to a reasonable royalty, typically established based on a hypothetical negotiation. *Unisplay*, 69 F.3d at 517. The "hypothetical negotiation" is intended "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *VirnetX*, 767 F.3d at 1326 (internal quotation marks omitted). This hypothetical reasonable royalty is calculated using the fifteen *Georgia-Pacific* factors. *ResQNet.com*, 594 F.3d at 869.

"When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features." *Ericsson*, 773 F.3d at 1226. "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* "A patentee is only entitled to a reasonable royalty attributable to the infringing features," and a reasonable royalty must be

"apportioned between the infringing and non-infringing features of the product." *Power Integrations, Inc v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). As such, when "multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention." *Id.*

Here, Riley opines that Polygroup's accused product is "the smallest saleable patent-practicing unit" and, consequently, Riley calculates a royalty base on a per-tree basis. Polygroup does not dispute this characterization, and there is no evidence that sub-components of an artificial holiday tree are sold separately. Nonetheless, Polygroup contends that Riley's analysis fails to further apportion value between the patented and unpatented features of the accused products.

When a patentee's "damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *Id.* at 977. But because it may be difficult to assign value to a feature that might not ever have been individually sold, "it is well-understood that this process may involve some degree of approximation and uncertainty." *Virnetx*, 767 F.3d at 1328. The Federal Circuit has held that "apportionment can be addressed in a variety of ways, including by careful selection of the royalty base to reflect the value added by the patented feature" or "by adjustment of the royalty rate so as to discount the value of a product's non-patented features." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018).

Riley's analysis purports to account for apportionment using the latter approach—namely, by isolating the profit premium that Willis Electric and Polygroup obtained for artificial trees with the patented features in comparison to similar trees without the patented features. Polygroup disagrees with Riley's apportionment analysis largely because Polygroup disputes the scope of the advantages of the patented features and the extent to which the patented features are the driving force behind the purported profit premium that Riley identifies. But apportionment involves "some degree of approximation and uncertainty." *Virnetx*, 767 F.3d at 1328. Polygroup's disagreement with Riley's apportionment analysis implicates the weight and credibility of the evidence, not its admissibility. Moreover, as addressed above, Polygroup's contention that "ease of assembly" is not an advantage of the patented features is a factual dispute that is best resolved by the jury.

The value of patented features also can be derived from an evaluation of comparable licenses that accounts for differences in the technologies involved and the economic circumstances of the contracting parties. *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (observing that, when "the licenses employed are sufficiently comparable, this method is typically reliable because the parties are constrained by the market's actual valuation of the patent"). Riley employs a market approach by considering other purportedly comparable licensing agreements, including licensing and manufacturing agreements between Willis Electric and other third parties. This approach, also, presents disputed fact issues that implicate weight and credibility rather than admissibility.

Polygroup's arguments additionally implicate the thirteenth *Georgia-Pacific* factor, which pertains to the "portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." 318 F. Supp. at 1120. Notably, the Federal Circuit has recognized that the *Georgia-Pacific* factors are "unprioritized and often overlapping," *ResQNet.com, Inc.*, 594 F.3d at 869, and witnesses are not required to "use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases," *Whitserve, LLC*, 694 F.3d at 31. Moreover, failing to consider every relevant *Georgia-Pacific* factor is distinct from presenting weak evidence in support of a specific *Georgia-Pacific* factor, because the latter circumstance tends to implicate weight and credibility. *Cf. Wallace Comput. Servs., Inc.*, 887 F.2d at 1.

Here, in addition to Riley's quantitative-apportionment and market-approach analyses addressed above, Riley extensively considers the *Georgia-Pacific* factors. In doing so, Riley acknowledges that "under the hypothetical license agreement, Polygroup would bear the business risk of manufacturing, marketing, and selling the Accused Products" and, therefore, Riley concludes that the thirteenth *Georgia-Pacific* factor "has a downward impact on the negotiated royalty rate."

In summary, Polygroup's disagreement with these aspects of Riley's opinions implicate the weight and credibility of her opinions rather than their admissibility. Because any purported flaws in Riley's analysis can be addressed through cross-examination and the presentation of contrary evidence, exclusion of Riley's reasonable royalty opinions is unwarranted.

Accordingly, the Court denies Polygroup's motion to exclude the opinions and testimony of Willis Electric's damages expert.

### C. Dr. James Dickens

Polygroup moves to exclude the opinions and testimony of Willis Electric's technical expert, Dr. James Dickens. According to Polygroup, Dr. Dickens misapplies or ignores the relevant law and facts as to several issues. The Court addresses each of Polygroup's arguments.

#### 1. Non-Infringing Alternatives and Secondary Considerations

Polygroup first argues that Dr. Dickens's opinions about non-infringing alternatives and secondary considerations of non-obviousness are based on an incorrect premise—namely, that a key advantage of Willis Electric's patented invention is the ease of assembling a pre-lit artificial holiday tree. Polygroup contends that this premise is foreclosed by the Federal Circuit's 2022 decision in the IPR proceedings. *See Polygroup Ltd.*, 2022 WL 1183332, at *4–5.

As addressed in Part I.B.1. of this Order, Polygroup's arguments as to this issue are unavailing for several reasons. Moreover, the parties and their experts present competing factual evidence and opinions pertaining to acceptable non-infringing alternatives and secondary considerations of non-obviousness. These disagreements reflect factual disputes that implicate the weight and credibility, not the admissibility, of Dr. Dickens's opinions.

For these reasons, the Court denies Polygroup's motion to exclude these aspects of Dr. Dickens's opinions.

### 2. Application of "Independent of" Claim Construction

Polygroup next argues that Dr. Dickens misapplies the Court's construction of the "independent of" claim limitation.

During claim construction, the parties disputed the meaning of the phrase "the electrical connection being made independent of the rotational orientation of the first tree/trunk portion relative to the second tree/trunk portion." Variations of this disputed phrase appear in the '186 Patent (asserted claims 1, 10, 20 and 28) and the '187 Patent (asserted claims 1 and 7). The Court rejected Polygroup's proposed construction of this phrase and adopted Willis Electric's proposed construction—namely, "an electrical connection that can be made at any available arrangement of the first tree/trunk portion relative to the second tree/trunk portion about a common vertical axis between the tree-trunk portions."

Polygroup contends that Dr. Dickens's opinions misapply the Court's claim construction by suggesting that "any available arrangement" of tree trunk portions means only those arrangements in which both a mechanical and electrical connection are made. But Dr. Dickens's opinions are consistent with this Court's claim construction. Although the Court did not separately define the phrase "any available arrangement," the Court observed in the claim construction order that "an electrical connection can be made 'independent of' the rotational orientation of the trunk portions if, regardless of which of multiple rotational orientations is used to mechanically connect the tree trunk portions, an electrical connection is made." Polygroup's technical expert similarly interprets the

phrase "any available arrangement" to mean "any rotational orientation of the first and second tree/trunk portions *in which a mechanical connection can be made between them*."

As the parties' summary judgment briefing reflects, Polygroup's dispute as to this issue pertains to whether "any available arrangement" of tree trunk portions includes an arrangement in which the plastic "fins" of one trunk connector are positioned precisely to rest on top of the "fins" of another trunk connector. Polygroup's technical expert advocates for this position, but Dr. Dickens repeatedly testified that this scenario does not involve an "available" connection as there is "not a mechanical connection just because [the trunk connectors] touch." And Dr. Dickens opines that, if the fins of one connector rest on top of the fins of another connector, this arrangement will not form a stable connection because the lower fins will yield. These disagreements reflect factual disputes that implicate the weight and credibility, not the admissibility, of Dr. Dickens's opinions.

For these reasons, the Court denies Polygroup's motion to exclude this aspect of Dr. Dickens's opinions.

### 3. Analysis of "Interference Fit" Claim Limitation

Polygroup argues that Dr. Dickens's opinions about the "interference fit" claim limitation ignore critical facts and do not reflect reliable scientific methods.

The asserted claims of the '186 Patent and the '379 Patent require that the trunk connector "forms an interference fit" with the trunk body when inserted therein. The Court did not construe this term, but the parties agreed in their joint claim construction statement that an "interference fit" is "an engineered connection where two components

or parts to be connected are manufactured to be of different dimensions such that when one component is pressed into the other, they interfere and deform to force a connection."

Dr. Dickens opines in his report and deposition testimony that, when he tested the accused products, he had to push and exert force to slide the connector in and out of the trunk body. Dr. Dickens also observed discoloration, markings and scratches on the component parts that, in his opinion, demonstrate that the connectors in some of Polygroup's accused products have an "interference fit" with the trunk portions. And Dr. Dickens testified that there are protrusions on the plastic connector that may cause an interference fit with the trunk portion.

Polygroup contends that Dr. Dickens ignored Polygroup's engineering drawings, which provide the dimensions for the connectors and trunk bodies on Polygroup's products and, according to Polygroup, irrefutably establish that no interference fit occurs between these components. But Polygroup misrepresents the record. Dr. Dickens considered the engineering drawings and testified as to why, in his opinion, the drawings do not prove the absence of an interference fit. Although Polygroup suggests that Dr. Dickens did not use reliable scientific methods, the record reflects that Dr. Dickens based his opinions on his own expertise and observations, including his physical testing and observations of the accused products. *See Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 (8th Cir. 2007) (observing that a qualified expert's "observations coupled with expertise generally may form the basis of an admissible expert opinion"). Polygroup's disagreements implicate the weight and credibility, not the admissibility, of Dr. Dickens's opinions.

CASE 0:15-cv-03443-WMW-DTS Doc. 748 Filed 01/05/23 Page 28 of 77

The Court, therefore, denies Polygroup's motion to exclude this aspect of Dr. Dickens's opinions.

**4. Analysis of "Detachably Connected" Claim Limitation**

Polygroup contends that Dr. Dickens's opinions about the "detachably connected" claim limitation should be excluded because they are based on an incorrect legal standard.

Polygroup's accused products must have wiring that is "detachably connected" to infringe claim 7 of the '186 Patent, claim 32 of the '379 Patent and claim 5 of the '072 Patent. According to Polygroup, after its accused products are assembled prior to sale, the wiring is no longer "detachable" without first disassembling the product. Dr. Dickens does not dispute this fact. Instead, Dr. Dickens relies on his ability to detach the wiring after cutting the trunk bodies in half. According to Willis Electric and Dr. Dickens, a product can infringe the "detachably connected" claim limitation even if the wiring is detachable only before the product is assembled and sold to a consumer.

A "device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995). In *High Tech*, the patent claim at issue was directed to a device comprising a camera "being rotatably coupled" to a "body member" of the device. *Id.* at 1553. The district court found infringement because the accused product had a camera that could be "rotatably coupled to the body member when the set screws [were] loosened or removed." *Id.* at 1555 (internal quotation marks omitted). The Federal Circuit reversed because the accused camera was "not rotatable within its housing unless [it was] altered, at least to the extent of removing

or loosening the set screws that secure the camera to the housing." *Id.* at 1556. "The question is not what a device might have been made to do, but what it was intended to do and did do," and the fact that "a device could have been made to do something else does not of itself establish infringement." *Id.* at 1555 (internal quotation marks and brackets omitted).

Here, it is undisputed that Polygroup did not design its accused products to have the internal wiring detached by a consumer during operation. Nor is there any evidence in the record suggesting that any functional purpose would be served by a consumer dismantling Polygroup's artificial trees or that any consumer has done so. To the contrary, the evidence shows that Dr. Dickens had to *permanently destroy* Polygroup's artificial tree, by cutting the trunk body open, to detach the wiring assemblies. The circumstances in this case are identical to the circumstances in *High Tech* in all material respects. *See id.* at 1556 (observing that the alleged infringer did not design its camera to rotate during operation and nothing in the record demonstrated that removing the set screws would serve a functional purpose or that any user had done so during actual use). The undisputed facts establish, contrary to Dr. Dickens's opinion, that Polygroup's accused products do not contain "detachably connected" wiring as required by claim 7 of the '186 Patent, claim 32 of the '379 Patent and claim 5 of the '072 Patent.

Because Dr. Dickens's opinions about the "detachably connected" claim limitation are contrary to law, the Court grants Polygroup's motion to exclude this aspect of Dr. Dickens's opinions.

### 5. Analysis of "Insertable" and "Securable" Claim Limitations

Polygroup argues that Dr. Dickens's opinions about the "insertable into" and "securable to" claim limitations should be excluded because they are based on an incorrect legal standard.

Similar to the detachability of the wiring assemblies addressed above, Polygroup argues that the trunk connectors in its accused products are inserted and secured into the trunk bodies during assembly before they are sold and, therefore, are not designed to be inserted or secured by a consumer. Willis Electric and Dr. Dickens do not dispute this fact and instead rely on evidence that the trunk connectors in Polygroup's accused products are capable of being inserted and secured into the trunk bodies during assembly.

The Federal Circuit has distinguished between a claim that requires a particular structure—such as "a camera 'rotatably coupled' to a body member"—and a claim that only requires a capacity to perform a function—such as magnetic members "capable of engaging" other magnetic members. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369 (Fed. Cir. 2009) (distinguishing *High Tech*). The "rotatably coupled" claim language in *High Tech* described a structure with a particular characteristic, and the accused product in that case did not possess that characteristic unless the structure was altered in an unintended manner. *See id.* By contrast, the "capable of engaging" claim language in *Revolution Eyewear* described a product's capacity to perform a function, and that functional capacity was inherent in the accused product regardless of whether the product was intended to perform that function and regardless of whether any customer ever performed the function. *See id.* In the latter circumstance, because the accused

product had the capacity to perform the claimed function, the Federal Circuit affirmed the district court's decision to grant summary judgment as to infringement. *Id.* at 1370.

Here, the claim language at issue requires a "trunk connector insertable into the first trunk body . . . and securable to the first trunk body." Unlike the "detachably connected" claim language addressed above, claim 12 of the '379 Patent does not describe the characteristics of a structure. Rather, this claim describes a capability—namely, the capacity to be inserted into and secured to a trunk body. There is no dispute that the trunk connectors in Polygroup's accused products possess that functional capability, even if no consumer ever performs that function. These circumstances are akin to the circumstances in *Revolution Eyewear*. *See id.* at 1369–70 (observing that, when a claim requires the capacity to perform a function, it is "irrelevant" that the accused products "are not actually used" in that manner so long as they possess the functional capability).

However, in *Revolution Eyewear*, the Federal Circuit recognized a second factual distinction with *High Tech*—namely, whether the accused product must be "altered in any way" for it to be capable of the claimed function. *Id.* at 1370. In *Revolution Eyewear*, no alteration of the accused product was necessary because the accused product was "capable of engaging" magnetic members "*as made and sold*." *Id.* It is undisputed here that the trunk connectors in Polygroup's accused products, after they are made and sold, are no longer "insertable into" or "securable to" a trunk body without first disassembling the products. For this reason, this case is factually distinguishable from *Revolution Eyewear*. The undisputed facts establish, contrary to Dr. Dickens's opinion,

that Polygroup's accused products, as made and sold, do not contain trunk connectors that are "insertable into" or "securable to" trunk bodies as required by claim 12 of the '379 Patent.

Because Dr. Dickens's opinions about the "insertable into" and "securable to" claim limitations are contrary to law, the Court grants Polygroup's motion to exclude these aspects of Dr. Dickens's opinions.

**6. Doctrine-of-Equivalents Opinions**

Polygroup next argues that Willis Electric has waived any doctrine-of-equivalents argument as to claims 4 and 10 of the '187 Patent because Willis Electric failed to assert this theory in its final infringement claim charts. Consequently, Polygroup argues, Dr. Dickens's doctrine-of-equivalents opinions must be excluded.

Claim charts are "designed specifically to require parties to crystallize their theories of the case early in the litigation so as to prevent the shifting sands approach to claim construction." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (internal quotation marks omitted). "These disclosures must contain enough information to provide notice of the party's infringement contentions and defenses . . . ." *QXMédical, LLC v. Vascular Sols., LLC*, 408 F. Supp. 3d 996, 1016 (D. Minn. 2019) (internal quotation marks omitted). If a plaintiff violates a scheduling order by failing to disclose the requisite infringement or invalidity contentions, the plaintiff may be precluded from asserting the improperly disclosed theory on a motion for summary judgment. *See id.* at 1016–17 (collecting cases).

In this case, the Court issued a pretrial scheduling order on March 21, 2016. That order, among other things, required Willis Electric to disclose a claim chart that identifies "(1) which claim(s) of the patents they allege are being infringed; (2) which specific products . . . allegedly infringe each claim; and (3) where each element of each claim listed in (1) is found in each product listed in (2), including the basis for each contention that the element is present." The pretrial scheduling order also provides:

> If any party contends that there is infringement of any claims under the doctrine of equivalents, that party shall separately identify this on the Claim Chart and, in addition to the information required for literal infringement, that party shall also explain each function, way, and result that is allegedly equivalent, and why it contends that any differences are not substantial.

Subsequently, after the stay in this case was lifted, the magistrate judge amended the pretrial scheduling order several times. As relevant here, on November 16, 2020, the magistrate judge imposed a deadline by which Willis Electric was required to disclose its "Final Claim Chart." That order amended several deadlines but expressly preserved all other requirements of the original March 21, 2016 pretrial scheduling order, "including limitations on discovery and guidance regarding how it should be conducted."

Pursuant to the magistrate judge's November 16, 2020 Order, Willis Electric disclosed its "Final Infringement Claim Charts" in December 2020. The claim charts and accompanying contentions identify several categories of Polygroup's accused products, labeled Group I, Group II, and Group III. Willis Electric's contentions do not assert that the Group I or Group II products literally infringe claim 4 or claim 10 of the '187 Patent, nor do Willis Electric's contentions assert a doctrine-of-equivalents theory of

infringement as to these claims. Indeed, Willis Electric's contentions disavow any such theory, stating that "Willis Electric does not currently believe that the appropriate construction of any terms of any asserted claims necessitates a showing of infringement under the doctrine of equivalents, as opposed to literal infringement." Willis Electric did not seek leave to amend these contentions thereafter. Contrary to Willis Electric's infringement contentions, Willis Electric's expert, Dr. Dickens, subsequently provided an infringement opinion for claim 4 and claim 10 of the '187 Patent as to the Group I and Group II accused products.

A court may preclude a patentee from relying on an infringement theory that was not disclosed in its infringement contentions as required by a scheduling order. *See, e.g.*, *Teashot LLC v. Green Mountain Coffee Roasters*, 595 F. App'x 983, 987 (Fed. Cir. 2015) (excluding doctrine-of-equivalents theory of infringement because it was not disclosed in infringement contentions); *O2 Micro*, 467 F.3d at 1367–70 (affirming summary judgment of noninfringement after ruling that district court did not err by excluding evidence disclosed in violation of pretrial scheduling order); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) (affirming a district court's exclusion of evidence pertaining to theories of infringement that were not disclosed as required by the local patent rules and the court's scheduling order); *QXMédical*, 408 F. Supp. 3d at 1016–17 (precluding party from presenting invalidity argument that had not been disclosed as required by scheduling order). In addition, a district court may impose sanctions on a party that fails to obey a discovery order, including by "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from

introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii). District courts also have inherent power "to impose sanctions short of dismissal for violations of court orders." *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 39, 49 (2016); *accord Nick v. Morgan's Foods, Inc.*, 270 F.3d 590, 594 n.2 (8th Cir. 2001). It is within a district court's "wide discretion" to select the appropriate sanction to impose. *Nick*, 270 F.3d at 595.

Here, it is undisputed that Willis Electric failed to disclose its doctrine-of-equivalents theory of infringement—or *any* theory of infringement—as to claim 4 and claim 10 of the '187 Patent with respect to the Group I and Group II accused products. Moreover, Willis Electric expressly *disavowed* such a theory of infringement. On this record, Willis Electric's evidence in support of this theory of infringement warrants exclusion.

Willis Electric attempts to avoid this result by arguing that Polygroup should have remedied this situation by bringing a non-dispositive motion. But Willis Electric's reliance on *Bombardier Recreational Products Inc. v. Arctic Cat Inc.* in support of this effort, is misplaced. In *Bombardier*, the magistrate judge concluded that the patentee's expert's report "did not constitute a change in infringement theory." Civ. No. 12-2706 (JRT/LIB), 2017 WL 690186, at *4 (D. Minn. Feb. 21, 2017). Similarly, in *Arctic Cat, Inc. v. Bombardier Recreational Products Inc.*, the district court observed that, if the defendant "considered Arctic Cat's doctrine of equivalents contentions deficient, the proper remedy would have been non-dispositive motion practice." Civ. No. 12-2692 (JRT/LIB), 2018 WL 654218, at *6 n.13 (D. Minn. Jan. 2, 2018). But in *Arctic Cat*, the

district court concluded that the plaintiff had provided a doctrine-of-equivalents infringement contention that was "broad, but sufficient." *Id.* at *6.

The decisions in *Bombardier* and *Arctic Cat* involve circumstances that are factually distinguishable from this case. Here, not only did Willis Electric provide *no* doctrine-of-equivalents infringement contention, Willis Electric also expressly *disavowed* any such infringement theory. Polygroup had no basis to know that Willis Electric's December 2020 infringement contentions were incomplete until after Willis Electric served Dr. Dickens's expert report in 2022. Moreover, the burden was not on Polygroup to guess that Willis Electric might seek to assert a new theory of infringement that it had previously disavowed. Rather, the burden was on Willis Electric to seek leave to amend its infringement contentions if Willis Electric wished to add new theories of infringement after the deadline for disclosing such theories. *See, e.g.*, *Dane Techs., Inc. v. Gatekeeper Sys., Inc.*, Civ. No. 12-2730 ADM/JJK, 2015 WL 12819180, at *5 (D. Minn. Jan. 20, 2015) (observing that "an expert report cannot introduce new infringement theories without leave to amend on showing good cause"). Willis Electric's arguments are unavailing.

Accordingly, the Court grants Polygroup's motion to exclude this aspect of Dr. Dickens's opinions.

### 7. GKI Tree Cumulativeness Opinions

Polygroup argues that Dr. Dickens's opinions about the GKI Tree product being "cumulative" of the Loomis Patent should be excluded as contrary to law.

Dr. Dickens opines that the features of the GKI Tree product are cumulative of the invention disclosed by the Loomis Patent. Willis Electric argues that these opinions are relevant to the applicability of IPR estoppel. As addressed below in Part II.A.1. of this Order, IPR estoppel cannot bar Polygroup from advancing invalidity theories of anticipation or obviousness on the GKI Tree because a physical product is *not* a type of prior art reference that can be raised in IPR proceedings. Because IPR estoppel is inapplicable to this case, Dr. Dickens's opinions pertaining to cumultaiveness are not relevant to this issue.

Willis Electric argues in the alternative that, even if IPR estoppel does not apply, Dr. Dickens's cumulativeness opinions are relevant to whether certain asserted claims of the One Plug Tree Patents are invalid as obvious in light of the GKI Tree. A jury "may be instructed to evaluate whether the evidence [of invalidity] before it is materially new, and if so, to consider that fact when determining whether an invalidity defense has been proved by clear and convincing evidence." *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 111 (2011). Here, the Loomis Patent is identified in the One Plug Tree Patents as a prior art reference that the PTO considered during prosecution. As such, to the extent that Dr. Dickens opines about the similarities between the Loomis Patent and the GKI Tree, these opinions may be relevant to rebuffing Polygroup's invalidity defense based on the GKI Tree. Polygroup does not dispute the relevance of this evidence, but contends that

Dr. Dickens's opinions fail to address "whether the GKI Tree discloses materially more than the disclosure of the" Loomis Patent. This argument implicates the weight and credibility of Dr. Dickens's cumulativeness opinions, however, not their admissibility.

Accordingly, the Court denies Polygroup's motion to exclude these aspects of Dr. Dickens's opinions.

## II. Cross-Motions for Summary Judgment

The parties also cross-move for summary judgment. Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when there is evidence that, if believed, would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). The party asserting that a fact is genuinely disputed must cite "particular parts of materials in the record" that support the assertion. Fed. R. Civ. P. 56(c)(1)(A); *accord Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

Willis Electric seeks partial summary judgment as to Polygroup's invalidity defense. Polygroup seeks summary judgment as to invalidity, non-infringement and lost profits. The Court addresses each motion in turn.

### A. Willis Electric's Motion for Summary Judgment

Willis Electric contends that Polygroup's invalidity defenses, as asserted with respect to the One Plug Tree Patents, fail as a matter of law.[4]

Issued patents are "presumed valid." 35 U.S.C. § 282(a). "The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* A party asserting that a patent is invalid must establish invalidity by clear-and-convincing evidence. *Microsoft Corp.*, 564 U.S. at 111. In doing so, the party asserting invalidity "bears a heavy burden of persuasion." *Id.* at 101 (internal quotation marks omitted).

Polygroup contends that the One Plug Tree Patents are invalid on four bases: obviousness under 35 U.S.C. § 103, anticipation under 35 U.S.C. § 102, claiming abstract ideas under 35 U.S.C. § 101 and indefiniteness under 35 U.S.C. § 112. Willis Electric argues that Polygroup is estopped from asserting invalidity defenses of anticipation and obviousness based on the GKI Tree. Willis Electric also argues that Polygroup's "abstract ideas" defense has been waived or, in the alternative, fails as a matter of law. And Willis Electric contends that Polygroup has presented insufficient evidence to support its indefiniteness defense. Each argument is addressed in turn.

[4] Willis Electric's motion pertains to—and the Court's analysis of that motion is limited to—the following asserted claims of the One Plug Tree Patents: claims 15 and 17 of the '186 Patent; claims 4, 10 and 13 of the '187 Patent; claims 12, 15 and 32 of the '379 Patent and claim 5 of the '072 Patent.

### 1. Anticipation or Obviousness (35 U.S.C. §§ 102, 103)

Willis Electric argues that statutory and common law estopp Polygroup from arguing that the asserted claims of the One Plug Tree Patents are anticipated or obvious based on the GKI Tree because these defenses reasonably could have been raised during IPR proceedings.

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *accord* 35 U.S.C. § 102(a)(1) (providing that a person is not entitled to a patent if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention"). A patent is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103(a).

A petitioner in IPR proceedings "may request to cancel as unpatentable [one] or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). A petitioner in IPR proceedings "may not assert . . . in a civil action . . . that the [patent] claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2); *accord Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 989 (Fed. Cir. 2022).

Willis Electric contends that Polygroup reasonably could have challenged the validity of the One Plug Tree Patents on anticipation and obviousness grounds based on the Loomis Patent during the IPR proceedings and, therefore, Polygroup is estopped from asserting these invalidity defenses in this case based on the GKI Tree, which is an embodiment of the Loomis Patent. Polygroup does not dispute that it reasonably could have raised anticipation or obviousness grounds for invalidity on the basis of the Loomis Patent during the IPR proceedings. Nor does Polygroup dispute that it knew or reasonably could have known about the GKI Tree when Polygroup petitioned for IPR. But Polygroup contends that it could not have relied on the GKI Tree as prior art during the IPR proceedings because the GKI Tree is a physical product as opposed to a patent or printed publication.

Undisputedly, physical products "cannot be raised during IPR proceedings." *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 453 (D. Del. 2020); *accord* 35 U.S.C. § 311(b) (providing that validity challenges in IPR proceedings may be asserted "only on the basis of prior art consisting of patents or printed publications"). For this reason, some district courts have concluded that "IPR estoppel does not apply to device art, because a petitioner cannot use an IPR to challenge the validity of a patent claim . . . based on prior art *products* or *systems*." *IOENGINE, LLC v. PayPal Holdings, Inc.*, __ F. Supp. 3d ___, 2022 WL 2800861, at *31 (D. Del. 2022) (emphasis added) (internal quotation marks omitted). "However, some [district] courts have estopped defendants from asserting device art when 'the physical product is entirely cumulative' of

the prior art raised in the IPR, i.e., when the product is 'materially identical' to the prior art reference raised in the IPR." *Id.* (quoting *Wasica*, 432 F. Supp. 3d at 454–55).

Neither the Supreme Court of the United States nor the Federal Circuit has resolved the division among the district courts that have considered this question. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, Civ. No. 17-1612 (MN), 2022 WL 2643517, at *2 (D. Del. July 8, 2022) (recognizing the split in persuasive decisions from district courts as to this issue and the absence of binding appellate precedent). Absent any binding precedent, some courts have relied on statutory interpretation to resolve this issue. *See, e.g.*, *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *3–4 (N.D. Ill. Sept. 14, 2020). This Court will follow suit so as to rationally tether its analysis to the text of the applicable statute.

Under Section 315(e)(2), IPR estoppel applies to any invalidity "*ground* that the petitioner raised or reasonably could have raised during" the IPR. 35 U.S.C. § 315(e)(2) (emphasis added). The Patent Act does not define the term "ground." *See* 35 U.S.C. § 100 (defining terms). Black's Law Dictionary defines "ground," when used as a noun, as the "reason or point that something (as a legal claim or argument) relies on for validity." Black's Law Dictionary 819 (10th ed. 2014).

Consistent with this definition, the Federal Circuit repeatedly has characterized specific prior art references (or combinations thereof) as distinct "grounds" that may be asserted in IPR proceedings. *See, e.g.*, *Cal. Inst. of Tech.*, 25 F.4th at 991 (observing that "the *prior art references* that [defendants] sought to raise in the district court" were "contested *grounds* [that] reasonably could have been included in . . . the IPR" and

affirming district court's decision barring defendants "from raising invalidity challenges based on *these prior art references*" (emphasis added)); *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1335–36 (Fed. Cir. 2020) (observing that PTAB "instituted inter partes review on three grounds of unpatentability," and characterizing each "ground" as a distinct prior art reference or combination of prior art references).

For these reasons, the Court interprets the term "ground" in the IPR estoppel provision of 35 U.S.C. § 315(e) to mean a specific prior art reference or combination thereof. *See, e.g.*, *Medline Indus.*, 2020 WL 5512132, at *4 (reaching same conclusion based on analysis of statutory text). Under this interpretation, IPR estoppel applies to any specific prior art reference or combination of such references that the IPR petitioner "raised or reasonably could have raised during" the IPR. 35 U.S.C. § 315(e)(2). Because a physical product is *not* a type of prior art reference that can be raised in IPR proceedings, IPR estoppel cannot bar Polygroup from advancing invalidity theories of anticipation or obviousness based on the GKI Tree.

Willis Electric seeks to avoid this result, arguing that this Court should apply the district court's reasoning in *Wasica Financial GmbH v. Schrader International, Inc.* In *Wasica*, the district court applied IPR estoppel to prevent the defendant from relying on a physical product that was "materially identical" to and "entirely cumulative" of a patent or printed publication that the defendant could have raised during the IPR proceeding. 432 F. Supp. 3d at 453, 455. The court in *Wasica* reasoned that "the Patent Act distinguishes between grounds and evidence" and, therefore, IPR estoppel "applies to ***grounds*** . . . even if the ***evidence*** used to support those grounds was not available to be

used in the IPR." *Id.* at 454. But, as the court in *Medline Industries, Inc. v. C.R. Bard, Inc.* observed, "such an interpretation stretches the meaning of the term 'ground' in the IPR estoppel provision too far," because "[i]f Congress had wanted to estop an IPR petitioner from pursuing invalidity grounds that relied upon a physical product in a particular situation, . . . it could have provided language to that effect." 2020 WL 5512132, at *4. Moreover, the court in *Wasica* did not engage in a close analysis of the statutory text and, for this reason, other courts have rejected the holding in *Wasica* and instead followed the holding in *Medline* and other decisions "that have adhered more closely to the statutory language." *Chemours Co.*, 2022 WL 2643517, at *2. For these reasons, the Court declines to follow the reasoning in *Wasica*.[5]

Willis Electric argues, in the alternative, that the common-law doctrines of claim preclusion and issue preclusion should bar Polygroup from asserting an invalidity defense based on anticipation or obviousness in light of the GKI Tree. Res judicata, also known as claim preclusion, "precludes the relitigation of a claim on grounds that were raised or

---

[5] Even if this Court were to apply the reasoning in *Wasica*, Willis Electric would fare no better. In *Wasica*, the district court held that IPR estoppel could apply to a physical product *only if* the product is "materially identical" to and "entirely cumulative" of a patent or printed publication. 432 F. Supp. 3d at 453, 455. The patent owner who invokes IPR estoppel has the burden to demonstrate that estoppel applies. *See Ironburg Inventions Ltd. v. Valve Corp.*, 418 F. Supp. 3d 622, 630 (W.D. Wash. 2019). Here, Willis Electric has not demonstrated that the GKI Tree is materially identical to or entirely cumulative of the Loomis Patent. Although Willis Electric cites evidence vaguely suggesting that the GKI Tree *embodies* the Loomis Patent, that fact alone does not establish that the GKI Tree is *materially identical* to the Loomis Patent. For instance, a product may embody a patented invention yet also include additional *unpatented* features that are material to an invalidity analysis. *Cf. Fox Factory, Inc. v. SRAM, LLC*, 813 F. App'x 539, 542 (Fed. Cir. 2020) (observing that "a product is not coextensive with a claimed invention simply because it falls within the scope of the claim").

could have been raised in the prior action." *Lane v. Peterson*, 899 F.2d 737, 741 (8th Cir. 1990).[6] Issue preclusion bars a party from relitigating an issue that was actually adjudicated in previous litigation between the same parties. *Sandy Lake Band of Miss. Chippewa v. United States*, 714 F.3d 1098, 1102 (8th Cir. 2013). But neither preclusion doctrine will bind a party that did not have a full and fair opportunity to litigate the matter in the earlier proceeding. *See Simmons v. O'Brien*, 77 F.3d 1093, 1095–96 (8th Cir. 1996); *Plough v. W. Des Moines Cmty. Sch. Dist.*, 70 F.3d 512, 517 (8th Cir. 1995). As addressed above, Polygroup did not have a full and fair opportunity to litigate the issue of invalidity based on the GKI Tree in the IPR proceedings because an IPR petitioner cannot rely on a physical product as a prior art reference in such proceedings. For this reason, the Court rejects Willis Electric's alternative argument based on claim preclusion and issue preclusion.

Accordingly, the Court denies Willis Electric's motion for summary judgment as to Polygroup's invalidity defense based on anticipation and obviousness.

### 2. Abstract Ideas (35 U.S.C. § 101)

Willis Electric next argues that Polygroup waived its defense that the asserted claims of the '186 Patent and the '187 Patent are invalid under 35 U.S.C. § 101 for claiming abstract ideas. According to Willis Electric, Polygroup waived this defense by

---

[6] Issues unique to patent cases are governed by Federal Circuit precedent. *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013). However, with respect to procedural issues that are not unique to the Federal Circuit's exclusive jurisdiction over patent matters, such as issue preclusion, the law of the regional circuit applies. *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003).

failing to include this defense in its pleadings. In the alternative, Willis Electric argues that this defense fails as a matter of law.

The Patent Act defines the subject matter that is eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks omitted).

A defendant "must affirmatively state any avoidance or affirmative defense" in its answer to a complaint. Fed. R. Civ. P. 8(c)(1). The Patent Act requires that any invalidity defense, including an invalidity defense under Section 101, "shall be pleaded." 35 U.S.C. § 282(b). And the Federal Circuit has characterized an invalidity defense under Section 101 as an affirmative defense. *See, e.g.*, *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1324 (Fed. Cir. 2017). "Generally, failure to plead an affirmative defense results in a waiver of that defense." *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007) (citing Fed. R. Civ. P. 8(c)). But if "an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply with Rule 8(c) is not fatal." *Id.* (internal quotation marks omitted).

Polygroup does not dispute that it failed to plead an invalidity defense under Section 101 in its answers to Willis Electric's complaint, first amended complaint and second amended complaint. Polygroup argues that it should be excused from this technical failure because Polygroup put Willis Electric on notice of this defense in Polygroup's September 2016 prior art statement. In that document, which is more than 1,100 pages long, Polygroup included one vague statement about invalidity under Section 101: "In addition, or in the alternative, some or all of the Asserted Claims may fail to satisfy the requirements for patentability under 35 U.S.C. § 101 . . . ." Thereafter, in February 2020, Polygroup filed an answer to Willis Electric's second amended complaint, but again failed to plead an invalidity defense under Section 101. In these circumstances, Polygroup has not demonstrated that it raised this defense in a manner that would not result in unfair surprise to Willis Electric. A single vague and equivocal reference to Section 101 in a lengthy prior art statement, which Polygroup seemingly abandoned in a subsequent pleading and did not mention again until serving expert reports, is insufficient to put Willis Electric on fair notice of this defense. As such, Polygroup has not established that it should be excused from its failure to plead this affirmative defense.

The Court grants Willis Electric's motion for summary judgment as to Polygroup's invalidity defense under 35 U.S.C. § 101 based on Polygroup's waiver of that defense.

### 3. Indefiniteness (35 U.S.C. § 112)

Willis Electric next argues that Polygroup has presented insufficient evidence to establish that the asserted claims of the '186 Patent and the '187 Patent are invalid as indefinite under 35 U.S.C. § 112.

A patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112(a). "Whether a patent claim is supported by an adequate written description is a question of fact." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015) (internal quotation marks omitted). A patent specification also must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open" to the public. *Id.* at 909 (internal quotation marks omitted).

It is a defendant's burden to overcome the presumption of patent validity and prove invalidity by clear-and-convincing evidence. 35 U.S.C. § 282(a); *Microsoft Corp.*, 564 U.S. at 111. And a party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts

which create a genuine issue for trial." *Krenik*, 47 F.3d at 957 (internal quotation marks omitted).

Willis Electric contends that Polygroup has no evidence to demonstrate that any specific term in the asserted claims of the '186 Patent and the '187 Patent are invalid under Section 112. Polygroup counters that these claims include functional language—namely, the "independent of" claim limitation—that lacks a corresponding structure for performing the claimed function. In support of this argument, Polygroup relies on the patents and the opinions of Polygroup's invalidity expert, Dr. Martens. Willis Electric counters that Dr. Martens's analysis of this issue is not legally sound.

Apparatus patent claims "are not necessarily indefinite for using functional language." *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (quoting *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008)). "If an apparatus claim is clearly limited to an apparatus possessing the recited structure and *capable* of performing the recited functions, then the claim is not invalid as indefinite." *Id.* (internal quotation marks and brackets omitted). When determining whether an apparatus claim possesses a structure capable of performing the recited functions, the claim language is viewed in light of the written description. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

In his expert report, Dr. Martens opines that "the generic 'trunks' and 'connectors' identified in the claims do not provide adequate corresponding structure that explains or limits how these generic structures perform the claimed function"—that function being,

namely, the ability to make an electrical connection "independent of" the rotational orientation of the trunk portions. The Court construed this disputed functional language in its claim construction order as follows:

> The Court rejects Polygroup's proposed construction of this phrase and adopts Willis Electric's proposed construction of this phrase—namely, "an electrical connection that can be made at any available arrangement of the first tree/trunk portion relative to the second tree/trunk portion about a common vertical axis between the tree-trunk portions."

According to Dr. Martens, the asserted patent claims fail to provide a corresponding structure to perform this function.

Significantly, Dr. Martens's indefiniteness opinion does not address the terms "coaxial trunk connectors" and "coaxial electrical contact set," which appear in claim 15 of the '186 Patent and claims 4, 10 and 13 of the '187 Patent.[7] The Court construed these terms in its claim construction order as follows:

> The Court adopts Willis Electric's proposed construction of "coaxial trunk connectors"—namely, "connectors capable of making an electrical connection between trunk sections and that include a set of electrical contacts that permit the electrical connection to be made about a common vertical axis of the trunk sections." And the Court adopts Polygroup's proposed construction of "coaxial contact sets"—namely, "a set of electrical contacts that share a common vertical axis."

The Court also construed the related claim terms "trunk electrical connector/trunk connector" and "trunk connector assembly" as follows:

---

[7] Dr. Martens briefly references the "coaxial trunk connectors" term in his report, but he does not opine that this term is indefinite or insufficiently describes a structure capable of performing the claimed function.

> The Court construes the terms "trunk electrical connector," "trunk connector," and "trunk connector assembly" to mean "an assembly that is capable of making an electrical connection between trunk/tree portions."

Both the '186 Patent and the '187 Patent include multiple figures and written descriptions of these physical structures—namely, trunk connectors, coaxial trunk connectors and coaxial contact sets. For instance, the figures and specifications depict and describe "male" and "female" counterpart connectors and contact sets that form coaxial electrical connections when two trunk portions are mechanically coupled along a common vertical axis. Willis Electric's technical expert, Dr. Dickens, opines that an "electrical contact set [is] of a coaxial nature when it has an electrical contact generally at a center point of the connector and another contact at a location around the center point such that the electrical contacts mate . . . no matter at what rotational orientation the [mechanical] connectors mate." Dr. Martens opines that the asserted patents describe "generic" structures involving "conventional parts arranged in conventional ways." But, as Dr. Dickens counters, the asserted patents describe a "novel combination or arrangement" of trunk portions that contain "electrical connectors *of the described coaxial nature* that allow for an electrical connection to be made at any rotational orientation at which a mechanical connection is made without having to separately align and connect electrical prongs to create [an] electrical connection." The only evidence on which Polygroup relies for its indefiniteness argument—namely, the asserted patents and the anticipated opinion testimony of Dr. Martens—does not establish that the asserted patents fail to disclose a structure capable of performing the recited functions.

In summary, although it is Polygroup's burden to overcome the presumption of patent validity and prove invalidity by clear-and-convincing evidence, Polygroup has not presented clear-and-convincing evidence establishing that the asserted claims of the '186 Patent or the '187 Patent are invalid as indefinite under 35 U.S.C. § 112. Accordingly, the Court grants Willis Electric's motion for summary judgment as to Polygroup's invalidity defense based on alleged indefiniteness under 35 U.S.C. § 112.

**B. Polygroup's Motion for Summary Judgment**

Polygroup moves for summary judgment as to invalidity, non-infringement and lost profits. Polygroup also seeks dismissal of two named defendants, arguing that these defendants are holding companies that do not sell any products accused of infringement. The Court addresses each argument in turn.

**1. Invalidity**

Polygroup argues that certain asserted claims of the One Plug Tree Patents are invalid as obvious in light of a prior art product—namely, the GKI Tree. Polygroup also argues that both asserted claims of the '617 Patent are invalid as anticipated by a prior art product—namely, the Wesley Pine Tree.

**a. Invalidity for Obviousness (35 U.S.C. § 103).**

Polygroup contends that certain asserted claims of the One Plug Tree Patents are invalid as obvious in light of the GKI Tree. Specifically, Polygroup argues that the following asserted patent claims are invalid as obvious: claims 7, 15 and 17 of the '186 Patent; claims 4, 10 and 13 of the '187 Patent; claims 12, 15 and 32 of the '379 Patent and claim 5 of the '072 Patent.

A patent is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. Determining whether a patent is invalid for obviousness requires considering "the scope and content of the prior art," any "differences between the prior art and the claims at issue," "the level of ordinary skill in the pertinent art" and "[s]uch secondary considerations as commercial success, long felt but unsolved needs, [and] failure of others." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (internal quotation marks omitted). Other relevant considerations include the "the effects of demands known to the design community or present in the marketplace" and "background knowledge possessed by a person having ordinary skill in the art." *Id.* at 418. The party seeking to invalidate a patent based on obviousness must establish this affirmative defense by clear-and-convincing evidence. *Microsoft Corp.*, 564 U.S. at 96–97.

The initial considerations in the obviousness analysis are "the scope and content of the prior art" and, relatedly, any "differences between the prior art and the claims at issue." *KSR Int'l*, 550 U.S. at 406. These considerations are factual inquiries. *Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1335 (Fed. Cir. 2015). Willis Electric's expert Dr. Dickens opines that the GKI Tree is materially different from the inventions claimed in One Plug Tree Patents because the GKI Tree lacks coaxial trunk connectors, an "interference fit" between certain components, detachable wiring and coaxial contact sets. To be sure, some of Dr. Dickens's opinions about the differences between the GKI Tree and the

CASE 0:15-cv-03143-WMW-DTS Doc. 748 Filed 01/05/23 Page 54 of 77

inventions claimed in the One Plug Tree Patents involve discrediting Polygroup's contrary evidence, including the opinions of Dr. Martens. But the burden to prove invalidity by clear-and-convincing evidence rests with Polygroup. *Microsoft Corp.*, 564 U.S. at 96–97. A jury reasonably could believe Dr. Dickens, and disbelieve Dr. Martens, about the similarities and differences between the GKI Tree and the inventions claimed in the One Plug Tree Patents.

In addition, it is undisputed that the GKI Tree is materially different from the inventions claimed in the One Plug Tree Patents in at least one way: the GKI Tree undisputedly did not have coaxial contact sets. Polygroup contends that it would have been obvious for a person skilled in the art to substitute the DC connector in the GKI Tree with a coaxial AC connector. A party seeking to invalidate a patent based on obviousness must establish, by clear-and-convincing evidence, that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *InTouch Techs. Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014) (internal quotation marks omitted). An expert's testimony as to obviousness must provide more than "a conclusory statement that a person of ordinary skill in the art would have known . . . how to combine any number of [prior art] references to achieve the claimed inventions." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). Because such a

conclusory statement is "fraught with hindsight bias," an expert must provide a factual basis for such a conclusion.[8] *Id.*

Dr. Martens opines that a person of ordinary skill in the art would have reason modify the GKI Tree to include a coaxial electrical connector. In support of this opinion, Dr. Martens observes that such connectors were widely known and available and that a person "of skill with this knowledge would find it obvious that . . . one connector could be replaced by another." In addition to the availability of the component parts, a skilled artisan "may have other reasons" for making such a modification to the GKI Tree, such as "improving ease of manufacturing and mitigating mechanical wear-and-tear." In short, Dr. Martens's opinions about motivation to combine are based on the facts that the component parts were known and readily available, and that the modification would improve the manufacturing process and reduce mechanical wear-and-tear.

In response, Dr. Dickens does not dispute that "a wide range of various types of electrical connectors were available and known." But he opines that implementing such a modification to the GKI Tree "would have required experimentation" and would not be as simple as Dr. Martens suggests, because the components "must be physically and electrically compatible with the other components." According to Dr. Dickens, a skilled artisan "would have had to go through numerous steps to attempt to design, create, and

---

8 An expert can "guard against this hindsight bias by appropriately considering all objective evidence of nonobviousness," including but not limited to the commercial success of the patentee's product or service, industry praise or licenses. *InTouch Techs.*, 751 F.3d at 1352. Both Dr. Dickens and Dr. Martens address these factors in their respective expert reports. As such, a genuine issue of material fact exists as to these factors.

CASE 0:15-cv-03443-WMW-DTS Doc. 748 Filed 01/06/23 Page 56 of 77

manufacture a custom coaxial connector that could work for that type of tree," which could have required "months of work and time, and hundreds of thousands of dollars to complete." And Dr. Dickens details the complexity of this process, opining that a skilled artisan would not have been motivated to undertake such a process. Dr. Dickens also explains in detail why he disagrees with Dr. Martens's opinion that improving the manufacturing process and reducing mechanical wear-and-tear would have been significant motivating factors. These competing opinions present a genuine dispute of material fact as to whether a person of ordinary skill in the art would have been motivated to modify the GKI Tree and whether that person would have had a reasonable expectation of success in doing so.

In addition, Dr. Dickens and Dr. Martens present competing opinions as to the secondary considerations for an obviousness analysis. These objective secondary considerations include commercial success, long felt but unsolved needs and the failure of others. *KSR Int'l*, 550 U.S. at 406. A court must always consider such evidence, when presented, as part of the obviousness analysis. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). "Objective evidence of no obviousness is an important component of the obviousness inquiry because evidence of secondary considerations may often be the most probative and cogent evidence in the record," and such evidence "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Id.* (internal quotation marks omitted). Dr. Dickens opines about the commercial success of products embodying the One Plug Tree Patents, industry adoption, industry praise and the failure

of and copying by others. In addition, Willis Electric's damages expert opines about commercial success, licensing and industry praise. And Willis Electric cites evidence from fact witnesses, such as buyers for retailers, pertaining to these factors. For these reasons, there are genuine disputes of material fact as to the secondary considerations for the obviousness analysis.

In summary, because numerous disputes of material fact exist, the Court denies Polygroup's motion for summary judgment as to invalidity based on obviousness under 35 U.S.C. § 103.

**b. Invalidity for Anticipation (35 U.S.C. § 102)**

Polygroup contends that claims 4 and 11 of the '617 Patent are anticipated by a prior art product—the Wesley Pine Tree—and, therefore, invalid under 35 U.S.C. § 102.

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp.*, 339 F.3d at 1377. The disclosure of a claim limitation in a prior art reference may be either express or inherent. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1306 (Fed. Cir. 2019). Whether a patent claim is invalid based on anticipation "is a question of fact." *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012).

As an initial matter, Willis Electric argues that the Wesley Pine Tree is not prior art because Polygroup relies on photographs and illustrations of this product that were created in 2016, after the effective filing date of the '617 Patent.[9] A physical product is

---

[9] It is undisputed that the critical date of the '617 Patent is in 2011, when the patentee filed the provisional patent application.

CASE 0:15-cv-03443-WMW-DTS Doc. 748 Filed 01/06/23 Page 58 of 77

prior art if it was "in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1). A patent challenger must prove, by clear-and-convincing evidence, that alleged prior art predates the patent's effective filing date. *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1368 (Fed. Cir. 2019). Willis Electric argues that photographs and illustrations of the Wesley Pine Tree were created after the effective filing date of the '617 Patent. But these photographs and illustrations are not the prior art on which Polygroup relies. Rather, Polygroup contends that the Wesley Pine Tree—the physical product itself—is the prior art that anticipates the '617 Patent. Polygroup presents undisputed evidence that the Wesley Pine Tree was sold in 2008 and 2009, before the effective filing date of the '617 Patent. And Polygroup presents evidence that the photographs on which it relies depict the same structure as the Wesley Pine Tree products sold in 2008 and 2009. As such, there is no genuine dispute as to whether the Wesley Pine Tree is prior art.

To invalidate the '617 Patent, the Wesley Pine Tree must disclose "each and every limitation of the claimed invention." *Schering Corp.*, 339 F.3d at 1377. Here, the parties dispute whether the Wesley Pine Tree discloses a "plurality of ribs." Asserted claims 4 and 11 of the '617 Patent depend on claim 1, which requires that "the inner wall" of the coupling mechanism "further compris[es] a plurality of ribs." The parties' dispute pertains to whether the Wesley Pine Tree discloses the same "plurality of ribs" depicted in Figure 9 of the '617 Patent, as shown below:



**’617 Patent, Fig. 9**



**Wesley Pine Tree coupling mechanism**

The Court did not construe the claim term “plurality of ribs.” A commonly understood meaning of “rib” is “an elongated ridge.” *See* Merriam-Webster’s Collegiate Dictionary 1071 (11th ed. 2014); *see also id.* at 1072 (defining “ridge” as “an elevated body part or structure,” “an elongated crest or linear series of crests,” or “a raised strip”). Consistent with this commonly understood meaning, the ’617 Patent describes “ribs” or “rib-like projections” that form channels in the coupling mechanism that mirror the shape of corresponding “ridges” in another trunk portion. And figures in the ’617 Patent clearly depict ribs as ridges or raised strips, such as the ribs labeled in Figure 4 with numbers 156 and 159, as shown below:

*Fig. 4*



Polygroup maintains that the internal hexagonal surfaces of the coupling mechanism in the Wesley Pine Tree can be considered a "plurality of ribs" because they are identical to the internal hexagonal surfaces of the coupling mechanism in Figure 9 of the '617 Patent. But Dr. Dickens disagrees. At his deposition, Dr. Dickens testified that "Figure 9 . . . has these structures coming in a double line," meaning that the corners of the hexagonal shape do not come to a "point," but instead the inside surface is "sticking out inward." Indeed, the specification of the '617 Patent describes Figure 9 as having "radially-extending ribs **230** that are substantially flat along the inner surface **232**, *but form channels that* mirror the shape of the vertices of the edges around second trunk portion **204** in a hexagonal shape." As shown below, and consistent with Dr. Dickens's testimony, the corners of this hexagonal shape do not come to a point on either the insertable portion of Figure 8 or the inner cavity of Figure 9:

*Fig. 8*




*Fig. 9*



In contrast, it is undisputed that the flat surfaces of the hexagonal inner cavity of the Wesley Pine Tree's coupling mechanism meet at points:



For this reason, Willis Electric has presented evidence from which a jury reasonably could find that the Wesley Pine Tree does not disclose every limitation of asserted claims 4 and 11 of the '617 Patent.

Accordingly, the Court denies Polygroup's motion for summary judgment as to invalidity based on anticipation under 35 U.S.C. § 102.

### 2. Non-Infringement

Polygroup moves for summary judgment of non-infringement as to the asserted claims of the One Plug Tree Patents and the '617 Patent.

Whoever "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent," infringes that patent. 35 U.S.C. § 271(a). A district court employs a two-step analysis when making a patent-infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, the district court construes the asserted claims of the patent to ascertain their meaning and scope. *Id.* Second, the fact finder compares the

construed claims to the accused product. *Id.* Because the Court previously construed the disputed claim terms in this case, only step two is now at issue. Summary judgment of non-infringement is appropriate if, after resolving all reasonable factual inferences in favor of the patentee, "no reasonable jury could find infringement." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1130 (Fed. Cir. 2011).

"A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Am. Med. Sys. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 895 (D. Minn. 2010) (quoting *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009)). As such, a "district court should approach a motion for summary judgment on the fact issue of infringement with great care." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 528 (Fed. Cir. 1996).

According to Polygroup, the undisputed evidence establishes that its accused products do not infringe the asserted patents because the accused products lack seven features claimed in the asserted patents. Willis Electric counters that genuine disputes of material fact exist as to each of these issues. The parties also dispute whether Willis Electric waived its doctrine-of-equivalents theory of infringement as to claims 4 and 10 of the '187 Patent. The Court addresses each argument in turn.

**a. Electrical Connection Independent of Rotational Orientation**

The parties first dispute whether Polygroup's accused products have "an electrical connection that can be made at any available arrangement of the first tree/trunk portion

relative to the second tree-trunk portion," as required by several asserted claims of the '186 Patent and the '187 Patent.

It is undisputed that Polygroup's accused products have trunk connectors that include twelve plastic "fins" around their perimeter, as depicted below:



Polygroup contends that, in its accused products, an electrical connection *cannot* be made at "any available arrangement" of two trunk portions because if the "fins" of one connector are positioned precisely to rest on top of the "fins" of another connector, the two trunk portions will be mechanically coupled but *not* electrically connected. In other words, there are available arrangements of the trunk portions in Polygroup's products that do not permit an electrical connection to be made. In support of this argument, Polygroup relies on the opinions of its expert, Dr. Martens.

Willis Electric counters this argument by relying on the opinions of its expert, Dr. Dickens. He repeatedly testified that the fins in the connectors of Polygroup's accused products *prevent* a mechanical connection from occurring if one set of fins is resting on top of another set of fins, and that it is "not a mechanical connection just because they touch." Dr. Dickens explained that "those ribs are quite flimsy" and "there

is no way the plastic on that section is going to handle [the] weight" of the tree. For this reason, according to Dr. Dickens, if the fins of one connector rest on top of the fins of another connector it will not form a stable connection, the lower fins will yield and the top portion will slide down into place and form an electrical connection. Polygroup characterizes this opinion as factually unsupported speculation. But a qualified expert's "observations coupled with expertise generally may form the basis of an admissible expert opinion." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 (8th Cir. 2007). Dr. Dickens's testimony reflects that he relied on his expertise and observations, including his experience assembling similar artificial trees. As such, there is a genuine dispute of material fact as to whether Polygroup's accused products have "an electrical connection that can be made at any available arrangement of the first tree/trunk portion relative to the second tree-trunk portion."

For this reason, the Court denies Polygroup's motion for summary judgment of non-infringement on this basis.

**b. Coupling of Trunk Bodies/Trunk Walls**

The parties next dispute whether "coupling" occurs between the trunk bodies or the trunk walls of Polygroup's accused products, as required by the asserted claims of the '186 Patent, the '187 Patent and the '072 Patent.

In its accused products, Polygroup argues, "the coupling or connection between trunk portions occurs at the connectors, not between the trunk bodies or trunk walls." In support of this contention, Polygroup relies on the opinions of Dr. Martens and design

drawings, which reflect that the trunk portions do not physically touch but instead have a gap of at least 0.25 millimeters.

As an initial matter, it is unclear why Polygroup believes that "coupling" trunk portions requires the trunk portions to be touching or in physical contact. The term "coupling" is commonly understood to mean "the act of bringing or coming together" or "a device that serves to connect the ends of adjacent parts or objects." *See* Merriam-Webster's Collegiate Dictionary 286 (11th ed. 2014). The plain meaning of "coupling" does not require physical contact or touching. Consistent with this plain meaning, the Court construed "coupling mechanism" to mean, in part, a "hollow structure *for joining two trunk portions*." And the Court rejected a construction that would require a coupling mechanism to create a "snug" or "secure" fit between trunk portions. Polygroup has identified nothing in the specifications of the asserted patents suggesting that "coupling" requires physical contact or touching. Indeed, the word "touch" appears nowhere in the asserted patents.

Even if physical touching or contact were required, Dr. Dickens provides three reasons why, in his opinion, the trunk bodies in Polygroup's accused products satisfy this claim limitation. Based on his review of the relevant design drawings, his physical inspection of the products, and his expertise, Dr. Dickens opines that the trunk bodies "touch, absolutely," because "necking occurs at the top of the first trunk portions, the alleged gap on which Dr. Martens relies does not account for paint and surface finishing, and trunk bodies cannot remain perfectly vertical as would be required to maintain a gap as small as 0.25 millimeters." Polygroup again characterizes this opinion as factually

unsupported speculation. But a qualified expert may rely on "observations coupled with expertise," which Dr. Dickens has done here. *Shuck*, 498 F.3d at 875. As such, a genuine dispute of material fact exists as to this issue.

Accordingly, the Court denies Polygroup's motion for summary judgment of non-infringement on this basis.

**c. Interference Fit**

The parties next dispute whether the connectors in Polygroup's accused products have an "interference fit" with the trunk portions, as required by the asserted claims of the '186 Patent and the '379 Patent.

The asserted claims of the '186 Patent and the '379 Patent require that the trunk connector "forms an interference fit" with the trunk body when inserted therein. The Court did not construe this term, but the parties agreed in their joint claim construction statement that an "interference fit" is "an engineered connection where two components or parts to be connected are manufactured to be of different dimensions such that when one component is pressed into the other, they interfere and deform to force a connection." According to Polygroup, when a connector is inserted into the trunk of Polygroup's accused products, "a gap exists and there is neither interference nor deformation to force a connection." In support of this argument, Polygroup relies on declarations from Dr. Martens and a Polygroup engineer. Dr. Martens bases his opinions on his review of the engineering drawings and measurements as well as his inspection of an example of the product.

Contrary to Polygroup's evidence, Dr. Dickens opines in his report and deposition testimony that, when he tested the accused products, he had to push and exert force to slide the connector in and out of the trunk body. Dr. Dickens also observed discoloration, markings and scratches on the component parts that, in his opinion, demonstrate that the connectors in some of Polygroup's accused products have an "interference fit" with the trunk portions. And Dr. Dickens testified that there are protrusions on the plastic connector that may cause an interference fit with the trunk portion. Polygroup vigorously disagrees with Dr. Dickens's observations and opinions. But Polygroup's disagreements implicate the weight and credibility of Dr. Dickens's opinions. It is the role of the jury, not the Court, to make credibility determinations and weigh the evidence. On this record, there is a genuine dispute of material fact as to whether the connectors in some of Polygroup's accused products have an "interference fit" with the trunk portions.

Accordingly, the Court denies Polygroup's motion for summary judgment of non-infringement on this basis.

**d. Detachably Connected Wiring**

The parties next dispute whether the wiring in Polygroup's accused products are "detachably connected," as required by claim 7 of the '186 Patent, claim 32 of the '379 Patent and claim 5 of the '072 Patent.

According to Polygroup, after its accused products are assembled prior to sale, the wiring is no longer "detachable" without first disassembling the product. Willis Electric does not dispute this fact and relies on evidence that the wiring in Polygroup's accused products is detachable *before* the wiring is inserted into the trunk portion during assembly

and remains detachable after assembly if the trunk portion is disassembled. According to Willis Electric, a product can infringe the "detachably connected" claim limitation even if the wiring is detachable only before the product is assembled and sold to a consumer.

As addressed above in Part I.C.4. of this Order, a "device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech*, 49 F.3d at 1555. "The question is not what a device might have been made to do, but what it was intended to do and did do," and the fact that "a device could have been made to do something else does not of itself establish infringement." *Id.* (internal quotation marks and brackets omitted).

Here, it is undisputed that Polygroup did not design its accused products to have the internal wiring detached by a consumer during operation. Nor is there any evidence in the record suggesting that any functional purpose would be served by a consumer dismantling Polygroup's artificial trees or that any consumer has done so. To the contrary, Willis Electric had to *permanently destroy* Polygroup's artificial tree, by cutting the trunk body open, to detach the wiring assemblies. The circumstances in this case are identical to the circumstances in *High Tech* in all material respects. *See id.* at 1556 (observing that alleged infringer did not design its camera to rotate during operation and nothing in the record demonstrated that removing the set screws would serve a functional purpose or that any user had done so during actual use). The undisputed facts establish that Polygroup's accused products do not contain "detachably connected" wiring as required by claim 7 of the '186 Patent, claim 32 of the '379 Patent and claim 5 of the '072 Patent.

Accordingly, the Court grants Polygroup's motion for summary judgment of non-infringement as to claim 7 of the '186 Patent, claim 32 of the '379 Patent and claim 5 of the '072 Patent on this basis.

**e. Insertable/Securable Trunk Connectors**

The parties next dispute whether the trunk connectors in Polygroup's accused products are "insertable" or "securable" into the trunk bodies, as required by claim 12 of the '379 Patent.

Similar to the detachability of the wiring assemblies addressed above, Polygroup argues that the trunk connectors in its accused products are inserted and secured into the trunk bodies during assembly before they are sold and, therefore, are not designed to be inserted or secured by a consumer. Willis Electric does not dispute this fact and relies solely on evidence that the trunk connectors in Polygroup's accused products are capable of being inserted and secured into the trunk bodies during assembly.

The Federal Circuit has distinguished between a claim that requires a particular structure—such as "a camera 'rotatably coupled' to a body member"—and a claim that only requires a capacity to perform a function—such as magnetic members "capable of engaging" other magnetic members. *Revolution Eyewear*, 563 F.3d at 1369 (distinguishing *High Tech*). The "rotatably coupled" claim language in *High Tech* described a structure with a particular characteristic, and the accused product in that case did not possess that characteristic unless the structure was altered in an unintended manner. *See id.* By contrast, the "capable of engaging" claim language in *Revolution Eyewear* described the capacity to perform a function, and that functional capacity was

inherent in the accused product regardless of whether the product was intended to perform that function and regardless of whether any customer ever performed the function. *See id.* In the latter circumstance, because the accused product had the capacity to perform the claimed function, the Federal Circuit affirmed the district court's decision to grant summary judgment as to infringement. *Id.* at 1370.

Here, the claim language at issue requires a "trunk connector insertable into the first trunk body . . . and securable to the first trunk body." Unlike the "detachably connected" claim language addressed above, claim 12 of the '379 Patent does not describe the characteristics of a structure. Rather, this claim language describes a capability—namely, the capacity to be inserted into and secured to a trunk body. There is no dispute that the trunk connectors in Polygroup's accused products possess that functional capability, even if no consumer ever performs that function. These circumstances are akin to the circumstances in *Revolution Eyewear*. *See id.* at 1369–70 (observing that, when a claim requires the capacity to perform a function, it is "irrelevant" that the accused products "are not actually used" in that manner so long as they possess the functional capability).

However, in *Revolution Eyewear*, the Federal Circuit recognized a second factual distinction with *High Tech*—namely, whether the accused product must be "altered in any way" for it to be capable of the claimed function. *Id.* at 1370. In *Revolution Eyewear*, no alteration of the accused product was necessary because the accused product was "capable of engaging" magnetic members "*as made and sold*." *Id.* It is undisputed here that, after they are made and sold, the trunk connectors in Polygroup's accused

products are no longer "insertable into" or "securable to" a trunk body without first disassembling the products. For this reason, this case is factually distinguishable from *Revolution Eyewear*. The undisputed facts establish that Polygroup's accused products do not contain trunk connectors that are "insertable into" or "securable to" trunk bodies as required by claim 12 of the '379 Patent.

Accordingly, the Court grants Polygroup's motion for summary judgment of non-infringement as to claim 12 of the '379 Patent on this basis.

**f. Wires that Extend Between Ends of First Trunk Portion**

The parties next dispute whether the wires in Polygroup's accused products "extend[ ] between a first end of the first trunk portion and a second end of the first trunk portion," as required by claim 7 of the '186 Patent. In light of the Court's conclusion in Part II.B.2.d. of this Order, the Court need not address this issue because Willis Electric cannot establish infringement of claim 7 of the '186 Patent as a matter of law.

**g. Electrical Connection Along the Central Vertical Axis**

The parties next dispute whether Polygroup's accused products have electric contacts that make "an electrical connection . . . at a point along the central vertical axis," as required by claim 4 of the '187 Patent.

According to Polygroup, its accused products have electrical contacts that make an electrical connection off-center as opposed to making the connection along the central vertical axis. In support of this argument, Polygroup relies on the declaration of Dr. Martens, who opines that "[b]ecause the centermost cylindrical electrical contact of the first trunk portion is located off the central vertical axis, it cannot make contact with

the center pin electrical contact of the second trunk portion at a point along the central vertical axis." Dr. Martens relies on the following images to depict how the electrical connection (annotated in blue) occurs off-center:



According to Willis Electric, the opinions of Dr. Martens conflate physical contact with electrical connection. As Dr. Dickens testified, "[e]lectrical connection is not—does not mean contact. Electrical connection is any structure that allows the current to flow through it." As such, Dr. Dickens opines that although the physical contact might be off-center, "the [electrical] current is allowed to flow right in, right into the middle and right up through the—the center of it. And that is an electrical connection that's made when you allow the electrons to flow through that entirety of metal structure." Although the parties did not seek a construction of the claim term "electrical connection," Dr. Dickens's testimony is consistent with the specification of the '187 Patent, which

depicts electrical contacts akin to those depicted in Dr. Martens's declaration. On this record, there is a genuine dispute of material fact as to this issue.

Accordingly, the Court denies Polygroup's motion for summary judgment of non-infringement on this basis.

**h. Doctrine of Equivalents**

Polygroup next argues that Willis Electric has waived any doctrine-of-equivalents argument as to claims 4 and 10 of the '187 Patent because Willis Electric failed to assert this theory in its final infringement claim charts. The Court agrees for the reasons addressed in Part I.C.6. of this Order. Accordingly, the Court grants Polygroup's motion for summary judgment of non-infringement as to claim 4 and claim 10 of the '187 Patent with respect to the Group I and Group II accused products.

**3. Lost Profits**

Polygroup next argues that Willis Electric cannot prove that it is entitled to lost profits damages.

If patent infringement is proved, "the court shall award the [patentee] damages adequate to compensate for the infringement." 35 U.S.C. § 284. The phrase "damages adequate to compensate" in Section 284 "includes any foreseeable lost profits the patent owner can prove." *Grain Processing*, 185 F.3d at 1349. If a patentee cannot prove lost profits, the statute sets "a reasonable royalty" as the damages floor. *See* 35 U.S.C. § 284.

To recover lost profits as opposed to a reasonable royalty, "a patent owner must prove a causal relationship between the infringement and its loss of profits." *BIC Leisure*, 1 F.3d at 1218. In other words, "[t]he patent owner must show that 'but for' the

infringement, it would have made the infringer's sales." *Id.* The Federal Circuit has adopted the four-factor *Panduit* test as one method for a patentee to establish entitlement to lost profits damages. *Rite-Hite*, 56 F.3d at 1545 (citing *Panduit Corp.*, 575 F.2d at 1152). This test requires the patentee to establish (1) demand for the patented product, (2) the absence of acceptable non-infringing alternatives, (3) the patentee's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that the patentee would have made. *Id.*

When considering the *Panduit* factors, the "requirement that patentees prove demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and *ensures that damages are commensurate with the value of the patented features*." *Mentor Graphics*, 851 F.3d at 1288 (emphasis added). "Products lacking the advantages of the patented invention can hardly be termed a substitute acceptable to the customer who wants those advantages." *Id.* at 1285–86 (internal quotation marks and brackets omitted). Determining whether a party has proven the absence of acceptable non-infringing alternatives typically is a fact question for the jury to resolve. *See id.* at 1287.

Polygroup argues that Willis Electric's damages expert, when assessing non-infringing alternatives under the *Panduit* test, erroneously defines acceptable non-infringing alternative designs to be designs that are "easily and quickly assembled." According to Polygroup, ease of assembly is not an advantage of Willis Electric's patented features and, therefore, Willis Electric's definition of acceptable alternatives is incorrect. However, Willis Electric's damages expert provides detailed opinions, based

on her examination of evidence, demonstrating a connection between ease of assembly and the patented inventions. Because this is a factual dispute for the jury to resolve, summary judgment as to this issue is unwarranted.

Polygroup tries to avoid this result by framing this factual dispute as a legal error. According to Polygroup, on appeal from PTAB's final written decision in the IPR proceedings, the Federal Circuit determined that ease of assembly is not a patented advantage of Willis Electric's patents. But, as addressed in Part I.B.1. of this Order, Polygroup's arguments as to this issue are unavailing for several reasons. And these disagreements reflect factual disputes that preclude summary judgment.

The Court, therefore, denies Polygroup's motion for summary judgment as to lost profits.

**4. Holding Company Defendants**

Finally, Polygroup seeks summary judgment as to Defendants Polygroup Macau Limited (BVI) and Polytree (H.K) Co. Ltd., arguing that there is no evidence that these holding companies engaged in any infringing conduct.

Willis Electric's second amended complaint alleges two types of indirect infringement: induced infringement and contributory infringement. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). An induced-infringement claim requires the defendant to know that the induced acts result in patent infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011). In addition, the plaintiff must establish that it was the defendant's specific intent to encourage another's infringement. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306

(Fed. Cir. 2006). Liability for contributory infringement "requires proof that (1) the defendant had knowledge of the patent in suit, (2) the defendant had knowledge of patent infringement, and (3) the accused product is not a staple article or commodity of commerce suitable for a substantial noninfringing use." *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021) (quoting *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015)); *accord* 35 U.S.C. § 271(c).

When moving for summary judgment, the "moving party bears the burden of brining forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law." *Shelter Ins. Cos. v. Hildreth*, 255 F.3d 921, 924 (8th Cir. 2001). Polygroup's failure to address the elements of induced or contributory infringement does not satisfy this burden. Moreover, Willis Electric identifies evidence that senior officers at the Polygroup holding companies knew about the asserted patents and the alleged infringement of those patents. As such, genuine disputes of material fact exist with respect to this issue.

Accordingly, the Court denies Polygroup's motion for summary judgment on this basis.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiff Willis Electric Co., Ltd.'s motion to exclude the expert testimony of Julie L. Davis, (Dkt. 648), is **DENIED**.

2. Plaintiff Willis Electric Co., Ltd.'s motion for summary judgment, (Dkt. 657), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part II.A. of this Order.

3. Defendants Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd. and Polygroup Trading Limited's motion to exclude the expert testimony of Michele Riley, (Dkt. 666), is **DENIED**.

4. Defendants Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd. and Polygroup Trading Limited's motion to exclude the expert testimony of Dr. James Dickens, (Dkt. 675), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part I.C. of this Order.

5. Defendants Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd. and Polygroup Trading Limited's motion for summary judgment, (Dkt. 689), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part II.B. of this Order.

Dated: January 5, 2023

s/Wilhelmina M. Wright
Wilhelmina M. Wright
United States District Judge

8411265

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

September 11, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *8,454,186*
ISSUE DATE: *June 4, 2013*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Curtis Goffe
Certifying Officer

**Plaintiff's Exhibit**
**P-1**
0:15-cv-03443-WMW-DTS

US008454186B2

(12) **United States Patent**
**Chen**

(10) **Patent No.: US 8,454,186 B2**
(45) **Date of Patent: *Jun. 4, 2013**

(54) **MODULAR LIGHTED TREE WITH TRUNK ELECTICAL CONNECTORS**

(75) Inventor: **Johnny Chen**, Sindian (TW)

(73) Assignee: **Willis Electric Co., Ltd.**, Taipei (TW)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/112,650**

(22) Filed: **May 20, 2011**

(65) **Prior Publication Data**

US 2012/0076957 A1 Mar. 29, 2012

**Related U.S. Application Data**

(60) Provisional application No. 61/385,751, filed on Sep. 23, 2010.

(51) **Int. Cl.**
***F21S 6/00*** (2006.01)
***A47G 33/04*** (2006.01)

(52) **U.S. Cl.**
USPC ............................... **362/123**; 362/122; 428/8

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,656,148 A | 1/1928 | Harris | |
| 2,969,456 A | 1/1961 | Raymaley | |
| 3,118,617 A | 1/1964 | Hellrich | |
| 3,214,579 A | 10/1965 | Pacini | |
| 3,571,586 A | 3/1971 | Duckworth | |
| 3,617,732 A | 11/1971 | Fisher | |
| 3,704,366 A | 11/1972 | Korb et al. | |
| 3,970,834 A | 7/1976 | Smith | |
| 4,072,857 A | 2/1978 | DeVicaris | |
| 4,140,823 A * | 2/1979 | Weskamp | 428/9 |
| 4,493,523 A | 1/1985 | Leong et al. | |
| 4,516,193 A | 5/1985 | Murphy | |
| 4,631,650 A | 12/1986 | Ahroni | |
| 4,779,177 A | 10/1988 | Ahroni | |
| 4,805,075 A | 2/1989 | Damore | |
| 4,807,098 A | 2/1989 | Ahroni | |
| 4,855,880 A | 8/1989 | Mancusi, Jr. | |
| 4,859,205 A | 8/1989 | Fritz | |
| 4,899,266 A | 2/1990 | Ahroni | |
| 5,033,976 A | 7/1991 | Sarian et al. | |
| 5,104,608 A | 4/1992 | Pickering | |
| 5,109,324 A | 4/1992 | Ahroni | |
| 5,121,310 A | 6/1992 | Ahroni | |
| 5,218,233 A | 6/1993 | Takahashi | |
| 5,550,720 A | 8/1996 | Carroll | |
| 5,586,905 A | 12/1996 | Marshall et al. | |
| 5,776,559 A | 7/1998 | Woolford | |

(Continued)

*Primary Examiner* — Britt D Hanley
(74) *Attorney, Agent, or Firm* — Christensen Fonder P.A.

(57) **ABSTRACT**

A lighted artificial tree includes a first tree portion including a first trunk portion, first branches joined to the first trunk portion, and a first light string. The first trunk portion has a trunk connector and a first trunk wiring assembly, the first trunk wiring assembly is electrically connectable to the first light string and the trunk connector, and at least a portion of the first wiring assembly is located inside the first portion. The second tree portion includes a second trunk portion, second branches, and a second light string. The second trunk portion has a trunk connector and a second trunk wiring assembly, the second trunk wiring assembly electrically connectable to the second lighting string and the trunk connector. The second tree portion may be mechanically coupled and electrically connected to the first tree portion by coaxially coupling the first trunk portion to the second trunk portion.

**28 Claims, 14 Drawing Sheets**



U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 5,820,248 | A | 10/1998 | Ferguson |
| 5,829,865 | A | 11/1998 | Ahroni |
| 5,921,806 | A | 7/1999 | Shuey |
| 6,030,670 | A | 2/2000 | Chang |
| 6,079,848 | A | 6/2000 | Ahroni |
| 6,111,201 | A | 8/2000 | Drane et al. |
| 6,147,367 | A | 11/2000 | Yang et al. |
| 6,457,839 | B1 | 10/2002 | Grandoit |
| 6,514,581 | B1 | 2/2003 | Gregory |
| 6,533,437 | B1 | 3/2003 | Ahroni |
| 6,544,070 | B1 | 4/2003 | Radliff |
| 6,588,914 | B1 | 7/2003 | Tang |
| 6,609,814 | B2 | 8/2003 | Ahroni |
| D486,385 | S | 2/2004 | Smith-Kielland et al. |
| 6,752,512 | B2 * | 6/2004 | Pan ............................ 362/123 |
| 6,794,825 | B1 | 9/2004 | Kao |
| 6,883,951 | B2 | 4/2005 | Wu |
| 6,908,215 | B2 | 6/2005 | Wu |
| 6,951,405 | B2 | 10/2005 | Yao |
| 7,052,156 | B2 | 5/2006 | Primeau |
| 7,055,980 | B2 | 6/2006 | Wu |
| 7,055,981 | B2 | 6/2006 | Yao |
| 7,132,139 | B2 | 11/2006 | Yang |
| 7,585,552 | B2 | 9/2009 | Meseke |
| 7,695,298 | B2 | 4/2010 | Arndt et al. |
| 8,053,042 | B1 | 11/2011 | Loomis |
| 8,062,718 | B2 * | 11/2011 | Schooley ..................... 362/123 |
| 2002/0097573 | A1 | 7/2002 | Shen |
| 2003/0142494 | A1 | 7/2003 | Ahroni |
| 2003/0198048 | A1 | 10/2003 | Frederick |
| 2003/0206412 | A1 | 11/2003 | Gordon |
| 2004/0004435 | A1 | 1/2004 | Hsu |
| 2004/0012950 | A1 | 1/2004 | Pan |
| 2004/0090770 | A1 | 5/2004 | Primeau |
| 2004/0096596 | A1 | 5/2004 | Palmer, III et al. |
| 2007/0092664 | A1 | 4/2007 | Chun |
| 2007/0177402 | A1 | 8/2007 | Wu |
| 2007/0230174 | A1 | 10/2007 | Hicks et al. |
| 2007/0253191 | A1 | 11/2007 | Chin et al. |
| 2008/0007951 | A1 | 1/2008 | Chan |
| 2008/0186731 | A1 | 8/2008 | Graham |
| 2008/0205020 | A1 | 8/2008 | Vich |
| 2009/0002991 | A1 | 1/2009 | Huang |
| 2009/0059578 | A1 | 3/2009 | Lau |
| 2009/0289560 | A1 | 11/2009 | Oliva |
| 2010/0000065 | A1 | 1/2010 | Cheng et al. |
| 2010/0053991 | A1 | 3/2010 | Boggs |
| 2010/0195332 | A1 | 8/2010 | Wasem |
| 2010/0196628 | A1 | 8/2010 | Shooley |
| 2011/0062875 | A1 | 3/2011 | Altamura |
| 2011/0076425 | A1 | 3/2011 | Cheng et al. |
| 2011/0215368 | A1 | 9/2011 | Chen |
| 2011/0286223 | A1 | 11/2011 | Chen |
| 2011/0303939 | A1 | 12/2011 | Chen |
| 2011/0305022 | A1 | 12/2011 | Chen |
| 2012/0009360 | A1 | 1/2012 | Fu et al. |


* cited by examiner

Fig. 1



Fig. 2



A
188
190
122
142
186
180
184
182
187
185
136
132
136
108
100
116
135
127
165
132
130
162
127
160
106
162
168
146
144
161
127
142
166
132
164
122
134
127
163
135
130
150
130
122
125
166
127
128
120
152
144
136
104
121
132
127
124
166
140
126
142
134
127
144
123
128
146
114
112
110
A

Fig. 3


216
200
206
214
210
216
125
120
127
220
121
127
220
127
123
222
210
218
206
212
204
200
206
208
202
210
198
114
102
196
192
110
112
110
194
188
186
184
180
185
242
244
240
212
230
210
165
127
220
224
127
127
160
127
220
224
161
127
224
220
224
220
127
163
232
210
212

Fig. 4


165
212
210
220
224
162
200
125
206
210
120
127
220
126
214
121
222
127
182
184
220
224
127
232
124
206
218
212
127
216
123
220
224
240
244
230
164
127
220
224
161
200
198
204
208
114
206
210
202
212
192
210
127
212
163
194

Fig. 5




Fig. 6




Fig. 7



Fig. 8




Fig. 9




Fig. 10



Fig. 11




Fig. 12




Fig. 13



Fig. 14a




Fig. 14b



Fig. 15a




Fig. 15b



Fig. 16a




Fig. 16b



Fig. 17



182
146
210
408
206
244
400
212
256
258
206
210
220
224
162
146
406
296
414
146
230
412
220
412
414
224
162
414
294
210
206
300
298
212
200
256
258
206
124
294
146
146
296
412
412
404
414
220
146
414
214
222
412
224
146
124
206
300
212
298
200
256
258
206
402
210
202
294
296
192
194
410

Fig. 18



400
146
146
182
181
296
294
162
161
146
162
146
294
414
162
296
412
146
162
146
121
146
124
296
146
124
146
294
412
124
146
414
410

*Fig. 19*


400
146
182
146
181
296
294
161
166b
414
162a
146
162b
294
296
166a
412
146
121
124
166
414
124
146
412
146
410

Fig. 20


400
400
181
436
182
146
422
180
182
296
422
434
420
146
161
432
422
160
162
296
422
294
430
121
420d
146
294
422
420c
296
420b
422
120
424
420a
426
194
410

# MODULAR LIGHTED TREE WITH TRUNK ELECTRICAL CONNECTORS

## RELATED APPLICATIONS

The present application claims priority to U.S. Provisional Application No. 61/385,751 filed on Sep. 23, 2010 and entitled ARTIFICIAL PRE-LIT TREE WITH MODULAR DIRECT-CURRENT LIGHTING SYSTEM, which is herein incorporated by reference in its entirety.

## FIELD OF THE INVENTION

The present invention is generally directed to artificial trees with decorative lighting. More specifically, the present invention is directed to lighted artificial trees having separable, modular tree portions mechanically and electrically connectable between trunk portions.

## BACKGROUND OF THE INVENTION

For the sake of convenience and safety, consumers often substitute artificial trees constructed of metal and plastic for natural evergreen trees when decorating homes, offices, and other spaces, especially during the holidays. Such artificial trees generally include multiple tree sections joined at the trunk and held erect by a floor-based tree stand. Traditionally, consumers wrap strings of lights about the artificial tree to enhance the decorative quality of the tree display. As more and more decorative light strings are draped around the tree, it becomes more and more difficult to provide power to the various light strings distributed throughout the tree.

To ease this burden to the consumer, manufacturers have created "pre-lit" artificial trees. Typical pre-lit trees include an artificial tree with multiple standard light strings distributed about the exterior of the tree. Wires of the light string are clipped to branch structures, while plug ends dangle throughout the branches. Generally, multi-purpose decorative light strings are used in pre-lit trees, often limited to 50 or 100 bulb assemblies, with a bladed power plug for insertion into the back outlet of another light string, or insertion into an alternating current (AC) power source.

As the popularity of such pre-lit trees has grown, so to have the bulk and complexity of pre-lit trees. Along with an increase in the number and density of branches of a typical pre-lit tree comes an increase in the number of lights and light strings on the pre-lit tree. This increased number of branches and lights can significantly increase the weight of the pre-lit tree making it difficult to lift and align individual trunk sections when assembling the tree. Further, the increased number of lights per tree, often as high as 1,000 or 1,500 lights, drastically increases the complexity of interconnecting and powering the numerous light strings.

It can be difficult to find and then properly connect the necessary plugs in order to power all of the light strings on the tree. Light strings may be connected to one another within a given tree section, or sometimes between sections, by connecting the strings end to end. Consumers need to be careful to follow the manufacturer's guidelines and not plug too many light strings together end-to-end and surpass the current-carrying capacity of the light string wiring. Due to such limitations, power plugs of the light strings may include receptacles for receiving other power plugs such that the power plugs may be "stacked" together, plugging one into the other. Short extension cords may be strung along the outside of the trunk to carry power to the various interconnected light strings. The result is a complex web of lighting that often requires a consumer to not only interconnect the plugs and receptacles of individual light strings together, but to stack and plug multiple light strings and cords into multiple power outlets.

Some known inventions have attempted to make pre-lit trees more convenient to put together and power. For example, U.S. Pat. No. 1,656,148 to Harris filed Apr. 5, 1926 and entitled "Artificial Christmas Tree" teaches a simple artificial tree with one embodiment having multiple tree sections that join together. The tree includes single bulbs at each end of a branch, with bulb wiring extending from inside a trunk through hollow branches. A bayonet fitting is used to adjoin the sections, a top section having a projecting pin, and a bottom section having an L-shaped bayonet slot. The two sections are coupled by aligning the projection pin with the bayonet slot and rotating to interlock the sections, thereby bringing a pair of spring contacts into alignment with a pair of terminals to make an electrical connection.

Another known artificial tree as described in U.S. Pat. No. 3,970,834 to Smith, filed Dec. 16, 1974 and entitled "Artificial Tree", describes a pre-lit tree made in sections which may be folded for easy storage. The individual tree sections include a threaded male end and a threaded female socket end. The male end of a tree section is screwed into the female end of another section. Wiring for the lights passes from the trunk through holes in branches and connects with individual lights at an interior of the branch. When the tree is screwed together, an electrical connection is made.

However, such known trees still require significant manipulation and handling of the tree sections to securely align and couple the sections together. Further, such known trees fail to disclose mechanical coupling and electrical connection devices and methods that meet the needs of generally larger, heavier artificial trees with complex lighting systems with large numbers of lights.

## SUMMARY OF THE DISCLOSURE

The present invention is directed to a modular lighted artificial tree that includes a first tree portion that may be mechanically coupled and electrically connected to a second tree portion. The first tree portion includes a first trunk portion, multiple branches joined to the first trunk portion, and a first light string affixed to some of the branches. The first trunk portion has a first trunk body and a trunk connector, and at least a portion of the trunk connector is housed within the first trunk body and electrically connected to the first light string. The second tree portion includes a second trunk portion, multiple branches joined to the second trunk portion, and a second light string affixed to some of the branches. The second trunk portion has a trunk body and a trunk connector, at least a portion of the trunk connector housed within the second trunk portion and electrically connected to the second light string. The second tree portion is mechanically and electrically connectable to the first tree portion by coupling a lower end of the second trunk body to an upper end of the first trunk body along a common vertical axis, thereby causing the trunk connector of the first trunk portion to make an electrical connection with the trunk connector of the second trunk portion. The electrical connection is made independent of any rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis.

In another embodiment, the present invention comprises a lighted artificial tree that includes a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string affixed to a portion of the first plurality of branches. The first trunk portion has a first

trunk wall defining a first trunk interior, a trunk connector and a first trunk wiring assembly, the first trunk wiring assembly is electrically connectable to the first light string and the trunk connector, and at least a portion of the first wiring assembly is located within the first trunk interior. The tree also includes a second tree portion including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string affixed to a portion of the second plurality of branches. The second trunk portion has a second trunk wall defining a second trunk interior, a trunk connector and a second trunk wiring assembly, and the second trunk wiring assembly is electrically connectable to the second lighting string and the trunk connector. At least a portion of the second wiring assembly is located within the second trunk interior. Further, the second tree portion is mechanically coupleable to the first tree portion by coaxially coupling the first trunk wall to the second trunk wall to form a circumferential interference fit between the first trunk wall and the second trunk wall, and the second tree portion is electrically connectable to the first tree portion such that a portion of the trunk connector of the first trunk portion contacts a portion of the trunk connector of the second trunk portion upon the coaxial coupling of the first trunk wall and the second trunk wall, thereby creating an electrical connection between the first wiring assembly and the second wiring assembly.

In another embodiment, the present invention comprises a lighted artificial tree that includes a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string affixed to a portion of the first plurality of branches, the first trunk portion having a first trunk body and a trunk connector, and at least a portion of the trunk connector is housed within the first trunk body and electrically connected to the first light string. The tree also includes a second tree portion including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string affixed to a portion of the first plurality of branches, the second trunk portion having a trunk body and a trunk connector, and at least a portion of the trunk connector is housed within the second trunk portion and electrically connected to the second light string. The second tree portion is mechanically and electrically connectable to the first tree portion by coupling a lower end of the second trunk body to an upper end of the first trunk body along a common vertical axis, thereby causing the trunk connector of the first trunk portion to make an electrical connection with the trunk connector of the second trunk portion, the electrical connection being made independent of any rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis.

In another embodiment, the present invention comprises a lighted artificial tree that includes a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string, the first trunk portion having a first trunk wall defining a first trunk interior, a first trunk connector and a first trunk wiring assembly, the first trunk wiring assembly electrically connectable to the first light string and the first trunk connector, and at least a portion of the first wiring assembly and a portion of the first trunk connector are located within the first trunk interior. The lighted artificial tree also includes a second tree portion connectable to the first tree portion and including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string, the second trunk portion has a second trunk wall defining a second trunk interior, a second trunk connector and a second trunk wiring assembly. The second trunk wiring assembly is electrically connectable to the second lighting string and the second trunk connector, at least a portion of the second wiring assembly and a portion of the second trunk connector located within the second trunk interior. The second tree portion is mechanically and electrically connectable to the first tree portion by aligning the second trunk portion with the first portion along a common axis such that a portion of the first trunk wall is coupled to a portion of the second trunk wall for form a first mechanical connection, and a first portion of the first connector is received by the second connector, thereby forming a second mechanical connection between the first trunk portion and the second trunk portion and forming an electrical connection between the first wiring assembly.

In another embodiment, the present invention includes a lighted artificial tree that includes a first trunk portion having a first end, a second end, and a first trunk connector; a second trunk portion having a first end, a second end, and a second trunk connector, the second trunk portion being mechanically and electrically connectable to the first trunk portion by coupling the first end of the second trunk portion to the second end of the first trunk portion and the first trunk connector to the second trunk connector. The tree also includes a light string that has a first portion having a first plurality of lighting elements electrically connected in series, a second portion having a second plurality of lighting elements electrically connected in series, the first plurality of lighting elements electrically connected in series to the second plurality of lighting elements through the first trunk connector and the second trunk connector when the first trunk portion is coupled to the second trunk portion.

In another embodiment, the present invention includes a modular lighted artificial tree that includes a first trunk portion including a first end, a second end, a first trunk wiring harness and a first trunk connector, the first trunk wiring harness electrically connected to the first trunk connector; a second trunk portion including a first end, a second end, a second wiring harness having a light string clip and a second trunk connector, the second trunk portion being electrically connectable to the first tree portion by coupling the first end of the second trunk portion to the second end of the first trunk portion such that the first trunk connector is electrically connected to the second trunk connector. The modular lighted artificial tree also includes a first plurality of branches attached to the second trunk portion and a first light string including a plurality of lighting elements, light string wiring, and an end clip, the plurality of lighting elements connected electrically by the light string wiring, a portion of the light string wiring affixed to the first plurality of branches, and the end clip electrically connected to the light string wiring. The end clip of the first light string is detachably connected to the light string clip such that the first light string is electrically connected to the first wiring harness and the second wiring harness.

In another embodiment, the present invention includes a method of manufacturing a modular, lighted artificial tree. The method includes assembling a first trunk wiring harness, including attaching first and second end connectors, to a pair of bus wires and attaching a light string connector to the pair of bus wires; connecting the first end connector to a first trunk connector assembly to form an electrical connection between the first wiring harness and the first trunk connector; attaching the light string connector to a trunk portion of the tree at an opening in a wall of a trunk of the tree such that at least a portion of the light string connector is located in an interior of the trunk; inserting a portion of the first wiring harness and the first trunk connector assembly into the trunk of the tree; and connecting an end of a pre-assembled light string to the first

light string connector, such that the light string is electrically connected to the pair of bus wires.

The above summary of the various representative embodiments of the invention is not intended to describe each illustrated embodiment or every implementation of the invention. Rather, the embodiments are chosen and described so that others skilled in the art can appreciate and understand the principles and practices of the invention. The figures in the detailed description that follow more particularly exemplify these embodiments.

## BRIEF DESCRIPTION OF THE FIGURES

The invention can be understood in consideration of the following detailed description of various embodiments of the invention in connection with the accompanying drawings, in which:

FIG. **1** is a front perspective view of a modular, lighted artificial tree, according to an embodiment of the present invention;

FIG. **2** is a front view of a base and trunk assembly of the tree of FIG. **1**;

FIG. **3** is an exploded front view of the base and trunk assembly of FIG. **2**;

FIG. **4** is a cross-sectional view of a base and trunk portions with trunk connectors of the tree of FIG. **1**;

FIG. **5** is a right side view of a trunk connector assembly connected to a portion of a trunk wiring harness, according to an embodiment of the present invention;

FIG. **6** is an exploded view of the trunk connector assembly and wiring assembly connector as depicted in FIG. **5**;

FIG. **7** is a top view of the trunk connector assembly of FIGS. **5** and **6**;

FIG. **8** is a right side view of another trunk connector assembly connected to a portion of a trunk wiring harness, according to an embodiment of the present invention;

FIG. **9** is an exploded view of the trunk connector assembly and wiring assembly connector as depicted in FIG. **8**;

FIG. **10** is a top view of the trunk connector assembly of FIGS. **8** and **9**;

FIG. **11** is a right side view of an embodiment of a trunk-top connector assembly;

FIG. **12** is an exploded view of the trunk-top connector assembly of FIG. **11**;

FIG. **13** is a top view of the trunk-top connector assembly of FIGS. **11** and **12**;

FIG. **14*a*** is a front perspective view of a base portion joined to a lower trunk portion of the tree of FIG. **1** and the trunk of FIG. **2**;

FIG. **14*b*** is a cross-sectional view of the base portion joined to the lower trunk portion of FIG. **14*a***;

FIG. **15*a*** is a front perspective view of a lower trunk portion joined to a middle trunk portion of the trunk of FIG. **2**;

FIG. **15*b*** is a cross-sectional view of the lower trunk portion joined to a middle trunk portion of FIG. **15*a***;

FIG. **16*a*** is a front perspective view of a middle trunk portion joined to an upper trunk portion of the trunk of FIG. **2**;

FIG. **16*b*** is a cross-sectional view of the middle trunk portion joined to the upper trunk portion of FIG. **16*a***;

FIG. **17** is a block diagram of a modular tree lighting system, according to an embodiment of the present invention;

FIG. **18** is an electrical circuit diagram of the modular lighting system depicted in FIG. **17**, with light strings having parallel-connected lighting elements, according to an embodiment of the present invention;

FIG. **19** is an electrical circuit diagram of the modular lighting system depicted in FIG. **17**, with light strings having series-connected lighting elements, according to an embodiment of the present invention; and

FIG. **20** is an electrical circuit diagram of the modular lighting system depicted in FIG. **17**, with light strings having groups of parallel-connected lighting elements connected in series, according to an embodiment of the present invention.

While the invention is amenable to various modifications and alternative forms, specifics thereof have been shown by way of example in the drawings and will be described in detail. It should be understood, however, that the intention is not to limit the invention to the particular embodiments described. On the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the invention as defined by the appended claims.

## DETAILED DESCRIPTION

Referring to FIG. **1**, an embodiment of modular lighted tree **100** of the present invention is depicted. Modular tree **100** includes base portion **102**, first lighted tree portion **104**, second lighted tree portion **106**, and third lighted tree portion **108**. In some embodiments, modular tree **100** may include more lighted tree portions, such as a fourth lighted tree portion, or may include fewer lighted tree portions. When tree **100** is assembled, as depicted, lighted tree portions **104**, **106**, and **108** are aligned along a common vertical axis A and held in a generally vertical orientation by base portion **102**.

Base portion **102** as depicted includes multiple legs **110** connected to a central trunk-support portion **112**. As depicted, trunk support portion **112** may be generally cylindrical to receive and support first tree portion **104**. Base portion **102** may include an optional base-trunk portion **114** extending upwardly from trunk support portion **112** to form a portion of a trunk of tree **100**. In other embodiments, base portion **102** may comprise other configurations capable of supporting and aligning tree portions **104**, **106**, and **108** in a steady, upright manner. Such alternate embodiments include a base portion having more or fewer legs **110**, an integrated structure with an opening for receiving first lighted tree portion **104**, and other such embodiments.

Referring also to FIG. **2**, modular tree **100** is depicted in an assembled configuration, with multiple branches and light strings removed for illustrative purposes.

As depicted, first lighted tree portion **104** includes first trunk portion **120**, multiple branches **122**, and one or more first light strings **124**.

First trunk portion **120** as depicted comprises a generally cylindrical, hollow structure including trunk portion body **121** having a lower end **123**, an upper end **125**, outside wall **126**, and one or more branch-support rings **127**. First trunk portion **120** also defines multiple openings **166** in wall **126**.

Branch-support rings **127** include multiple branch receivers **128** extending outwardly and away from trunk portion **120**. In some embodiments, branch receivers **128** define a channel for receiving a trunk end of a branch **122**.

Each branch **122** generally includes primary branch extension **130** and may also include multiple secondary branch extensions **132** extending away from branch extension **130**. Branch **122** is connected to trunk portion **120** at a branch receiver **128** at trunk-end **134**. In some embodiments, as depicted, branches **122** include strands **136** simulating the needles found on natural pine or coniferous trees. Strands **136** are attached to branch frame **135**, which in some embodiments comprises a solid-core frame, such as a metal rod, wire, multiple twisted wires or rods, or similar such materials. In other embodiments, frame **135** may be hollow.

Trunk ends of branches **122** may be bent or otherwise formed to define a loop or circular opening such that trunk end **134** of branch **122** may be secured to branch receiver **128** by way of a pin (not depicted) extending through branch receiver **128** and the loop formed at trunk end **134** of branch **122**. In this way, a branch **122** may be allowed to pivot about the pin and branch receiver **128**, allowing tree portion **104** to collapse to a smaller envelope size for convenient storage.

First light string **124** includes light string wiring **140** and a plurality of lighting element assemblies **142**. Each lighting assembly element **142** includes housing **144** and lighting element **146**. Lighting elements **146** may comprise incandescent bulbs, light-emitting diodes, a combination thereof, or any of other known types of light-emitting elements.

Lighting elements **146** may be electrically connected in parallel, series, or a combination of series and parallel, as discussed further below with respect to FIGS. **18-20**, to form a parallel-connected, series-connected, parallel-series connected, or series-parallel connected first light string **124**.

First light string **124** is affixed to one or more branches **122** of lighted tree portion **104** via multiple clips **150**. A proximal end **152** of light string **124** may be connected to outside wall **126** of first trunk portion **120** by a connector or clip as described further below, or may be inserted through an opening **166** in wall **126** into an interior space defined by first trunk portion **120**.

In one embodiment, first lighted tree portion **104** includes a plurality of first light strings **124**. Such first light strings **124** may be substantially the same, for example, a series-parallel connected light string having 100 lighting element assemblies **142**. In other embodiments, first lighted tree portion **104** may include first light strings **124** having a particular configuration and other first light strings **124** having another, different configuration. For example, first light strings **124** located closer to base portion **102** may be longer in length with more light emitting assemblies **142**, while first light strings **124** further from base portion **102** may be relatively shorter in length, with fewer light emitting assemblies **142**. In other embodiments, first lighted tree portion **104** may include only a single light string **124**.

Second lighted tree portion **106**, adjacent first lighted tree portion **104**, is similar to lighted tree portion **104** and includes second trunk portion **160**, multiple branches **122** and one or more second light strings **162**.

Second trunk portion **160** as depicted also comprises a generally cylindrical, hollow structure including trunk portion body **161** having a lower end **163**, an upper end **165**, outside wall **164**, and one or more branch-support rings **127**. First trunk portion **120** also defines multiple openings **166** in wall **164**.

In one embodiment, trunk portion **160** may have a trunk diameter that is substantially equal to a trunk diameter of first trunk portion **120**, while in other embodiments, may have a trunk diameter that is different from that of the first trunk portion. In one such embodiment, a trunk diameter of second trunk portion **160** is slightly less than a trunk diameter of first trunk portion **120** such that that trunk **116** has a somewhat tapered look.

Similar to first light strings **124**, second light strings **162** may comprise any combination of series-connected or parallel-connected individual or groupings of lighting element assemblies **142**.

Third lighted tree portion **108**, adjacent to second lighted tree portion **106** includes third trunk portion **180**, branches **122**, and one or more third light strings **182**. In some embodiments, such as the depicted embodiment, a diameter of third trunk portion **180** may be somewhat smaller in diameter than a diameter of second lighted tree portion **108**. As depicted, third trunk portion **180** comprises a relatively smaller diameter pipe-like body portion **184** including lower end **185**, upper end **186**, trunk wall **187**, and defining top opening **188** (see also FIGS. **3** and **4**). Also as depicted, in some embodiments, third trunk portion **180** may also not include branch-support rings **127**, as branches **122** of third lighted tree portion **108** may be somewhat shorter in length than branches **122** of second lighted tree sections **106** and may be directly connected to body portion **184** of third trunk portion **180**.

Third light string **182** includes wiring **190** and multiple lighting element assemblies **142**. Similar to first light strings **124**, third light strings **182** may comprise any combination of series-connected or parallel-connected individual or groups of lighting element assemblies **142**.

In the embodiment depicted, third light string **182** emerges from top opening **188** such that a portion of third light string **182** is within an interior space defined by third trunk portion **180**. Alternatively, third light string **182** may be connected via an electrical connector at opening **188**. In other embodiments, third light string is mechanically connected to trunk portion via a connector at wall **186** of third trunk portion **180**, or may be received in part by an opening (not depicted) in wall **186**. In yet other embodiments, third light string **182** may be an extension of second light string **162**.

Referring to FIG. **3**, an exploded, cross-sectional view of base portion **102**, and trunk portions **120**, **160**, and **180** is depicted.

In the embodiment depicted, base portion **102** includes an optional trunk-adapted power converter **192** which receives power from an external power source (not depicted) via power cord **194**. Power converter **192** converts power from the external power source to a power appropriate for lighting strings **124**, **162**, and **182**. In one embodiment, power converter **192** converts or transforms incoming alternating-current (AC) power to direct-current (DC) power. Such embodiments include converting from 120V AC to 9 VDC or 3 VDC for parallel or series-parallel construction and for use with, though not limited to, light elements **146** comprising LEDs.

Power converter **192**, when present in tree **100**, may be generally cylindrical in shape and sized to fit within a portion of either trunk-support portion **112** or base-trunk portion **114**, or both. Known DC-powered light sets and known fiber optic lighted trees often include a power converter, but such power converters typically comprise block-like structures that plug directly into a power source, such as a 120V AC wall outlet. Not only are such known power converters unattractive, but may easily become dislodged from their power receptacle or outlet due to the significant weight of the converter. Tree **100** with power converter **192** of the present invention avoids such problems by securely locating the power converter within base portion **102**.

In other embodiments, tree **100** may not include power converter **192**, and light strings **124**, **162**, and **182** may utilize power from the external power source to energize lighting elements **146**. In one such embodiment, all lighting elements **146** of tree **100** receive 120V AC power via a single power cord **194**.

In the embodiment depicted in FIG. **3**, base-trunk portion **114** includes first or lower end **196** and second or upper end **198**. Lower end **196** may be sized to fit into trunk-support section **112**.

Referring to FIGS. **2-4**, base support portion **102** is configured to easily and securely mechanically couple and electrically connect to first tree portion **104**; first tree portion **104** is configured to mechanically couple and electrically connect to second tree portion **106**; and second tree portion **106** is

configured to mechanically couple and electrically connect to third tree portion **108**. As discussed further below, such mechanical and electrical connections are accomplished in part through a series of trunk connectors and wiring harnesses inserted into base **102** and trunk portions **120**, **160** and **180**.

Referring to FIGS. **3** and **4**, in the embodiment depicted, base portion **102** houses trunk connector assembly **200** and base wiring harness **202**. In one embodiment, such as the embodiment depicted, trunk connector assembly **200** is a female trunk connector configured to receive a male counterpart to form a coaxial-like electrical connection. Trunk connector assembly **200** is inserted into upper end **198** of base-trunk portion **114**. Base wiring harness **202** when connected to trunk connector assembly **200** extends through a portion or all of the interior of base-trunk portion **114** and trunk support portion **112**. As discussed further below with respect to FIGS. **5-7**, trunk connector assembly **200** includes head assembly **204** coupled to electrical connector **206** via a length of wiring **208**.

Base wiring harness **202** includes electrical connector **206** and power cord **194**. In embodiments that include power converter **192**, such as the embodiment depicted, base wiring harness **202** may also include additional wiring **212** and power converter **192**.

Consequently, when assembled, trunk connector assembly **200** is electrically connected to a plug end of power cord **194** through base wiring harness **202** such that power is available at connector assembly **200** when tree **100** is plugged into a power source.

First trunk portion **120** houses trunk connector assembly **212**, another trunk connector **200** and first trunk wiring harness **214**. In one embodiment, such as the embodiment depicted, trunk connector assembly **212** is a male trunk connector configured to be inserted into a female counterpart, such as connector assembly **204** to form a coaxial-like electrical connection. Trunk connector assembly **212** is inserted into lower end **123** of first trunk body **121**. Trunk connector assembly **200** is inserted into upper end **125** of first trunk body **121**. First trunk wiring harness **214** when connected to trunk connector assemblies **200** and **212** extends through a portion, or all, of the interior of first trunk portion **120**. As discussed further below with respect to FIGS. **8-10**, trunk connector assembly **212** includes head assembly **216** coupled to electrical connector **206** via a length of wiring **218**.

First trunk wiring harness **214** includes an electrical connector **210** coupled to connector assembly **200** at electrical connector **206**, an electrical connector **210** coupled to connector assembly **212** at electrical connector **206**, a plurality of optional wall mount connectors **220**, and wiring **222**. Embodiments of first trunk wiring harness **214** are described in further detail below with respect to FIG. **17**.

In one embodiment, wall mount connectors **220** mount to wall **126** through openings **166** such that a portion of connector **220** is inside first trunk body **121**, and a portion outside first trunk body **121**. Wall mount connectors **220** are configured to mechanically and electrically connect to first light strings **124**. In one embodiment, each first light string **124** includes a connector **224** that mates with wall mount connector **220** to detachably fix light string **124** to first trunk body **161** and first trunk wiring harness **214**. In one embodiment, connector pair **220** and **224** may be easily connected or disconnected to attach or detach light string **124** to trunk portion **120**.

Consequently, when assembled, trunk connector assembly **200** is electrically connected to connector assembly **212** and light strings **124** through wiring harness **214**.

In the depicted embodiment, second trunk portion **160** houses a pair of trunk connector assemblies **212** and second trunk wiring harness **230**. A lower trunk connector assembly **212** is inserted into lower end **163** of second trunk body **161**. An upper trunk connector assembly **212** is inserted into upper end **165** of second trunk body **161**. Second trunk wiring harness **230** when connected to trunk connector assemblies **212** extends through a portion, or all, of the interior of first trunk portion **160**.

Second trunk wiring harness **230** may be generally similar to first trunk wiring harness **214**, and includes an electrical connector **210** coupled to lower connector assembly **212** at electrical connector **206**, an electrical connector **210** coupled to upper connector assembly **212** at electrical connector **206**, a plurality of optional wall mount connectors **220**, and wiring **232**.

In one embodiment, wall mount connectors **220** mount to wall **164** through openings **166** such that a portion of connector **220** is inside second trunk body **161**, and a portion outside second trunk body **161**. Wall mount connectors **220** are configured to mechanically and electrically connect to second light strings **162**. In one embodiment, each second light string **162** includes a connector **224** that mates with wall mount connector **220** to detachably fix light string **162** to second trunk body **161** and second trunk wiring harness **214**. In one embodiment, connector pair **220** and **224** may be easily connected or disconnected to attach or detach light string **162** to trunk portion **160**.

Consequently, when assembled, upper trunk connector assembly **212** is electrically connected to lower connector assembly **212** and light strings **162** through second trunk wiring harness **230**.

Third trunk portion **180** in the depicted embodiment includes, in addition to trunk body portion **184**, large adapter **240**, small adapter **242**, and trunk-top connector **244**. Bottom end **185** of trunk body portion **184** fits into an upper opening of small adapter **242**. As described further below with respect to FIGS. **16*a*** and **16*b***, when assembled, a top portion of trunk-top connector **244** is received by a lower opening of small adapter **242**, while a bottom portion of top connector **244** is received by large adapter **240** to securely connect third trunk portion **180** to second trunk portion **160**.

As depicted, a bottom portion of trunk-top connector defines an electrical receiver for receiving a portion of trunk connector assembly **212** of second trunk portion **160**. As such, third trunk portion **180** is in electrical connection with second trunk portion **160**. Further, third light string **182** is electrically connected to trunk-top connector **244**, thereby causing third light string **182** to be in electrical connection with second trunk wiring harness **230** and first trunk wiring harness **214**, as well as in electrical connection to the various first and second light strings **124** and **162** via their respective wiring harnesses. Alternatively, third trunk portion **180** may include a separate third trunk wiring harness detachably connectable to one or more of third light strings **182**. Details of the various embodiments of electrical circuits formed are described further below with respect to FIGS. **17-20**.

Referring to FIGS. **5-7**, an embodiment of connector **204** is depicted. FIG. **5** depicts an assembled connector **200**, configured as a female connector, coupled to, or connected to a portion of a trunk wiring harness, such as a trunk wiring harness **214**; FIG. **6** depicts an exploded view of connector **200** and a connector **210** of trunk wiring harness **214**; and FIG. **7** depicts a top view of connector assembly **200**.

As described above, an embodiment of connector assembly **200** includes head assembly **204**, wiring **208**, and connector **206**. As depicted, connector assembly **200** comprises a

female-style electrical connector, though in other embodiments may comprise other multi-contact electrical connectors as described further below.

Wiring **208** may include one or more wires comprising an insulated or uninsulated conductor. As depicted, wiring **208** of connector assembly **200** includes first wire **256** and second wire **258**.

In an embodiment, head assembly **204** includes contact set **250**, insert **252**, and trunk plug **254**. Contact set **250** as depicted includes a first electrical contact **260** and a second contact **262** and defines receptacle **264**. In the embodiment depicted, first electrical contact **260** comprises a portion of outside surface of contact set **250** and an inside surface of contact set **250** and forms an electrical connection with first wire **256**. Second electrical contact **262** forms an electrical connection with second wire **258**, and may be located generally at a center portion of receptacle **264**, extending upward and away from a closed end of receptacle **264**. Consequently, the depicted embodiment of contact set **250** comprises a coaxial electrical connector.

However, it will be understood that contact set **250** may include other types of single-contact or multi-contact electrical connectors. Such embodiments include first electrical contact **260** and second electrical contact **262** comprising a pair of electrical contacts of substantially the same structure, such as a pair of blade connectors, spade connectors, or other such electrical terminals or contacts as known to those skilled in the art.

When present, insert **252** may be comprised of a generally elongated, cylindrical structure having a body **264** defining an outside surface **266** and cavity **268**, top end **270**, bottom end **272**, and flange **274** defining top surface **276**. Cavity **268** may have a diameter appropriate for receiving contact set **250**. In some embodiments, body **264** of insert **252** may be tapered. Although not intending to be limiting, insert **252** may comprise a plastic or similar non-conducting material.

Plug **254** comprises a generally cylindrical shape sized to be inserted into one of trunk portions **120** or **160**, or base **102**, and for securely positioning contact set **250** within its respective trunk or base portion. Plug **254** in an embodiment includes a top end **278**, second end **280**, left side **282**, right side **284**, one or more ribs **286** and top surface **288**. Plug **254** defines cavity **290**. Plug **254** may be tapered such that a plug diameter at bottom end **280** is somewhat smaller than a plug diameter at top end **278**. In some embodiments, plug **254** may comprise a non-conductive plastic material with elastic properties allowing sides **282** and **284**, and to a certain extent, ribs **286** to bend or flex slightly.

When assembled, contact set **250** is received into cavity **268** of insert **252**, and insert **252** is received into cavity **290** of plug **254** such that flange **274** is adjacent top surface **288** of plug **254**. For body-tapered embodiments of insert **252**, as insert **252** is inserted into cavity **268**, force is exerted onto contact set **250** such that plug **254**, insert **252** and contact **250** are held together forming an interference fitment, thereby securing contact set **250** in head assembly **204**.

Wiring **208** connects head assembly **204** to connector **206**. Connector **206** defines one or more wire-receiving cavities **292** for securely receiving first wire **256** and second wire **258**. In one embodiment, connector **206** couples with connector **210** of a trunk wiring harness. In such an embodiment, connectors **206** and **210** bring wiring **208** into contact with wiring **222**, such that a conductor of wire **256** is in electrical connection with a conductor of wire **294** and a conductor of wire **258** is in electrical connection with a conductor of wire **296**. In some embodiments, connector **206** detachably locks to connector **210**.

Referring to FIGS. **8-10**, an embodiment of connector **212** is depicted. FIG. **8** depicts an assembled connector **212**, configured as a male connector, coupled to, or connected to a portion of a trunk wiring harness, such as a trunk wiring harness **214**; FIG. **9** depicts an exploded view of connector **212** and a connector **210** of trunk wiring harness **214**; and FIG. **10** depicts a top view of connector assembly **212**.

As described above, an embodiment of connector assembly **212** includes head assembly **216**, wiring **218**, and connector **206**. As depicted, connector assembly **212** comprises a male-style electrical connector, though in other embodiments may comprise other multi-contact electrical connectors as described further below.

Wiring **218** may include one or more wires comprising an insulated or uninsulated conductor. As depicted, wiring **218** of connector assembly **212** includes first wire **298** and second wire **300**.

In an embodiment, head assembly **216** includes contact set **302**, insert **304**, and trunk plug **254**. Contact set **302** as depicted includes a first electrical contact **306** and a second contact **308** and defines receptacle **310**. In the embodiment depicted, first electrical contact **306** comprises a portion of outside surface of contact set **302** and forms an electrical connection with first wire **298**. Second electrical contact **308** forms an electrical connection with second wire **300**, and may be located generally at a center, bottom portion of receptacle **310**. Consequently, the depicted embodiment of contact set **302** comprises a coaxial electrical connector.

However, it will be understood that contact set **302** may include other types of single-contact or multi-contact electrical connectors. Such embodiments include first electrical contact **306** and second electrical contact **308** comprising a pair of electrical contacts of substantially the same structure, such as a pair of blade connectors, spade connectors, or other such electrical terminals, receivers, or contacts as known to those skilled in the art.

When present, insert **304** may be comprised of a generally elongated, cylindrical structure having a body **312** defining an outside surface **314** and cavity **316**, top end **318**, bottom end **320**, and flange **322** defining top surface **324**. Cavity **316** may have a diameter appropriate for receiving contact set **302**. In some embodiments, body **312** of insert **304** may be tapered. Although not intending to be limiting, insert **304** may comprise a plastic or similar non-conducting material.

When assembled, contact set **302** is received into cavity **316** of insert **304**, and insert **304** is received into cavity **290** of plug **254** such that flange **322** is adjacent top surface **288** of plug **254**. For body-tapered embodiments of insert **304**, as insert **304** is inserted into cavity **268**, force is exerted onto contact set **302** such that plug **254**, insert **304** and contact set **304** are held together forming an interference fitment, thereby securing contact set **304** in head assembly **216**.

Wiring **218** connects head assembly **216** to connector **206**. Connector **206** defines one or more wire-receiving cavities **292** for securely receiving first wire **298** and second wire **300**. In one embodiment, connector **206** couples with connector **210** of a trunk wiring harness. In such an embodiment, connectors **206** and **210** bring wiring **218** into contact with wiring **222**, such that a conductor of wire **298** is in electrical connection with a conductor of wire **294** and a conductor of wire **300** is in electrical connection with a conductor of wire **296**. In some embodiments, connector **206** detachably locks to connector **210**.

Referring to FIGS. **11-13**, an embodiment of trunk-top connector **244** is depicted. FIG. **11** depicts trunk-top connector **244** as assembled; FIG. **12** depicts trunk-top connector in

exploded view; and FIG. **13** depicts a bottom view of assembled trunk-top connector **244**.

In the depicted embodiment, trunk-top connector **244** includes a body portion **330** and dual-wire contact set **250**.

Body portion **330** includes top portion **332** and bottom portion **334**. Top portion **332** and bottom portion **334** together may comprise an integrated body portion **330**, or may comprise separate and distinct pieces such that body portion **330** comprises an assembly. In one embodiment, bottom portion **334** is substantially the same as adapter **252**. Although depicted as a generally cylindrical shape with a circular cross-section, body portion **330** may take other shapes adapted to couple with trunk body **184**, such as square or rectangular, as needed.

Top portion **330** may include a plurality of vertical ribs **336** distributed about a perimeter of top portion **330**. A top portion of each rib **336** may be angled inward to aid in guiding top portion **330** into trunk body **184** during assembly.

Bottom portion **334** includes flange **338** and defining cavity **340**. In some embodiments, bottom portion **334** may be slightly tapered such that bottom portion **334** has an upper diameter somewhat larger than a lower diameter so as to assist in forming an interference fit with adapter **240** (refer also to FIG. **3**). Flange **338** includes a bottom surface **342** and a top surface **344**.

Contact set **250** as described above in further detail is sized to fit into cavity **340** of bottom portion **334**, and is in electrical connection with wires **344** and **346**. Wires **344** and **346** may comprise a portion of light set **182**, or may be part of a separate, and in some embodiments, detachably-connected, trunk-top wiring harness configured to electrically connect contact set **250** with light set **182**.

Referring primarily to FIGS. **14***a* and **14***b*, and secondarily to FIGS. **3** and **4**, a coupling of base-trunk portion **114** of base portion **102** with trunk portion **120** is depicted. FIG. **14***a* depicts the portions coupled together along a common vertical axis A, while FIG. **14***b* depicts the portions coupled together, with cross-sectional views of base-trunk portion **114** and trunk body **121**.

Base portion **102** may be mechanically coupled and electrically connected to trunk portion **120** by simply aligning upper end **198** of base-trunk portion **114** with lower end **123** of trunk body **121** along axis A and inserting upper end **198** into lower end **123**. In the depicted embodiment, to form the mechanical coupling and electrical connection between base portion **102** and trunk portion **120**, it is not necessary to rotate either portion about axis A.

From a mechanical standpoint, as described above, upper end **198** of base-trunk portion **114** has an outside diameter that is slightly less than an inside diameter of lower end **123** of trunk body **121**, such that upper end can be inserted into lower end **123**, causing a trunk wall **126** to overlap with a trunk wall **350** of base-trunk portion such that a portion of the walls may be adjacent one another. When upper end **198** is inserted fully into lower end **123**, or in other words, when lower end **123** is lowered fully onto upper end **198**, lower end **123** seats firmly against base-trunk portion **114** at an angled region of transition **352** between upper end **198** and lower end **192** of base-trunk portion **114**.

At angled region of transition **352**, an outside diameter of base-trunk portion **114** transitions from a relatively smaller outside diameter of upper portion **198** to a relatively larger outside diameter of lower end **192**. In one embodiment, the larger outside diameter of lower end **192** is approximately the same outside diameter as lower end **123**. When base-trunk portion **114** and first trunk body **121** are generally cylindrical with a circular cross section as depicted, region of transition **350** comprises a generally circular region about the perimeter of base-trunk portion **114**. The angle formed by region of transition **350** relative to a horizontal plane perpendicular to base-trunk portion **114** may vary from 0 degrees to substantially 90 degrees, though as depicted, an angle of region of transition **350** may range from 30 degrees to 60 degrees.

When seated, the weight of trunk portion **120** exerts a downward force onto base-trunk portion **114** creating an interference fit between lower end **123** and upper end **198**, thereby mechanically coupling base portion **102** to first trunk portion **120** and first tree portion **104**. Unlike typical lighted trees having multiple trunk sections, tree **100** of the present invention does not require that base or trunk portions be aligned in any particular matter, except along axis A.

Known lighted trees having multiple tree or trunk portions generally require that after aligning the trunk portions along a vertical axis, a trunk portion must be rotated about the vertical axis to complete the mechanical connection between trunk portions. Embodiments of tree **100** of the present invention provide simplified structures and methods for mechanically coupling tree portions along the trunk without the burden of multiple steps such as rotational alignment or affixing external fasteners such as screws, bolts or pins.

It will be understood that the above embodiment for mechanically coupling base portion **102** to tree portion **104** is not intended to be limiting. In other embodiments, lower end **123** may comprise an outer diameter smaller than upper end **198** such that lower end **123** inserts into upper end **198**, rather than vice versa. In yet other embodiments, trunk portion **120** couples with base-trunk body **114** via other structure integrated with, or separate from, base portion **102** or tree portion **104**. In one such embodiment, a sleeve attached to upper end **198** forms a receiving cavity for lower end **123** such that lower end **123** may be inserted into the sleeve to join the two portions. In such an embodiment, trunk diameters might be substantially equal. In another embodiment requiring only minimal rotational alignment, lower end **123** and upper end **198** may comprise other shapes at their ends, such as a square, leaving four coupling positions about axis A.

When lower end **123** is seated against upper end **198**, in addition to the mechanical coupling at the walls of the trunk portions, connector assemblies **200** and **212** form an additional mechanical coupling of base portion **102** and trunk portion **120**.

During assembly of base portion **102**, plug **254** of connector assembly **200** is inserted into upper end **198** of base-trunk portion **114**. In an embodiment, plug **254** is tapered such that top end **278** has a larger diameter than bottom end **280**. Top end **278** may also have a slightly larger diameter than an inside diameter of base-trunk portion **114**, while bottom end **280** has a slightly smaller diameter than an inside diameter of base-trunk portion **114**. As such, when plug **254** is inserted into base-trunk portion **114**, portions of plug **254**, including sides **280** and **282** and ribs **286** contact an inside surface of trunk wall **350** of base-trunk portion **114**. Sides **280**, **282**, and to a certain extent, ribs **286** deform in order to fit plug **254** inside base-trunk portion **114**. Such deformation or compression of plug **254** seats the plug securely within base-trunk portion **114**, forming a compression or interference fit with portion **114**. As such, plug **254** is unlikely to move along vertical axis A or rotationally about vertical axis A when a user of tree **100** couples base portion **102** and trunk portion **120** together.

Similarly, connector assembly **212** is secured within lower end **123** of trunk body **121** of trunk portion **120**, with plug **254** wedged tightly into place.

Further, connector assemblies **200** and **212** are securely positioned within their respective trunk sections such that when base portion **102** is coupled with trunk portion **120**, portions of connector assembly **200** and connector assembly **212** come into contact, thus forming a mechanical coupling of the connector assemblies. More specifically, the portion of contact set **302** extending beyond top surface **324** of flange **322** of connector assembly **212** is inserted into cavity **264** of contact set **260** of connector assembly **200** (see also FIGS. **5**, **6**, **8**, and **9**). Contact **262** of contact set **250** is inserted into cavity **310** of contact set **302**. Top surface **324** of flange **322** may also contact adapter **252**.

These multiple points of mechanical contact between connector assemblies **200** and **212** combined with the secure fit of connector assemblies **200** and **212** to the trunk portions via plugs **254** creates a substantial mechanical coupling not only at the trunk walls, but also at the inside, center portions of base portion **102** and trunk portion **120**. The deformation of plugs **254** asserting an outward force on the trunk portions along with the mechanical coupling of the connector assemblies reduces the likelihood of the shifting of connector assemblies **200** and **212**, as is discussed further below.

The plug fitment and coupling of connector assemblies **200** and **212** also provides some additional structural support to the generally hollow base-trunk portion **114** and first trunk-body portion **121**. As the weight of each tree portion **104**, **106**, and **108** may be substantial, any force transverse to axis A has potential to degrade or deform the trunk walls. Such force may be distributed to plugs **254** through the walls to lessen the detrimental impact of any such forces.

In addition to the mechanical coupling of base portion **102** and lighted tree portion **104**, when base portion **102** is coupled to lighted tree portion **104** the two portions become electrically connected. As discussed above, when connector assembly **212** is coupled to connector assembly **200**, contact set **250** is inserted into cavity **264** of contact set **260** of connector assembly **200**. Contact **262** of contact set **250** is inserted into cavity **310** of contact set **302**. Consequently, an electrical connection is made between contact **260** of connector assembly **200** and contact **306** of connector assembly **212**, thus electrically connecting wires **256** and **298**. An electrical connection is also made between contact **262** of connector assembly **200** and contact **308** of connector assembly **212**, thus electrically connecting wires **258** and **300**.

In one embodiment, the coaxial nature of connectors **200** and **212** permit the electrical connection of the connectors at any rotational orientation about a vertical axis. Therefore, when a user assembles base portion **102** to tree portion **104**, other than aligning the two portions along a vertical axis A, no rotational alignment is necessary. Thus, when a user assembles tree **100**, there is no need to rotate or reposition a particular tree portion after lifting it up and before placing it onto a base portion. A user simply aligns the trunk portion with the base portion or other trunk portion along a vertical axis and brings the trunk portion downward to couple with the stationary base or trunk portion, thus mechanically coupling and electrically connecting the tree portions. If some rotation occurs inadvertently, the coupling and connection still occurs, regardless of the rotation.

Referring to FIGS. **15***a* and **15***b*, as well as FIGS. **3-10**, a coupling of first trunk portion **120** with second trunk portion **160** is depicted. The mechanical coupling and electrical connection of first trunk portion **120** with second trunk portion **160** is substantially similar to the coupling and connection of trunk portion **114** of base portion **102** with trunk portion **120** as described above with respect to FIGS. **14***a* and **14***b*. FIG. **15***a* depicts first trunk portion **120** and upper end **125** of first trunk body **121** coupled together with second trunk portion **160** and lower end **163** of second trunk body **161**, along a common vertical axis A. FIG. **15***b* depicts the portions coupled together, including connectors, with cross-sectional views of first trunk body **121** and second trunk body **161**.

When mechanically coupled, upper end **125** of first trunk body **121** fits into lower end **163** of second trunk body **161**, forming a fit between the two trunk bodies, substantially similar to the fit described above with reference to end **198** of base-trunk portion **114** and end **123** of first trunk body **121**. Further, connector assembly **200** mechanically couples and electrically connects with connector assembly **212** in a manner described above.

Consequently, when trunk portions **120** and **160** are joined, first trunk wiring harness **222**, already in electrical connection with connector assembly **200**, becomes electrically connected with second trunk wiring harness **230** via connector assembly **212**.

FIGS. **15***a* and **15***b* also depict first trunk wiring harness **214** connected at connector **206** to connector assembly **200** and to trunk body **161** at wall **126**. A connector **224** of light string **124** connects light string **124** and its lighting elements **146** to first trunk wiring harness **214** and consequently to connector assembly **200**.

Referring to FIGS. **16***a* and **16***b*, as well as FIGS. **3**, **4**, and **8-13**, a coupling of second trunk portion **160** with third trunk portion **180** is depicted. Generally, a lower end of third trunk portion **180** is inserted into an upper end of second trunk portion **160** to form the mechanical coupling and electrical connection between the two portions.

In the embodiment depicted, top portion **332** of body portion **330** of trunk-top connector **244** is inserted through small adapter **242** and into third trunk body **184** at lower end **185**. Vertical ribs **336** contact an inside surface of trunk body **184** to securely hold connector **244** to trunk body **184**. An inside surface of small adapter **242** contacts an outside surface of body **184**. Contact set **250** (not depicted in FIGS. **16***a* and **16***b*) is located in bottom end **334** of connector body portion **330**. Wires **334** and **336** extend away from connector **244** and into the interior of trunk body **184**. Small adapter **242** and body portion **330** are inserted into large adapter **240**. Bottom end **334** of body **330** extends through an opening in large adapter **240**. Third trunk portion **180** is inserted into end **165** of trunk body portion **161**.

Connector assembly **212** located in end **165** of trunk body portion **161** couples with trunk-top connector **244**. When fully engaged, bottom end **334** of connector **244** engages plug **254**, or in some embodiments engages top surface **324** of adapter **304** of connector assembly **212**. Contact set **302** is received into bottom end **334** of body **300**. Consequently, a secondary mechanical coupling between connector assembly **212** and connector assembly **244**, and between trunk portions **160** and **180**, is formed.

When mechanically coupled, connectors **212** and **244** form an electrical connection between second trunk portion **160** and third trunk portion **180**. Similar to the electrical connection described with respect to connectors **212** and **200**, contact set **320** engages with contact set **250** to form an electrical connection between connectors **212** and **244**, and thusly between second trunk wiring harness **232** and connector assembly **244**, including wires **344** and **346**. Further details regarding the electrical circuits formed by the electrical connections between trunk portions and their respective trunk connectors are described below with respect to FIGS. **17-20**.

Referring to FIG. **17**, a block diagram of an embodiment of modular lighting system **400** of tree **100** comprising the various electrically-relevant components discussed above is

depicted. Lighting system **400** includes base lighting subsystem **402**, first tree portion lighting subsystem **404**, second tree portion lighting subsystem **406**, and third tree portion lighting subsystem **406**. Throughout FIG. **17**, the symbols "+" and "−" are used to indicate an example electrical polarity and to indicate electrical connection or continuity between wires and connectors. It will be understood that these polarity indicators while useful for teaching the present invention are not intended to limit the invention to a particular polarity configuration, or in any way limit the invention only to DC operation.

Base lighting subsystem **402** includes connector assembly **200**, wiring harness **202**, optional power converter **192**, and power cord **194**. In the embodiment depicted, connector **200** is detachably connected to wiring harness **202**. In one such embodiment, connector **206** mates with connector **210** to connect wire **294** to wire **256** and wire **296** to wire **258**. In embodiments not including power converter **192**, power cord **194** may connect directly to connector **210** such that power cord **194** is detachably coupled to connector assembly **200**. Other embodiments may not include connectors **206** and **210**, such that power cord **194** is integrated into connector **200**.

When power cord **194** is connected to a power source **410**, power is consequently available at connector assembly **200**.

Because of the modularity and detachability of connector assembly **200** and wiring harness **202**, connector assembly **200** may be used universally with a variety of wiring harnesses **202** and power cord **194** configurations.

First tree lighting subsystem **404** includes connector assembly **212**, first trunk wiring harness **214**, first light strings **124** and connector assembly **200**. In an embodiment, connector assemblies **212** and **200** are detachably connected to first trunk wiring harness **214** via connectors **206** and **210**. In this manner, any number of different first trunk wiring harnesses **214** may be used to create lighting subsystem **404**. In the embodiment depicted, first trunk wiring harness **214** includes three connectors **210** for connecting to three light strings **124**. If a particular tree portion **104** requires more or fewer light strings **124**, based on tree size, light count, and so on, a different wiring harness **214** may be used to comprise subsystem **404**.

First trunk wiring harness **214** also includes wiring **222**, which comprises first bus wire **294**, second bus wire **296**, and a plurality of light string connection wires **412** and **414**. Light string connection wires **412** and **414** electrically connect first light strings **124** to first trunk wiring harness **214**. In some embodiments, bus wires **294** and **296** may be a higher or heavier gauge wire, such as 20 AWG, while light string connection wires **412** and **414** may be a lighter gauge wire, such as 22 AWG. The connection between any of bus wires **294** and **296** and wires **412** and **414** may be made by soldering, crimping, connecting using wire connectors, or otherwise causing the wires to be in electrical contact with one another, as is known in the art.

Second tree lighting subsystem **406** includes a pair of connector assemblies **212**, second trunk wiring harness **230**, and second light strings **162**. In an alternate embodiment, second tree lighting subsystem **406** includes a pair of connector assemblies **200**, or one connector assembly **200** and one connector assembly **212**, rather than a pair of connector assemblies **212**.

As depicted, connector assemblies **212** are detachably connected to second trunk wiring harness **230** via connectors **206** and **210**. In this manner, any number of different second trunk wiring harnesses **230** may be used to create lighting subsystem **406**. In the embodiment depicted, second trunk wiring harness **230** includes four connectors **210** for connecting to four light strings **162**. Similar to first trunk wiring harness **214** as described above, if a particular tree portion **104** requires more or fewer light strings **162**, based on tree size, light count, and so on, a different wiring harness **214** may be used to comprise subsystem **404**.

Second trunk wiring harness **230** also includes wiring **232**, which comprises first bus wire **294**, second bus wire **296**, and a plurality of light string connection wires **412** and **414**. Light string connection wires **412** and **414** electrically connect first light strings **162** to first trunk wiring harness **232**.

When second trunk portion **180** is coupled and connected to first trunk portion **160**, which is connected to base portion **102**, second trunk wiring harness is in electrical communication with first trunk wiring harness **214**, and base wiring harness **202**. Consequently, second light strings **162** are in electrical communication with first light strings **124** via first and second trunk wiring harnesses **214** and **230**.

Third tree lighting subsystem **408** includes connector assembly **244**, one or more light strings **182**, and in some embodiments, a pair of connectors **206**, **210** for detachably connecting light string **182** to connector **244**. When third trunk body **180** is coupled and connected to second trunk body **160**, connector **244** makes electrical connection with connector assembly **212**, such that light string **182** is electrically connected to second trunk wiring harness **230**.

Thus, when base portion **102** is coupled and connected to trunk portions **120**, **160**, and **180**, wiring harnesses **202**, **214**, **230** and light strings **124**, **162**, and **182** are all electrically connected to one another, directly, or indirectly. When power cord **194** is plugged into, or otherwise electrically connected to, power source **410**, power is available throughout modular lighting system **400**, thus powering lighting elements **146**.

As discussed briefly above, the modularity of lighting system **400** provides a number of benefits for manufacturers and users of tree **100**. From a manufacturing standpoint, as the number of light strings increases or decreases for various lighted trees **100**, wiring harnesses **214** or **230** can be interchanged or modified while still using common modular connector assemblies **200**, **212**, and **244**. Further, when modular light sets **124**, **162**, and **182** having connectors **224** that connect to connectors **220** at trunk **116**, light sets with more or fewer lighting elements **146** may be clipped on to trunk **116** via the connector pair **220** and **224**, without necessarily changing trunk wiring harnesses (though in some cases, heavier gauge wiring may be necessary).

From a user perspective, the modularity of individual light strings **124**, **162**, and **182** offers a user the opportunity to easily disconnect the light string from trunk **116** for replacement as needed.

Although embodiments of tree **100** include modular lighting system **400**, it will be understood that although tree **100** may generally be considered a modular tree mechanically coupled and electrically connected at its respective trunk portions, in some embodiments, the lighting system of modular lighted tree **100** may not include a fully modular lighting system **400**. In such alternate embodiments, a lighting system of the present invention may not include detachable light strings **124**, **162**, **182**, or may not include detachable trunk wiring harnesses.

Referring to FIGS. **18-20**, schematic diagrams depict several embodiments of lighting system **400** with light strings **124**, **162**, and **182** having varying electrical configurations.

Referring specifically to FIG. **18**, an electrical schematic of an embodiment of lighting system **400** having only parallel light strings **124**, **162**, and **182** is depicted.

In the depicted embodiment, lighting elements **146** are connected in parallel to each other to form parallel light

strings **124**, **162**, **182**. An advantage to parallel construction is that if one lighting element **146** fails, the remaining lighting elements **146** remain lit. Lighting elements **146** as described above may comprise any known type of lighting element, including incandescent bulbs, LEDs, and so on, with any number of lighting elements **146** included in a string. A number of lighting elements **146** used in a particular lighting string may vary dependent on the overall number of lighting elements **146** desired on tree **100**, desired wire gauge, and other such factors. Light connect wires **412** and **414** of a lighting string **124**, may connect to or through trunk body **121** through an opening **166** (FIG. **2**) common to both wires **412** and **414** to connect to harness **214**. In other embodiments, such as the one depicted in FIG. **20**, a portion of light string **124** may connect to first wiring harness **214** through more than one opening **166**.

Bus wires **294** and **296** interconnect to provide power from power source **410** throughout tree **100**. Each light string **124**, **162**, and **182** is connected to bus wires **294** and **296**, thus providing power to all lighting elements **146** on tree **100**.

Referring to FIG. **19**, an embodiment of lighting system **400** comprising series-connected light strings **124**, **162**, and **182** is depicted. In this embodiment, all lighting elements **146** of each lighting string are wired electrically in series. In one embodiment, a light string **124** comprises fifty lighting elements **146**, each lighting element comprising a 2.5V incandescent bulb, and bus wires **294** and **296** provide 125V AC power to lighting system **400**.

Lighting strings **124** each have a first lead connected to bus wire **294** and a second lead connected to bus **296**. In the depicted embodiment, electrical connection to the bus wires is maintained within a single trunk body **121**, and in some embodiments, through a single opening **166**.

On the other hand, lighting system **400** may include a light string, such as light string **162***a* that includes a first lead **412** connected to a bus wire **294** through a first opening **166***a*, and second lead **414** connected to a bus wire **296** through a second opening **166***b*.

Referring to FIG. **20**, in yet another embodiment of modular lighting system **400**, light strings **124**, **162**, and **182** comprise series-parallel configurations.

In the depicted embodiment, light string **124** comprises multiple groups **420** of parallel connected lighting elements **146**. Each group **420** includes multiple lighting elements **146** connected in parallel. Because of the parallel connection, and within limits of the current-carrying capacity of the wires of the light string and wiring harnesses, nearly any quantity of lighting elements may be wired in parallel.

Groups **420**, including group **420***a*, **420***b*, **420***c*, and **420***d*, are connected in series to form the parallel-series light string **124**. The number of groups **420** may vary from string-to-string, depending on the number of lights strings desired, source voltage, bus voltage, and lighting element rating. In one embodiment having 120V AC available at bus wires **294** and **296**, light string **124** comprises 50 groups **420** having 10 lighting elements **146**, each lighting element rated for 2.5V. Such a relatively long string reduces the amount of connections to tree portion **120**, and further provides the benefit of parallel construction such that the failure of a single lighting element **146** does not cause all lighting elements **146** to lose power (unlike a pure series-connected light string).

In one embodiment, light string **124** includes multiple group connectors **422**. Group connectors **422** facilitate the assembly and connection of multiple groups of parallel-connected lighting elements **146**. In one embodiment, lighting elements **146** are assembled onto a pair of initially continuous wires **424** and **426**. Alternating portions of wires **424** and **426** are punched out, or otherwise removed such that wires **424** and **426** are discontinuous between groupings **420**. Group connectors **422** enclose and isolate the regions of discontinuity of light string **124** between each parallel group **420**. Further details of this and similar embodiments of light string **124** and group connector **422** are provided in U.S. application Ser. No. 13/112,749, entitled "Decorative Light String for Artificial Lighted Tree", filed May 20, 2011, and commonly assigned to the assignees of the present application, the contents of which are herein incorporated by reference into the present application.

Still referring to FIG. **20**, lights string **162** and **182** may also be constructed of multiple groups **420**, each group **420** including multiple parallel-connected lighting elements **146**. In this embodiment, unlike the embodiments described above with respect to FIGS. **18** and **19**, the pair of bus wires **294** and **296** may not extend through the length of all trunk sections, as is depicted in FIG. **20**. In the depicted embodiment, bus wire **294** is terminated within second trunk body **161** where it makes an electrical connection with a first lead **430** of light string **182**.

At a first "end" of light string **162**, a second lead **432** extends into second trunk body **161** and makes an electrical connection with wiring harness **230** or connector assembly **212** (not depicted in FIG. **20**). In this embodiment, connector assembly **212** and its contact set **302** thereby includes an electrical connection to bus wire **296**, which is in electrical connection to a power source **410**, and lead **432** of light string **162**.

Light string **182** likewise may include one or more groups **420** connected in series. Light string **182** includes first lead wire **434** connected to connector **244** or another electrical connector, and second lead wire **436** connected at a second end of light string **182** to bus wire **296**. Consequently, light string **162** and **182** combine to form a greater multi-string parallel-series light string **440** which mechanically and electrically spans both second trunk portion **160** and third trunk portion **180**. Electrical connection between light strings **162** and **182** is made when second trunk portion **160** is coupled and connected to third trunk portion **180**.

Although only one of each light string **124**, **162**, and **182** is depicted in FIG. **20**, it will be understood that more than one light string may be present on tree **100**. Further, other or additional light strings, including light string **124**, generally may be split between trunk portions in a manner similar to light strings **162** and **182** which form a split light string **440**.

The embodiments above are intended to be illustrative and not limiting. Additional embodiments are within the claims. In addition, although aspects of the present invention have been described with reference to particular embodiments, those skilled in the art will recognize that changes can be made in form and detail without departing from the spirit and scope of the invention, as defined by the claims.

Persons of ordinary skill in the relevant arts will recognize that the invention may comprise fewer features than illustrated in any individual embodiment described above. The embodiments described herein are not meant to be an exhaustive presentation of the ways in which the various features of the invention may be combined. Accordingly, the embodiments are not mutually exclusive combinations of features; rather, the invention may comprise a combination of different individual features selected from different individual embodiments, as understood by persons of ordinary skill in the art.

Any incorporation by reference of documents above is limited such that no subject matter is incorporated that is contrary to the explicit disclosure herein. Any incorporation

by reference of documents above is further limited such that no claims included in the documents are incorporated by reference herein. Any incorporation by reference of documents above is yet further limited such that any definitions provided in the documents are not incorporated by reference herein unless expressly included herein.

For purposes of interpreting the claims for the present invention, it is expressly intended that the provisions of Section 112, sixth paragraph of 35 U.S.C. are not to be invoked unless the specific terms "means for" or "step for" are recited in a claim.

What is claimed:

1. A lighted artificial tree, comprising:

a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string, the first trunk portion defining a first trunk interior and having a first trunk electrical connector and a first trunk wiring assembly, the first trunk wiring assembly electrically connectable to the first light string and the first trunk electrical connector, and wherein at least a portion of the first trunk wiring assembly is located within the first trunk interior;

a second tree portion including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string, the second trunk portion defining a second trunk interior and having a second trunk electrical connector and a second trunk wiring assembly, the second trunk wiring assembly electrically connectable to the second lighting string and the second trunk electrical connector, and wherein at least a portion of the second wiring assembly is located within the second trunk interior; and

wherein the second tree portion is mechanically coupleable to the first tree portion about a central vertical axis, and the second tree portion is electrically connectable to the first tree portion such that a portion of the first trunk electrical connector of the first trunk portion contacts a portion of the second trunk electrical connector of the second trunk portion, thereby creating an electrical connection between the first wiring assembly and the second wiring assembly;

wherein an end of the second trunk portion is configured to couple with an end of the first trunk portion in at least four different rotational alignments of the first trunk portion relative the second trunk portion about the central vertical axis, and the electrical connection between the first and second tree portions are made independent of the rotational alignments of the first trunk portion relative the second trunk portion about the central vertical axis when the lower end of the second trunk portion is coupled to the upper end of the first trunk portion.

2. The lighted artificial tree of claim 1, wherein the upper end of the first trunk portion has an outside diameter smaller than an inside diameter of the lower end of the second trunk portion such that the upper end of the first trunk portion fits into the lower end of the second trunk portion to form a circumferential interference fit between the first trunk wall and the second trunk wall.

3. The lighted artificial tree of claim 1, wherein the first trunk electrical connector of the first trunk portion is housed within the first trunk interior and the second trunk electrical connector of the second trunk portion is housed within the second trunk interior.

4. The lighted artificial tree of claim 1, wherein a male portion of the first trunk electrical connector of the first trunk portion includes a male portion insertable into a female portion of the second trunk electrical connector of the second trunk portion.

5. The lighted artificial tree of claim 1, wherein the first trunk electrical connector of the first portion includes a first coaxial electrical contact set and the second trunk electrical connector of the second trunk portion includes a second coaxial electrical contact set such that the electrical connection between the first wiring assembly and the second wiring assembly comprises an electrical connection between the first coaxial electrical contact set and the second coaxial electrical contact set.

6. The lighted artificial tree of claim 1, wherein the first trunk wiring assembly includes a first wire and a second wire, each of the first wire and the second wire in electrical communication with the first trunk electrical connector of the first trunk portion and extending between a first end of the first trunk portion and a second end of the first trunk portion, and providing power to the first light string.

7. The lighted artificial tree of claim 6, wherein the first wire and the second wire are detachably connected to the first trunk electrical connector of the first trunk portion.

8. The lighted artificial tree of claim 1, wherein a portion of the first trunk wiring assembly includes a light string connector attached to a first trunk wall, and the first light string at a trunk end includes a connector for detachably connecting to the light string connector such that the first light string is detachably connected to the first trunk wall and the first trunk wiring assembly.

9. The lighted artificial tree of claim 1, wherein the first tree portion comprises a base portion.

10. A lighted artificial tree, comprising:

a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string, the first trunk portion having a first trunk body and a trunk connector, at least a portion of the trunk connector housed within the first trunk body and electrically connected to the first light string;

a second tree portion including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string, the second trunk portion having a trunk body and a trunk connector, at least a portion of the trunk connector housed within the second trunk portion and electrically connected to the second light string; and

wherein the second tree portion is mechanically and electrically connectable to the first tree portion by coupling a lower end of the second trunk body to an upper end of the first trunk body along a common vertical axis at a rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis, thereby causing the trunk connector of the first trunk portion to make an electrical connection with the trunk connector of the second trunk portion within an interior of the lighted artificial tree, the electrical connection being made independent of the rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis.

11. The lighted artificial tree of claim 10, further comprising a power cord in electrical connection with the trunk connectors of the first and second tree portions.

12. The lighted artificial tree of claim 11, further comprising a power converter housed within a base of the tree, the power converter connected in electrical series with the power cord and the first wiring harness.

13. The lighted artificial tree of claim 12, wherein the power converter converts alternating current (AC) to direct current (DC).

14. The lighted artificial tree of claim 12, wherein the power converter is a cylindrical power converter housed within a trunk portion of the base or a trunk body of the first trunk portion.

15. The lighted artificial tree of claim 10, wherein the trunk connectors of the first and second tree portions form coaxial trunk connectors.

16. The lighted artificial tree of claim 10, wherein the trunk connector of the first trunk portion includes a first plug insertable into the upper end of the first trunk body and having a first plug surface, the trunk connector of the second trunk portion includes a second plug insertable into the lower end of the second trunk body and having a second plug surface, the first plug surface being adjacent to and in contact with the second plug surface when the first tree body is coupled to the second tree body.

17. The lighted artificial tree of claim 16, wherein the first plug includes flexible portions that deform when inserted into the trunk body, thereby forming an interference fit between the first plug and the first trunk body.

18. The lighted artificial tree of claim 10, wherein the first light string includes a plurality of lighting elements in parallel electrical connection to one another.

19. The lighted artificial tree of claim 10, wherein the first light string includes a plurality of lighting elements in series electrical connection to one another.

20. A lighted artificial tree, comprising:

a first tree portion including a first trunk portion, a first plurality of branches joined to the first trunk portion, and a first light string, the first trunk portion having a first trunk wall defining a first trunk interior, a first trunk connector and a first trunk wiring assembly, the first trunk wiring assembly electrically connectable to the first light string and the first trunk connector, at least a portion of the first wiring assembly and a portion of the first trunk connector located within the first trunk interior;

a second tree portion connectable to the first tree portion and including a second trunk portion, a second plurality of branches joined to the second trunk portion, and a second light string, the second trunk portion having a second trunk wall defining a second trunk interior, a second trunk connector and a second trunk wiring assembly, the second trunk wiring assembly electrically connectable to the second lighting string and the second trunk connector, at least a portion of the second wiring assembly and a portion of the second trunk connector located within the second trunk interior; and

wherein the second tree portion is mechanically and electrically connectable to the first tree portion by aligning the second trunk portion with the first portion along a common axis such that a portion of the first trunk wall is coupled to a portion of the second trunk wall to form a first mechanical connection in one of a plurality of rotational alignments of the first trunk portion to the second trunk portion, and a first portion of the first connector is received by the second connector, thereby forming a second mechanical connection between the first trunk portion and the second trunk portion and forming an electrical connection between the first wiring assembly and the second wiring assembly the electrical connection being made independent of the plurality of rotational alignments of the first tree portion relative to the second tree portion.

21. The lighted artificial tree of claim 20, wherein the first mechanical connection comprises an interference fit between the portion of the first trunk wall and the portion of the second trunk wall.

22. The lighted artificial tree of claim 20, wherein the first wiring assembly is a modular wiring assembly separably connected to the first trunk connector and first light string.

23. The lighted artificial tree of claim 20, wherein an end portion of the first light string is housed within the second trunk interior.

24. The lighted artificial tree of claim 20, wherein the first light string includes a first group of lighting elements electrically connected in parallel and a second group of lighting elements electrically connected in parallel, the first and second groups electrically connected in series.

25. The lighted artificial tree of claim 20, further comprising a third tree portion mechanically and electrically connectable to the second tree portion.

26. The lighted artificial tree of claim 20, wherein lighting elements of the first light string include incandescent bulbs.

27. The lighted artificial tree of claim 26, wherein lighting elements of the first light string include light-emitting diodes.

28. A modular lighted artificial tree, comprising:

a first trunk portion including a first end, a second end, a first trunk wiring harness and a first trunk connector, the first trunk wiring harness electrically connected to the first trunk connector;

a second trunk portion including a first end, a second end, a second wiring harness having a light string clip and a second trunk connector, the second trunk portion being electrically connectable to the first trunk portion by coupling the first end of the second trunk portion to the second end of the first trunk portion such that the first trunk connector is electrically connected to the second trunk connector;

a first plurality of branches attached to the second trunk portion; and

a first light string including a plurality of lighting elements, light string wiring, and an end clip, the plurality of lighting elements connected electrically by the light string wiring, a portion of the light string wiring affixed to the first plurality of branches, and the end clip electrically connected to the light string wiring;

wherein the end clip of the first light string is detachably connected to the light string clip such that the first light string is electrically connected to the first wiring harness and the second wiring harness; and

wherein the second trunk portion is mechanically and electrically connectable to the first trunk portion by coupling the first end of the second trunk body to a second end of the first trunk body along a common vertical axis at a rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis, thereby causing the trunk connector of the first trunk portion to make an electrical connection with the trunk connector of the second trunk portion within an interior of the lighted artificial tree, the electrical connection being made independent of the rotational orientation of the first trunk portion relative the second trunk portion about the common vertical axis.

* * * * *

US008454186C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10534th)

# United States Patent

**Chen**

(10) **Number: US 8,454,186 C1**

(45) **Certificate Issued: *Mar. 13, 2015**

(54) **MODULAR LIGHTED TREE WITH TRUNK ELECTRICAL CONNECTORS**

(75) Inventor: **Johnny Chen**, Sindian (TW)

(73) Assignee: **Willis Electric Co., Ltd.**, Sindian, Taipei County (TW)

**Reexamination Request:**
No. 90/020,073, Jul. 7, 2014

**Reexamination Certificate for:**
Patent No.: **8,454,186**
Issued: **Jun. 4, 2013**
Appl. No.: **13/112,650**
Filed: **May 20, 2011**

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(60) Provisional application No. 61/385,751, filed on Sep. 23, 2010.

(51) **Int. Cl.**

| | |
|---|---|
| ***F21S 6/00*** | (2006.01) |
| ***A47G 33/04*** | (2006.01) |
| ***F21S 4/00*** | (2006.01) |
| ***F21V 33/00*** | (2006.01) |
| ***H01B 17/00*** | (2006.01) |
| ***A47G 33/06*** | (2006.01) |
| *F21V 21/002* | (2006.01) |
| *F21W 121/04* | (2006.01) |
| *F21V 23/06* | (2006.01) |
| *F21Y 101/02* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. ***F21S 4/001*** (2013.01); *F21V 21/002* (2013.01); ***F21V 33/00*** (2013.01); ***H01B 17/00*** (2013.01); *F21W 2121/04* (2013.01); *F21V 23/06* (2013.01); ***A47G 33/06*** (2013.01); *F21Y 2101/02* (2013.01); *Y10T 29/49117* (2015.01)
USPC .............................. **362/123**; 362/122; 428/8

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/020,073, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Stephen J Ralis

(57) **ABSTRACT**

A lighted artificial tree includes a first tree portion including a first trunk-portion, first branches joined to the first trunk portion, and a first light string. The first trunk portion has a trunk connector and a first trunk wiring assembly, the first trunk wiring assembly is electrically connectable to the first light string and the trunk connector, and at least a portion of the first wiring assembly is located inside the first portion. The second tree portion includes a second trunk portion, second branches, and a second light string. The second trunk portion has a trunk connector and a second trunk wiring assembly, the second trunk wiring assembly electrically connectable to the second lighting string and the trunk connector. The second tree portion may be mechanically coupled and electrically connected to the first tree portion by coaxially coupling the first trunk portion to the second trunk portion.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-32** is confirmed.

* * * * *

(12) **INTER PARTES REVIEW CERTIFICATE** (3101st)
**United States Patent** (10) **Number: US 8,454,186 K1**
**Chen** (45) **Certificate Issued: Apr. 26, 2023**

(54) **MODULAR LIGHTED TREE WITH TRUNK ELECTRICAL CONNECTORS**

(75) Inventor: **Johnny Chen**

(73) Assignee: **WILLIS ELECTRIC CO., LTD.**

**Trial Numbers:**

IPR2016-01610 filed Sep. 2, 2016
IPR2016-00800 filed Apr. 18, 2016
IPR2016-01609 filed Sep. 2, 2016

**Inter Partes Review Certificate for:**

Patent No.: **8,454,186**
Issued: **Jun. 4, 2013**
Appl. No.: **13/112,650**
Filed: **May 20, 2011**

The results of IPR2016-01610 consolidated with both IPR2016-00800 and IPR2016-01609 are reflected in this inter partes review certificate under 35 U.S.C. 318(b).

# INTER PARTES REVIEW CERTIFICATE
## U.S. Patent 8,454,186 K1
## Trial No. IPR2016-01610
## Certificate Issued Apr. 26, 2023

1

AS A RESULT OF THE INTER PARTES REVIEW PROCEEDING, IT HAS BEEN DETERMINED THAT:

Claims **7**, **15** and **17** are found patentable.

Claims **1**, **3**, **4**, **6**, **8-11**, **16**, **18-22**, **25**, **26** and **28** are cancelled.

**29**. (substitute for claim **1**) *A modular lighted artificial tree, comprising:*

*a first modular tree portion including*

*a first trunk portion,*

*a first plurality of branches pivotally joined to the first trunk portion, and*

*a first light string positioned on and external to the first plurality of branches,*

*the first trunk portion defining a first trunk interior and having a first trunk electrical connector and a first trunk wiring assembly, the first trunk wiring assembly electrically connectable to the first light string and the first trunk electrical connector, and*

*wherein at least a portion of the first trunk wiring assembly is located within the first trunk interior; and*

*a second modular tree portion including*

*a second trunk portion,*

*a second plurality of branches pivotally joined to the second trunk portion, and*

*a second light string positioned on and external to the second plurality of branches,*

*the second trunk portion defining a second trunk interior and having a second trunk electrical connector and a second trunk wiring assembly, the second trunk wiring assembly electrically connectable to the second light string and the second trunk electrical connector, and*

*wherein at least a portion of the second trunk wiring assembly is located within the second trunk interior; and*

2

*wherein the second modular tree portion is mechanically coupleable to the first modular tree portion about a central vertical axis, and*

*the second modular tree portion is electrically connectable to the first modular tree portion such that a portion of the first trunk electrical connector of the first trunk portion contacts a portion of the second trunk electrical connector of the second trunk portion, thereby creating an electrical connection between the first trunk wiring assembly and the second trunk wiring assembly within the modular lighted artificial tree, and*

*wherein an end of the second trunk portion is configured to couple with an end of the first trunk portion in at least four discrete rotational alignments of the first trunk portion relative to the second trunk portion about the central vertical axis, and*

*wherein the electrical connection between the first trunk wiring assembly and the second trunk wiring assembly of the respective first and second modular tree portions is made independent of any one discrete rotational alignment of the at least four discrete rotational alignments of the first trunk portion relative to the second trunk portion about the central vertical axis when a lower end of the second trunk portion is coupled to an upper end of the first trunk portion.*

**30**. (substitute for claim **8**) *The modular lighted artificial tree of claim* ***29****,*

*wherein a portion of the first trunk wiring assembly includes a light string connector attached to the first trunk wall, and the first light string at a trunk end includes a connector for detachably connecting to the light string connector such that the first light string is detachably connected to the first trunk wall and the first trunk wiring assembly.*

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2118

**Short Case Caption:** Willis Electric Co., Ltd. v. Polygroup Ltd. (Macao Commercial Offshore)

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,921 words.
- ☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- ☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 09/20/2024

Signature: /s/ J. Michael Jakes

Name: J. Michael Jakes